ACCEPTED
01-14-00399-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
2/19/2015 3:46:27 PM
CHRISTOPHER PRINE
CLERK

**No. 01-14-00399-CV**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
2/19/2015 3:46:27 PM
CHRISTOPHER A. PRINE
Clerk

In The First Court of Appeals
Houston, Texas

CHRISTUS HEALTH GULF COAST

d/b/a CHRISTUS ST. JOHN HOSPITAL,

*Defendant-Appellant,*

v.

JAY HOUSTON,

*Plaintiff-Appellee.*

On Appeal from the 55th Judicial District Court
Harris County, Texas

**BRIEF AND APPENDIX OF APPELLEE JAY HOUSTON**

David Hodges                           Martin J. Siegel
Gabriel Assaad                          LAW OFFICES OF
KENNEDY HODGES, LLP                MARTIN J. SIEGEL, P.C.
711 W. Alabama Street              700 Louisiana Street, Suite 2300
Houston, Texas 77006               Houston, Texas 77002
Telephone: (713) 523-0001        Telephone: (713) 226-8566
                                               Martin@Siegelfirm.com

*Attorneys for Appellee Jay Houston*

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................... i

INDEX OF AUTHORITIES .................................................................. iii

STATEMENT REGARDING ORAL ARGUMENT ...................................... vii

ISSUES PRESENTED FOR REVIEW ................................................... viii

INTRODUCTION ............................................................................. 1

STATEMENT OF FACTS ................................................................... 3

    I.    Houston's Surgeries and Current Condition ................................. 3

    II.   The Evidence at Trial ............................................................. 6

        A.   Houston's Case Against Christus' Nurses ........................... 6

        B.   Christus' Case Against Dr. Holt ........................................ 8

        C.   The Trial Court's Exclusion of Dr. Gomez's
            Testimony ................................................................... 9

    III.  The Verdict and Judgment ..................................................... 14

SUMMARY OF THE ARGUMENT ....................................................... 16

ARGUMENT ................................................................................. 17

    I.    Standards of Review ............................................................. 17

    II.   The District Court Did Not Abuse its Discretion
       in Excluding Dr. Gomez's Testimony ...................................... 19

        A.   Dr. Gomez's Testimony Was Properly Excluded
            as Irrelevant ............................................................... 19

B.   There Was No Foundation for Dr. Gomez's Opinion About Causation .................................... 28

    i.   The *Robinson* Factors Demonstrate the Unreliability of Dr. Gomez's Opinion ...................... 29

    ii.  Dr. Gomez's Opinion Also Flunks the *Gammill* "Experience" Test........................................ 32

C.   Dr. Gomez Was Not Qualified to Opine on Causation .................................................................. 41

III.   The Final Judgment is Correct .................................... 44

A.   The Trial Court Correctly Accounted for the Settlement Credit ........................................... 44

B.   The Court Correctly Calculated Prejudgment Interest ................................................................. 47

C.   The Court Did Not Abuse its Discretion in Deciding What Portion of Damages Christus Can Pay Periodically ........................................ 48

PRAYER ............................................................................. 54

CERTIFICATE OF SERVICE .................................................. 55

CERTIFICATE OF COMPLIANCE........................................... 56

# INDEX OF AUTHORITIES

page

**Case**

*Bartosh v. Gulf Health Care Ctr. – Galveston*,
178 S.W.3d 434 (Tex. App. – Houston [14th Dist.] 2005) ........... 37, 38, 39

*Bostic v. Georgia-Pacific Corp.*,
439 S.W.3d 332 (Tex. 2014) ...................................................... 21, 22, 23

*Bowie Mem. Hosp. v. Wright*,
79 S.W.3d 48 (Tex. 2002) ................................................................ 26, 27

*Bradley v. Rogers*,
879 S.W.2d 947
(Tex. App. – Houston [14th Dist.] 1994, writ den.) ................................. 27

*Broders v. Heise*,
924 S.W.2d 148 (Tex. 1996) ..................................................................... 42

*Constancio v. Shannon Med. Ctr.*,
2012 WL 1948345 (Tex. App. – Austin 2012) ..................... 27, 28, 40, 41

*Cresthaven Nursing Residence v. Freeman*,
134 S.W.3d 214 (Tex. App. – Amarillo 2003)........................................ 48

*Duff v. Yelin*,
751 S.W.2d 175 (Tex. 1988) ............................................................. 26, 27

*Edinburgh Hosp. Auth. v. Trevino*,
941 S.W.2d 76 (Tex. 1997) ....................................................... 44, 45, 47

*E.I. du Pont de Nemours and Co., Inc. v. Robinson*,
923 S.W.2d 549 (Tex. 1995) ................................................. 29, 30, 31, 32

*Exxon Corp. v. Makofski*,
116 S.W.3d 176
(Tex. App. – Houston [14th Dist.] 2003, rev. denied).............................. 30

*Fennern v. Whitehead*,
   2010 WL 2428458 (Tex. App. – Austin 2010) ........................................ 22

*Gammill v. Jack Williams Chevrolet*,
   972 S.W.2d 713 (Tex. 1998) ............................................................. *passim*

*Garrett Operators, Inc. v. City of Houston*,
   __ S.W.3d __, 2015 WL 293305
   (Tex. App. – Houston [1st Dist.] 2015)..................................................... 18

*Hogue v. Columbia Med. Ctr. of Las Colinas*,
   2002 WL 33962000, No. DV-99-01417-L
   (193rd Dist. Ct. – Dallas County, July 24, 2002) .......................... 45, 46, 47

*IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*,
   143 S.W.3d 794 (Tex. 2010) .................................................................. 21

*In re K.R.P.,*
   80 S.W.3d 669
   (Tex. App. – Houston [1st Dist.] 2002, rev. denied).......................... 51, 53

*In re O'Quinn*,
   355 S.W.3d 857 (Tex. App. – Houston [1st Dist.] 2011,
   mandamus den.)................................................................................... 42

*In re Windisch*,
   138 S.W.3d 507 (Tex. App. – Amarillo 2004)......................................... 43

*Keo v. Vu*,
   76 S.W.3d 725
   (Tex. App. – Houston [1st Dist.] 2002, rev. denied)........................... 18, 42

*Lee v. United States*,
   765 F.3d 521 (5th Cir. 2014).................................................................. 49

*Lette v. Baptist Health Sys*.,
   82 S.W.3d 600 (Tex. App. – San Antonio 2002) .............................. 21, 25

*Mack Trucks, Inc. v. Tamez*,
   206 S.W.3d 572 (Tex. 2006)................................................................. 18

iv

*Pack v. Crossroads, Inc.*,
   53 S.W.3d 492 (Tex. App. – Fort Worth 2001, rev. denied)............. 42, 44

*Pioneer Natural Resources USA, Inc. v. W.L. Ranch, Inc.*,
   127 S.W.3d 900
   (Tex. App. – Corpus Christi 2004, rev. denied) ...................................... 43

*Plunkett v. Conn. Gen'l Life Ins. Co.*,
   285 S.W.3d 106 (Tex. App. – Dallas 2009, rev. denied) .................. 30, 31

*Prabhakar v. Fritzgerald*,
   __ S.W.3d __, 2012 WL 3667400 (Tex. App. – Dallas 2012)................. 19

*Quiroz v. Covenant Health Sys.*,
   234 S.W.3d 74 (Tex. App. – El Paso 2007, rev. denied) ......................... 31

*Rehabilitative Care Sys. of Am. v. Davis*,
   43 S.W.3d 649 (Tex. App. – Texarkana 2001) ....................................... 39

*Rowan Co., Inc. v. Acadian Ambulance Serv., Inc.*,
   2008 WL 1989791 (S.D. Tex. 2008)........................................................ 25

*Sisters of St. Joseph of Tex., Inc. v. Cheek,*
   61 S.W.3d 32
   (Tex. App. – Amarillo 2001, rev. denied)................................... 21, 22, 25

*Spin Doctor Golf, Inc. v. Paymentech, L.P.*,
   296 S.W.3d 354 (Tex. App. – Dallas 2009, rev. denied) ........................ 43

*State Farm Lloyds v. Mireles,*
   63 S.W.3d 491 (Tex. App. – San Antonio 2001) .................................... 38

*State Offc. of Risk Mgmt. v. Trujillo,*
   267 S.W.3d 349 (Tex. App. – Corpus Christi 2008)............................... 39

*Texarkana Memorial Hosp., Inc. v. Murdock,*
   946 S.W.2d 836 (Tex. 1997) ...................................................... 23, 24, 35

*Thompson v. Stolar*,
   __S.W.3d __, 2014 WL 5023087 (Tex. App. – El Paso 2014)................ 24

*W.C. Larock D.C., P.C. v. Smith*,
   310 S.W.3d. 48 (Tex. App. – El Paso 2010) ..................................... 21, 27

*Whirlpool Corp. v. Camacho*,
   298 S.W.3d 631 (Tex. 2009) ...................................................... 28, 32, 33

*Wiggs v. All Saints Health Sys.*,
   124 S.W.3d 407
   (Tex. App. – Ft. Worth 2003, rev. denied) .................................. 36, 37, 38

*Wilson v. Shanti*,
   333 S.W.3d 909
   (Tex. App. – Houston [1st Dist.] 2011, rev. denied) ................................ 18

*Wolfson v. BIC Corp.*,
   95 S.W.3d 527 (Tex. App. – Houston [1st Dist] 2002, rev. denied) ......... 19

## Statutes and Rules

TEX. CIV. PRAC. & REM. CODE § 33.013 ....................................................... 46

TEX. CIV. PRAC. & REM. CODE § 74.301 ....................................................... 14

TEX. CIV. PRAC. & REM. CODE § 74.503 ............................................ 15, 48, 53

TEX. CIV. PRAC. & REM. CODE § 101.023 ..................................................... 44

TEX. FIN. CODE § 304.1045 ........................................................................ 48

TEX. R. EVID. 401 ..................................................................................... 19

TEX. R. EVID. 402 ..................................................................................... 19

TEX. R. EVID. 702 ............................................................................. *passim*

**STATEMENT REGARDING ORAL ARGUMENT**

The Court can easily resolve this appeal without oral argument. Christus' appeal focuses on the trial court's decision to exclude testimony from the hospital's expert cardiovascular and thoracic surgeon. But the lower court's decision was a conventional one applying familiar legal standards. Reviewing it will not immerse the Court in overly complicated facts or novel or difficult legal principles. The same is true for the other issues Christus raises, which have to do with the district court's formulation of the judgment. Houston therefore believes that oral argument would not significantly assist the Court in its disposition of this appeal.

# ISSUES PRESENTED FOR REVIEW

1. In medical malpractice cases, causation requires proof that the act in question was a substantial factor in producing injury. Christus' expert could not opine that damage to nerves in Houston's shoulder was a substantial factor in causing his subsequent hand disability – nor could he say how much of the disability was due to the nerve damage as opposed to other causes. Did the trial court abuse its discretion by excluding the expert's causation opinion?

2. An expert witness who bases his opinion on his professional background needs sufficient relevant experience to validate the opinion. Christus' expert has never treated or even seen nerve damage of the kind he claims Houston suffered, and he conceded that he was unqualified to say whether it caused Houston's specific hand symptoms. Did the trial court abuse its discretion by excluding the expert's causation opinion?

3. The Texas Supreme Court held in a case involving governmental liability that a settlement credit should be applied before reducing damages to the statutorily prescribed limit. The trial court did the same in this medical malpractice case. Did the court err in this regard?

4. Texas law gives trial courts discretion to order immediate payment, rather than periodic payment, of some damages for future medical care. Houston established at trial that he needs approximately $140,000 for imminent follow-up surgeries, therapies, and the like. Did the trial court abuse its discretion by ordering Christus to pay this portion of the award upon entry of judgment rather than over ten years?

## INTRODUCTION

A jury found Christus St. John Hospital 60% liable for permanently disabling Jay Houston's left hand. During shoulder replacement surgery, Houston's orthopedic surgeon, Dr. Marston Holt, ruptured Houston's axillary artery, leading to clotting and a blockage of the artery. Jurors found Christus nurses negligent for failing to alert Dr. Holt to symptoms of ischemia – the deprivation of blood to Houston's hand – that developed after the operation. As a result, the ischemia persisted for days, and by the time it was corrected, Houston's hand was permanently disabled.

At trial, Christus offered the expert opinion of a cardiovascular and thoracic surgeon, Dr. Miguel Gomez. Dr. Gomez opined that Dr. Holt must have damaged nerves adjacent to Houston's axillary artery when he ruptured it, and that this caused some unspecified portion of Houston's ultimate disability. Dr. Gomez could not say how much of the disability was caused by the nerve damage as opposed to the ischemia, or even that it was a substantial factor in Houston's outcome. Given this failing, the trial court excluded the opinion, and its ruling is the main ground of this appeal.

The trial court did not abuse its discretion in striking Dr. Gomez's opinion on causation. The testimony would not have assisted the jury in its primary task: apportioning responsibility between Christus and Dr. Holt.

1

Unable to even roughly quantify the effect of the supposed nerve damage on Houston's outcome, Dr. Gomez therefore also couldn't say it was a substantial factor in his disability. Unless this basic threshold is crossed, there is no proof of causation in a medical malpractice case.

The trial court also acted within its discretion because Dr. Gomez's opinion was unreliable and he was unqualified to give it. Dr. Gomez does not perform shoulder surgery and he has never seen an axillary artery injury, let alone associated nerve damage. He did not examine Houston or rely on medical literature. Above all, he is not an orthopedist and has no experience with hand injuries and so could not opine about the source of Houston's disability. Asked, for example, if Houston's current inability to grip is due to the nerve damage he believes occurred during the operation, he conceded: "That's not my area of expertise." The trial judge was therefore right to exclude Dr. Gomez's opinion.

Christus also appeals various aspects of the judgment, but the district court correctly applied a settlement credit and calculated prejudgment interest. The court was also within its discretion to only partially grant the hospital's request for periodic payment of future damages.

This Court should therefore affirm the judgment.

## STATEMENT OF FACTS

## I.     Houston's Surgeries and Current Condition

In 2008, Houston sought treatment for pain in his left shoulder. RR 6/81-82.[1] He had degenerative arthritis – "the ball and socket of the shoulder were worn out." RR 5/237. Dr. Holt recommended a partial shoulder replacement to exchange part of the ball of Houston's shoulder and resurface it with a metal implant. RR 3/95, 5/237.

The surgery occurred on Thursday, January 8, 2009, at Christus. Dr. Holt encountered unusually heavy bleeding during the procedure: "we saw some bleeding coming from deep which… we spent time searching for. And ultimately… it just sort of stopped spontaneously." RR 3/98. Although Dr. Holt didn't know it at the time, he punctured or tore Houston's axillary artery in the course of the operation, which caused the bleeding. *Id.*, RR 5/28-29. This artery supplies blood down the arm to the hand. RR 3/238; Def. Exh. 9.

After surgery, Houston was transferred to the post-anesthesia care unit or "PACU," where he remained for approximately four hours. RR 4/65. Nurses in the PACU documented that his hand was cool to the touch, that he

---

[1]     "RR __/__" refers to the designated volume number and page number in the reporter's record. "CR __" refers to the designated page in the clerk's record. "Houston App." refers to the appendix attached to this brief.

lacked a radial pulse in his left wrist, and that he had poor blood flow in the capillaries of his hand – called "capillary refill." RR 4/67-92. He was then transferred to a room, where he spent the night.

That evening and the next day, Houston's hand was pale, cool and clammy, with slow capillary refill and red spots. RR 3/40-41, 4/94, 106-09, 114-20, 6/86. There is conflicting evidence on whether he could feel or move his hand or fingers the day after the surgery. Dr. Holt testified that he couldn't and attributed the symptom to the continued effect of Houston's anesthesia, called an "interscalene block." RR 3/101-03, 185; Def. Exh. 5. A Christus nurse, however, documented that Houston could partially move and flex his fingers on the morning after the procedure. RR 3/243, 4/114-16; Def. Exh. 1 at p. Christus000073. Houston was discharged at 5:00 p.m. on Friday, January 9. RR 4/123; Def. Exh. 5.

Over the weekend, Houston had a fever and great pain. RR 3/48. By Monday morning, he looked gray, his arm was swollen and he felt dizzy. RR 3/50, 6/88. He and his wife called Dr. Holt, who told them to come to his office. RR 3/50. After examining Houston, Dr. Holt told them to go to the Christus emergency room. RR 3/51. He also called a vascular surgeon, Dr. Gordon Martin, and asked him to meet Houston there. RR 5/10.

At the hospital, Dr. Martin examined Houston's hand and decided he was experiencing ischemia – a lack of normal blood flow – because his axillary artery was blocked by clotted blood at the site of the rupture that occurred during surgery. RR 5/10-18, 265, 3/139-40. He performed an emergency bypass, grafting a segment of vein from Houston's thigh to the artery to circumvent the blockage and restore blood flow to the hand. RR 5/15-18. He did not see damage to Houston's nerves adjacent to the axillary artery during the procedure, though bruising or stretching of the nerves (as opposed to "severing or cutting") would not have been visible. RR 5/19, 27. The bypass succeeded in immediately restoring blood flow to Houston's hand as well as some mobility to his fingers. RR 5/21.

Houston has permanent damage to the nerves and muscles in his left hand. RR 3/145-47, 248, 5/22, 268-69. Despite extensive physical therapy and two follow-up surgeries, he cannot use his hand normally or even fully close it. RR 6/92-95, 101-02. He struggles with tasks of daily living, such as dressing, bathing, and housework. RR 3/61, 6/104-08. He is in constant pain and takes six pain medications daily, leaving him tired. RR 6/96. His post-operative shoulder rehabilitation was also restricted, impairing function, and he has right-handed problems from overcompensating for the disability in his left hand. RR 5/269-70, 6/101. He lost time at work, and the ordeal

contributed to the demise of his marriage. RR 3/60, 6/98. Once an active person who coached his son's little league team, lifted weights and hunted, he can no longer do any of these. RR 3/36, 6/102, 106-08. Houston's life care planner testified that he will need $389,189.16 in total future medical care, including three surgeries and a wide variety of therapies and medications. Pl. Exh. 12; RR 6/58-59.

## II.    The Evidence at Trial

Houston sued Christus and Dr. Holt for malpractice in 2011. CR 8. He settled with Dr. Holt for $99,999.00, CR 104-05, 746 (amount of settlement), but the case against the hospital went to trial in 2013.

### A.    Houston's Case Against Christus' Nurses

Houston's case at trial centered on the hospital's negligent nursing care, which permitted his ischemia to persist undetected for days. This included nurses' failure to notify Dr. Holt of the absence of a radial pulse in the PACU, RR 4/68-69; failure to notify him of abnormal symptoms such as poor blood flow and impaired circulation in Houston's hand once he left the PACU, RR 4/76-77; failure to properly assess and document Houston's neurovascular condition at several different points during his hospital stay, RR 4/94-97, 102-05; failure to check on Houston often enough, RR 4/99, 112, 123; failure to recognize the clinical importance of his missing pulse

6

and poor capillary refill, RR 4/107-08, 118; failure to document anything at all about Houston's status on one nurse's shift, RR 4/120-23; and failure to notify Dr. Holt of Houston's alarming condition immediately before discharge. RR 4/59-64. Several different witnesses testified that Christus' nurses provided substandard care, and the hospital's own expert orthopedic surgeon conceded that Christus therefore shared liability for Houston's injuries. RR 3/253-60, 268. [2]

Dr. Holt testified that if nurses had relayed the facts of Houston's condition to him during Houston's hospitalization, he would have obtained a consultation from a vascular expert, discovered the ischemia, and relieved the blockage in time to prevent most or all of Houston's eventual disability. RR 3/122-30. Houston's expert orthopedic surgeon confirmed: "With reasonable medical probability, the mechanism of the neurologic injury, the numbness, the weakness, the paralysis, is because of the lack of blood flow… ischemia, the lack of blood flow locally to those nerves, was the cause of the lasting damage he has." RR 5/268. "Had it been corrected on the 8th or the 9th [before Houston's discharge from the hospital], it's very likely that lasting permanent damage would have been avoided." RR 5/266.

---

[2] *See, e.g.,* RR 3/103-08, 115-27 (Holt testimony); RR 3/253-60 (Edwards testimony); RR 4/59-126 (Budge testimony); RR 5/240-63 (Vance testimony); RR 5/138-40 (Stringfellow testimony); RR 5/169-70 (Schumacher testimony).

### B. Christus' Case Against Dr. Holt

Christus defended the case by arguing that Dr. Holt was to blame for Houston's injuries. The parties agreed that Dr. Holt was not negligent for cutting into Houston's axillary artery because such an injury is an inherent risk or complication of the shoulder replacement. RR 3/237, 279-80, 6/172; *see also* Christus Brf. 8. Instead, the hospital's orthopedic surgeon expert testified that Dr. Holt was negligent in failing to sufficiently follow up with Houston after the operation. RR 3/229-33, 240. Although Dr. Holt saw Houston on the morning after the surgery and found him to be as expected at that point in his recovery, RR 3/100-02, Christus' expert opined that this examination wasn't thorough enough and that Dr. Holt should have seen Houston more often. RR 3/229-33, 240. Houston's orthopedic surgeon expert agreed that Dr. Holt's post-surgical care was deficient in this regard. RR 5/280-81.

In addition, Christus presented expert testimony from Dr. Gomez that Dr. Holt was negligent for failing to promptly investigate the unusual bleeding during the shoulder procedure. RR 6/147. He specifically criticized Dr. Holt for not visiting Houston in the PACU to "make sure that there is not more bleeding going on, that there is not a major injury that needed to be addressed that they missed in the OR." *Id.* Dr. Gomez

8

acknowledged, however, that it would be "difficult to say" whether this failure had any effect on Houston's outcome, offering only that a better result was "possible." RR 6/147-48. "I mean, it's – how much of his nonfunctioning of his arm is nerve versus muscle and skin," he opined, "I am not an expert to testify to. So if the artery was repaired immediately, he might have not had as much muscle and skin damage to his extremity. How much nerve damage would have been saved, it's hard to tell." RR 6/148. He added: "I mean, he had ischemic changes to his hand. He lost some skin. He lost, you know – and how much muscle he lost, I'm not sure. I mean, I didn't examine Mr. Houston so it's hard to tell completely. But I think skin and muscle injuries would have been less." RR 6/173.

## C.     The Trial Court's Exclusion of Dr. Gomez's Testimony

Christus also wanted to offer additional testimony from Dr. Gomez supporting a second theory of how Houston was injured: that his nerve damage occurred when Dr. Holt punctured or tore his axillary artery during the shoulder surgery, rather than afterward as a result of the prolonged blockage and ischemia. Houston App. Tab 1 (RR 5/304-07). The court denied Houston's motion to exclude this opinion before trial, but Houston renewed it before Dr. Gomez testified. CR 164-76, 381; RR 5/293-94.

9

Dr. Gomez explained this opinion in a proffer during argument on Houston's motion. Houston App. Tab 1 (RR 5/304-07). He stated: "The major branches of the brachial plexus are intimately involved with the axillary artery at that point where it was injured. And so to injure the artery, you almost invariably injure multiple nerves." *Id*. (RR/305). He based this opinion "on the anatomy" generally and his belief that Houston never regained function in his hand after the operation. *Id.* (RR 5/305-06).

Although Dr. Gomez opined that Dr. Holt must have damaged nerves during the operation, he could not say to what extent this harmed Houston's hand:

A.    …And so [it is] almost impossible to determine what part was due to the injury during the first surgery and what was due to ischemia. It's – it's impossible to know.

Q.    How would it ever be possible to know – I mean, would it ever be possible?

A.    No.

*Id*. (RR 5/307).

In light of this causation testimony, the court questioned the admissibility of Dr. Gomez's opinion: "[I]f he can't allocate how much, then how can he offer the [jury] anything for them to hang their hat on? They've got a thought out there and no further guidance as to a percentage." *Id*. (RR 5/319). Christus' counsel responded to this by asking Dr. Gomez

10

whether Houston's inability to grip was caused by the nerve damage that supposedly occurred during surgery, but Dr. Gomez conceded: "That's not my area of expertise." *Id*. (RR 5/321). As the court concluded:

> Ms. Lunceford: He can't allocate, but he can certainly say that based on reasonable medical probability, that he – that was a nerve injury that occurred to the radial nerve at the time of the original surgery.
>
> The Court: I'm not sure you can just raise it and then lay it out there, because at that point if the jury makes any decision based on it, it's not based on the evidence.

*Id.* (RR. 5/327).

The court therefore signed an order excluding Dr. Gomez's testimony about the nerve injury that supposedly happened during surgery. CR 540. Christus' counsel later proffered the entirety of Dr. Gomez's pretrial deposition transcript as the testimony it would have offered at trial but for the court's order. RR 6/166-67.

In his deposition, Dr. Gomez acknowledged that he is not a neurologist and that he has never performed the surgery Dr. Holt did on Houston or any procedure directly involving the axillary artery. Houston App. Tab 2 (CR 183-84). In fact, he has never seen an injury to the axillary artery. *Id.* (CR 193). He did not physically examine Houston, *id*. (CR 190); RR 6/173, nor did he review or rely on any medical literature in forming his

opinions. *Id*. (CR 185-86). Dr. Gomez could not say how or by what mechanism Dr. Holt damaged Houston's nerves, explaining this lack of knowledge by reiterating, "I'm not an orthopedic specialist." *Id.* (CR 195). Thus, he did not know if Houston's nerves were stretched, lacerated or something else. *Id*. (CR 211).

Dr. Gomez opined in the deposition that Dr. Holt must have damaged Houston's nerves during the procedure, *id*. (CR 189-90, 192), but he vacillated on precisely which were affected:

> A.  There's multiple nerves there. There's the ulnar nerve, the median nerve, the musculotaneous nerve. Without examining him, it's hard for me to tell how many of those were injured.
>
> Q.  So sitting here today, can you identify which nerves were injured during the surgery performed by Dr. Holt on January 8, 2009?
>
> A.  I mean, the ulnar nerve for sure was injured.
>
> Q.  Any other nerves?
>
> A.  Without examining him, it's hard to know.
>
> Q.  Sitting here today, can you offer an opinion, within a reasonable degree of medical probability, as to which nerves were injured on January 8, 2009 during the surgery of Dr. Holt?
>
> A.  I believe the median nerve, the ulnar nerve, the musculotaneous nerves were injured.

*Id.* (CR 190-91). Later though, after reviewing a nerve conduction study done on Houston, Dr. Gomez changed his opinion: "the radial nerve – I'm sorry. I guess it was the radial nerve that had the majority of the injury." *Id*. (CR 192). Then he admitted that he was "not an expert" in the nerve conduction test, called an EMG, either. *Id*. (CR 196).

Dr. Gomez could not say how much of Houston's outcome is due to nerve damage from any cause as opposed to muscle damage: "how much of his nonfunctioning of his arm is nerve versus muscle and skin, I am not an expert to testify to." *Id.* (CR 200); *see also id.* CR 201 ("I'm not an expert as far as nerve and muscle. And how much of his function is due to loss of nerve versus due to loss of muscle function or muscle capacity, I can't comment on").

He also acknowledged that some of Houston's nerve damage must have been caused by the ischemia and lack of blood flow after surgery, as Houston maintains. *Id.* (CR 214). As Christus' orthopedic surgeon expert testified, closing off blood flow to the nerves in the hand kills them. RR 3/248. And since Dr. Gomez did not know the nature or degree of any damage inflicted by Dr. Holt to the nerves during surgery, he had no way of quantifying or comparatively assessing the extent of either cause of nerve damage:

Q.    Doctor, I'm just trying to figure out, the damage that was caused by the axillary artery injury that is solely a result of the axillary artery injury and not the nerve damage to Mr. Houston. Is it correct to say that you cannot offer that opinion within a reasonable degree of medical probability?

A.    I don't think anybody can.

Q.    So you can't offer that opinion within a reasonable degree of medical probability?

A.    No. I don't think anybody can.

Houston App. Tab 2 (CR 201).

### III.    The Verdict and Judgment

The jury found negligence and assigned 60% of the responsibility to Christus and 40% to Dr. Holt. Christus App., Tab 2 (CR 569). It awarded $1,610,000 in past and future physical pain and mental anguish, lost earning capacity, past and future disfigurement, past and future physical impairment, future loss of household services, and future medical care. *Id.* (CR 572-73).

Houston moved the Court to enter judgment on the verdict. CR 578-82. Christus opposed the motion and argued that, contrary to Houston's proposal, the court should apply the cap on noneconomic damages under TEX. CIV. PRAC. & REM. CODE § 74.301 before reducing the award in the amount of the credit for Houston's settlement with Dr. Holt. CR 60-01. Christus also objected to Houston's calculation of prejudgment interest and

costs and filed a request for periodic payment of future damages under TEX. CIV. PRAC. & REM. CODE § 74.503. CR 583-85, 601-02.

Following an amended motion for entry of judgment and opposition from Christus, the court entered final judgment. CR 722-26. Christus then moved for a new trial, attacking the exclusion of Dr. Gomez's testimony, the calculation of the judgment, and the allotment of periodic payment versus immediate payment. CR 727-52. Houston acknowledged that some of its mathematical calculations were incorrect and therefore submitted an amended final judgment correcting the errors, which the court signed on April 7, 2014. CR 866-67, 873; Christus App. Tab A (CR 879-83). The court denied the hospital's motion for new trial the same day. CR 884.

The amended final judgment reduced Houston's noneconomic damages to $250,000 and entered a total judgment against the hospital, including prejudgment interests and costs, of $1,215,842.59. The court attached an Exhibit A to the judgment setting forth its rulings on Christus' request for periodic payments. Christus App. Tab A (CR 882-83). It concluded that $105,000 of Houston's damages for expenses of future medical care should be paid periodically over 10 years, while the remaining $200,000 should be paid immediately. *Id*. Christus then moved again for a

new trial on the same grounds as its original motion, CR 885-909, which was denied by operation of law.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in excluding Dr. Gomez's causation opinion. Because Dr. Gomez could not even generally quantify how much of Houston's disability is due to the nerve damage he assumes occurred in surgery, his opinion could not assist the jury in its key task at trial: dividing responsibility between the hospital and Dr. Holt. Dr. Gomez was also unable to testify that the in-surgery nerve damage was a substantial factor in his disability. Thus, he could not meet the long established test for causation in medical malpractice cases. Recent precedent from the Texas Supreme Court and earlier decisions confirms that the trial court was within its discretion to order the exclusion in these circumstances. *See* Point II(A), *infra*.

The trial court also acted within its discretion because Dr. Gomez's opinion was unreliable, and he was not a qualified witness under Rule 702. Dr. Gomez has never seen an axillary artery injury or related nerve damage. He did not examine Houston, and he can cite no testing or medical literature supporting his opinion. He is not an orthopedist and so conceded that he could not opine about whether the nerve injury caused Houston's specific

16

deficits, such as his difficulty gripping objects. Christus relied on Dr. Gomez's clinical experience as the basis for his opinions, but it takes little probing to see that Dr. Gomez actually lacks the necessary background. *See* Point II(B), *infra*.

Finally, Christus' objections to the judgment are unfounded. In applying the settlement credit before the cap on noneconomic damages, the lower court acted consistently with the most applicable precedent. The court also correctly calculated prejudgment interest. And Christus is wrong in claiming the court abused its discretion by declining to allow it to pay all of Houston's future damages over time. Evidence in the record supports the court's decision ordering periodic payment of only $105,000 of the $305,000 in damages for future medical costs, as well as its decision denying periodic payment of damages for future lost wages and loss of household services. *See* Point III, *infra.*

The Court should consequently affirm the judgment.

## ARGUMENT

### I.     Standards of Review

Christus' first issue challenging the exclusion of Dr. Gomez's testimony is reviewed for abuse of discretion. As this Court recently summarized:

> We will uphold a trial court's evidentiary ruling excluding expert testimony if a legitimate basis for the ruling exists. We reverse only if the trial court acted arbitrarily, unreasonably, or without reference to any guiding rules or principles. An abuse of discretion is not demonstrated by a mere error in judgment. Neither will an appellate court reverse the trial court's conclusion even if it would have held differently.

*Wilson v. Shanti*, 333 S.W.3d 909, 912-13 (Tex. App. – Houston [1st Dist.] 2011, rev. denied) (citations omitted); *accord Keo v. Vu*, 76 S.W.3d 725, 730 (Tex. App. – Houston [1st Dist.] 2002, rev. denied). Above all, "[i]n an abuse of discretion review, close calls must go to the trial court. Thus, trial courts are given wide latitude in their rulings on the reliability of expert testimony." *Id.* (citations and quotation omitted); *accord Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006) (trial courts enjoy "broad discretion").

Christus' second issue, which challenges how the trial court applied the settlement credit and the cap on noneconomic damages, raises a legal question that should be reviewed de novo. *See Garrett Operators, Inc. v. City of Houston*, __ S.W.3d __, 2015 WL 293305 at * 8 (Tex. App. – Houston [1st Dist.] 2015).

Its third issue – whether the lower court erred in denying Christus' request that all of Houston's future damages be paid periodically – is also

reviewed for abuse of discretion. *See Prabhakar v. Fritzgerald*, __ S.W.3d __, 2012 WL 3667400 at * 8 (Tex. App. – Dallas 2012); Christus Brf 48.

## II. The District Court Did Not Abuse its Discretion in Excluding Dr. Gomez's Testimony

### A. Dr. Gomez's Testimony Was Properly Excluded as Irrelevant

Christus' primary argument on appeal is that the trial court abused its discretion in excluding Dr. Gomez's opinion that Dr. Holt must have damaged Houston's nerves at the same time he punctured or tore his axillary artery, and that this is responsible to some unknown degree for Houston's disability. *See* Christus Brf., Issue 1. The district court correctly excluded this opinion for several reasons, beginning with the fact that it would not have assisted the jury in its central task of apportioning liability between the hospital and Dr. Holt. Expert testimony that does not help jurors resolve a material factual dispute is irrelevant and inadmissible under Rules 702, 401 and 402 of the Texas Rules of Evidence. *See Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 720 (Tex. 1998); *Wolfson v. BIC Corp.*, 95 S.W.3d 527, 532 (Tex. App. – Houston [1st Dist] 2002, rev. denied).

The parties agreed that Dr. Holt and Christus were both somewhat responsible for Houston's injuries. Houston's expert agreed with the hospital that Dr. Holt should have followed up with Houston more

19

aggressively, while Christus' expert agreed with Houston that the hospital's nurses were negligent. *See* pp. 7-8, *supra*. What the parties disputed was *the extent* to which Dr. Holt and Christus each caused Houston's final condition – or the extent to which no one did if, as Dr. Gomez opined, some nerve damage accompanied the artery injury, which was not the product of negligence. In either case, the parties' dispute centered on how much responsibility the jury should assign to Christus versus Dr. Holt.

Since that was true, it served no purpose for jurors to hear that there was an innocent cause of some portion of Houston's disability if they could not be told how significant it was. Even Dr. Gomez agreed that at least some of Houston's ultimate outcome was due to muscle and nerve damage caused by post-operative ischemia, as Houston maintained, though he also claimed that some other unspecified portion occurred during surgery. Houston App. Tab 2 (CR 214). The trial court was therefore exactly right in asking whether, if Dr. Gomez couldn't "allocate how much, then how can he offer the [jury] anything for them to hang their hat on? They've got a thought out there and no further guidance as to a percentage." Houston App. Tab 1 (RR 5/319). Without an opinion on the extent to which Houston's nerve damage was caused during the operation, Dr. Gomez would only have been inviting jurors to speculate about the central issue at trial: the

respective responsibility of Christus and Dr. Holt. *Id*. (RR 5/327) ("I'm not sure you can just raise it and then lay it out there, because at that point if the jury makes any decision based on it, it's not based on the evidence").

To attribute some portion of responsibility for Houston's disability to nerve damage that occurred during surgery, Christus had to show that Dr. Holt's actions were a *substantial* factor in bringing about the disability:

> The two elements of proximate cause are cause in fact (or substantial factor) and foreseeability… Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred.

*IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798-99 (Tex. 2010) (citations omitted); *see also W.C. Larock D.C., P.C. v. Smith*, 310 S.W.3d. 48, 56 (Tex. App. – El Paso 2010). Causing a trivial or minimal part of the plaintiff's injury is not substantial factor causation. *See Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332, 341, 345 (Tex. 2014); *Lette v. Baptist Health Sys.*, 82 S.W.3d 600, 602 n. 1 (Tex. App. – San Antonio 2002) (cause must be more than "remote" or "minor"); *Sisters of St. Joseph of Tex., Inc. v. Cheek,* 61 S.W.3d 32, 36 (Tex. App. – Amarillo 2001, rev. denied) (same).

Christus asserts: "Dr. Gomez's opinions included that the actions of Dr. Holt were a substantial factor in causing the injury, and without which

21

actions, the permanent injury would not have occurred."  Christus Brf. 39-40.  But a review of the testimony Christus cites – at pages 320-21 of volume 5 of the trial transcript – reveals that Dr. Gomez said nothing of the sort.  *See* Houston App. Tab 1 (RR 5/320-21).  He neither used the phrase "substantial factor" nor otherwise testified to that effect.  *See id*.  Nor could he.  Admittedly at a loss to assess the degree to which the supposed in-surgery nerve damage caused Houston's disability, Dr. Gomez was necessarily unable to go farther and say that it was a substantial factor.  *See, e.g., Sisters of St. Joseph,* 61 S.W.3d at 37 (expert's testimony that hospital's negligence "caused" death does not establish that it was substantial factor in causation); *Fennern v. Whitehead*, 2010 WL 2428458 at * 5 (Tex. App. – Austin 2010) (testimony that conditions "increased [plaintiff's] risk" of dying did not satisfy duty to prove they were substantial factors in death).  This inability to meet the established legal test for causation rendered his opinion irrelevant.

The inadequacy of Dr. Gomez's testimony in this regard is best illustrated by the Texas Supreme Court's recent decision in *Bostic*.  The plaintiffs there alleged that exposure to drywall products containing asbestos sold by Georgia-Pacific caused Bostic's mesothelioma, but the Supreme Court held that their inability to quantify the extent of Bostic's exposure to

22

Georgia-Pacific's products precluded a finding that they were a substantial rather than a trivial cause of Bostic's disease. *See id.* at 355-56. This failure was compounded by the plaintiffs' inability to allocate causation between Georgia-Pacific and another asbestos manufacturer:

> Without any meaningful and scientific attempt to quantify the exposures from the two sources, the testimony was legally insufficient, for there was no meaningful way for the jury to conclude that Bostic's exposure to Georgia-Pacific's products was a substantial factor in causing his disease, nor was there any basis for the jury to apportion liability between these two sources of asbestos.

*Id.* at 359.

Plaintiff's failure in *Bostic* is identical to Dr. Gomez's shortcoming here. Since Dr. Gomez cannot quantify causation in even general terms or allocate it between the two events claimed to be responsible for Houston's condition – Dr. Holt's supposed in-surgery damaging of nerves, and the nurses' failure to prevent prolonged ischemia – his testimony is legally insufficient evidence of causation. The district court was therefore correct to strike it.

Decisions before *Bostic* also confirm the validity of the trial court's order. In *Texarkana Memorial Hosp., Inc. v. Murdock*, the Supreme Court reversed a judgment awarding $500,000 in medical expenses to the plaintiffs where their expert proved only that the hospital had caused a condition

23

responsible for some of the expenses. *See* 946 S.W.2d 836, 840-41 (Tex. 1997). The expert's failure to allocate which part of the injury was caused by the hospital and which by preexisting illnesses required reversal of the award. *See id.* "[I]t is axiomatic that a jury must have an evidentiary foundation on which to base its findings." *Id.* at 841. Dr. Gomez's inability to allocate causation in this case is equally fatal to his opinion.

Similarly, in *Thompson v. Stolar*, the jury found a chiropractor to be 20% responsible for the plaintiff's knee injuries because he delayed in referring her for treatment of an infection, with 80% responsibility assigned to another doctor. *See* __ S.W.3d __, 2014 WL 5023087 at * 3 (Tex. App. – El Paso 2014). But the plaintiff's expert testified only that damage resulting from the infection "would have been much less likely" with a prompt referral, and he could not "assign a percentage of 'less likely,'" saying "there's just no way to know." *Id.* at ** 7-8. The court of appeals found this to be insufficient evidence of the chiropractor's share of responsibility. *Id.* at ** 8-9. Here too, Dr. Gomez's inability to quantify the ultimate effects of the nerve damage he claims occurred during surgery – or even describe it as a substantial factor – renders his opinion no evidence of Dr. Holt's causation.

24

And in *Lette*, the court held that plaintiff's expert's opinion was not proof that the drug Toradol caused the plaintiff's injuries since the expert could opine only that it "caused or potentiated" bleeding. 82 S.W.3d at 602. The testimony "fail[ed] to quantify the degree to which the administration of the Toradol was related to the arterial bleed; that is, whether the Toradol was a remote, minor or substantial factor in causing the bleeding to occur. Accordingly, the testimony fail[ed] to meet the standard required for proof of medical causation." *Id.* at n. 1. Because Dr. Gomez is similarly incapable of assessing the extent of causation in this case, his opinion was correctly excluded. *See also, e.g., Rowan Co., Inc. v. Acadian Ambulance Serv., Inc.*, 2008 WL 1989791 at ** 11-12 (S.D. Tex. 2008) (dismissing case since plaintiff's expert could not, among other failings, "assign a percentage of chance that [the injury] was a result of inadequate pain control"); *Sisters of St. Joseph,* 61 S.W.3d 32, 36-37 (expert's inability to quantify degree to which nurses' failure to ambulate patient caused death, or testify that it was substantial factor in death, required reversal).

Christus argues that Dr. Gomez's testimony "would have provided assistance to the jury in their deliberations by helping them understand human anatomy and how injuring the axillary artery… would unavoidably damage the surrounding nerves." Christus Brf. 17. But the trial court did

25

not disapprove of general testimony on anatomy. Houston App. Tab 1 (RR 5/308). What the court rightly excluded was his opinion on causation since his inability to allocate fault would only invite speculation about the parties' relative responsibility. After all, that was the key issue facing the jurors. *See, e.g., Duff v. Yelin*, 751 S.W.2d 175, 177 (Tex. 1988) (faulting expert's opinion that hospital's care was a "possible cause" of injury; "the principal reason behind this case going to trial [was] to affix liability upon the negligent party").

Christus also argues that Dr. Gomez's testimony "would have aided the jury in determining when Mr. Houston's permanent nerve injury occurred, and to *the possibility* that Dr. Holt's negligence, or no one's negligence, rather than a delay in performing the artery repair surgery, was the cause in fact of Mr. Houston's unfortunate nerve injury." Christus Brf. 17 (emphasis added). This only points up another failing in Dr. Gomez's opinion: because he could not even generally quantify the degree of causation stemming from asserted nerve damage during surgery, there was no more than a possibility – as Christus concedes in the passage above – that it was a substantial factor in Houston's ultimate outcome. And it is well settled that expert testimony establishing no more than a possible causal effect is inadmissible. *See Bowie Mem. Hosp. v. Wright*, 79 S.W.3d 48, 52-

26

53 (Tex. 2002); *Duff*, 751 S.W.2d at 176; *Bradley v. Rogers*, 879 S.W.2d 947, 957-59 (Tex. App. – Houston [14th Dist.] 1994, writ den.). "'Perhaps,' 'possibly,' 'can,' and 'could' indicate mere conjecture, speculation or possibility rather than qualified opinions based on reasonable medical probability." *W.C. Larock*, 310 S.W.3d at 58.

Finally, Christus cites *Constancio v. Shannon Med. Ctr.*, 2012 WL 1948345 (Tex. App. – Austin 2012), for the proposition that Dr. Gomez need not have allocated causation between the claimed in-surgery nerve damage and ischemia. Christus Brf. 35, 39. *Constancio* predates *Bostic* and is not on point in any case because jurors there were not assigning relative percentages of responsibility to the parties – they were simply deciding whether the defendant's negligence (failure to perform certain monitoring) caused the patient's death in light of his preexisting illnesses. *See* 2012 WL 1948345 at **8-9.

Moreover, the expert in *Constancio* opined that the patient would have survived had the monitoring occurred, even considering the preexisting ailments; that the "respiratory event" the monitoring would have detected was a "major factor" in his death; and that the patient's preexisting conditions were less than 50% responsible for his death. *Id.* at ** 9-10. All these together easily satisfied the "substantial factor" test, *see id.* at 11,

whereas Dr. Gomez could not opine that the supposed in-surgery nerve damage rather than the ischemia caused Houston's current condition, that it was even a "major factor" in that condition, or that ischemia was less than 50% responsible for it. *Constancio* is therefore inapposite.

The trial court correctly concluded Dr. Gomez's opinion would not aid the jury in its all-important task of apportioning responsibility. It was therefore within its discretion to exclude it.

## B. There Was No Foundation for Dr. Gomez's Opinion About Causation

Dr. Gomez's opinion that Dr. Holt must have damaged nerves near the axillary artery during surgery, which in turn caused some unspecified portion of Houston's disability, was also unreliable. "[C]ourts are to rigorously examine the validity of facts and assumptions on which the testimony is based, as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodologies are applied by the expert to reach the conclusions." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 647 (Tex. 2009). "Scientific evidence which is not grounded in the methods and procedures of science is no more than subjective belief or unsupported speculation. Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under Rule 702." *Gammill*, 972 S.W.2d at 720 (quotation omitted).

### i. The *Robinson* Factors Demonstrate the Unreliability of Dr. Gomez's Opinion

Dr. Gomez's opinions should first be assessed against the familiar factors for judging reliability set forth in *E.I. du Pont de Nemours and Co., Inc. v. Robinson,* 923 S.W.2d 549 (Tex. 1995). "[A] trial court should consider the factors mentioned in *Robinson* when doing so will be helpful in determining reliability of an expert's testimony, regardless of whether the testimony is scientific in nature or experience-based." *Mack Trucks*, 206 S.W.3d at 579. The factors include:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert;

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of the theory or technique.

*Robinson,* 923 S.W.2d at 557.

Dr. Gomez's opinion has not been tested, a fact Christus ascribes to medical ethics. Christus Brf. 34. But if injuries to the axillary artery

29

regularly produced permanent nerve damage and symptoms like Houston's – such as through accidents or complications from other medical procedures – there could well be documentation of that fact in the literature. Yet Dr. Gomez disclaimed reliance on testing or literature in reaching his opinion. Houston App. Tab 2 (CR 185-86). *See Exxon Corp. v. Makofski*, 116 S.W.3d 176, 187 (Tex. App. – Houston [14th Dist.] 2003, rev. denied) ("*Havner* instructs us to be especially skeptical of scientific evidence that has not been published or subject to peer review"). Hence the first, third, fourth and fifth *Robinson* factors cut against admissibility.[3]

Moreover, Dr. Gomez relies prominently on his own "subjective interpretation." *Robinson*, 923 S.W.2d at 557. He conclusively asserts that damage to Houston's axillary artery must have correspondingly produced nerve damage, though he has never seen such an injury or read about it in the literature, and that the postulated nerve damage accounts for some of Houston's present limitations. Houston App. Tab 1 (RR 5/305-06); Houston App. Tab 2 (CR 183-86, 189-90, 192-93). Not surprisingly, this sort of theorizing without concrete supporting data is suspect. *See, e.g., Plunkett v.*

---

[3] To justify Dr. Gomez's non-reliance on medical writings, Christus cites its orthopedic expert's testimony that "[t]here are no papers written on axillary artery injury in total arthroplasty." RR 3/279; Christus Brf. 34. But this testimony does not establish that there is no literature on nerve damage related to axillary artery injuries in other settings, such as accidents or other procedures.

*Conn. Gen'l Life Ins. Co.*, 285 S.W.3d 106, 116-17 (Tex. App. – Dallas 2009, rev. denied) (expert's theory that mold must have contaminated plaintiffs' personal property incompetent proof of causation given absence of supportive data); *Quiroz v. Covenant Health Sys.*, 234 S.W.3d 74, 89 (Tex. App. – El Paso 2007, rev. denied) ("there is no evidence that what the doctor believed could have happened to [plaintiff] actually did happen"). When Dr. Gomez's "subjective interpretation" of Houston's outcome is discounted, little else underlies his testimony.

Lastly, Christus claims that Dr. Gomez's method in this case mirrors how he practices medicine. Christus Brf. 34-35. But the sixth *Robinson* factor does not support his opinion either because, as discussed more fully below, he does not actually treat injuries like Houston's. He is neither a neurologist nor an orthopedist. Houston App. Tab 2 (CR 183-84). Whatever method he devised to conclude that some unknown portion of Houston's disability was caused by nerve damage during surgery does not derive from his medical practice, since he does not treat nerve or hand conditions. *See Robinson*, 923 S.W.2d at 559 ("opinions formed solely for the purpose of testifying are more likely to be biased toward a particular result").

The *Robinson* factors therefore confirm that Dr. Gomez's opinion is unreliable. Fully aware of this, Christus falls back on *Gammill's* allowance of opinion testimony based on the expert's professional experience. Christus Brf. 24-26, 35. But experts ordinarily should meet the standards enunciated in both *Robinson* and *Gammill*: "[I]n very few cases will the evidence be such that the trial court's reliability determination can properly be based only on the experience of a qualified expert to the exclusion of factors such as those set out in *Robinson*, or, on the other hand, properly be based only on factors such as those set out in *Robinson* to the exclusion of considerations based on a qualified expert's experience." *Whirlpool Corp.*, 298 S.W.3d at 638. Indeed:

> If courts merely accept "experience" as a substitute for proof that an expert's opinions are reliable and then only examine the testimony for analytical gaps in the expert's logic and opinions, an expert can effectively insulate his or her conclusions from meaningful review by filling gaps in the testimony with almost any type of data or subjective opinions.

*Id.* at 639. Thus, Dr. Gomez's inability to satisfy the test in *Robinson* alone supports the trial court's decision to exclude his testimony.

> ii. **Dr. Gomez's Opinion Also Flunks the *Gammill* "Experience" Test**

Nor is this the rare case where experience alone can validate an expert's opinion. Dr. Gomez's view, based on his general understanding of

32

anatomy, that nerves are located near the axillary artery may be unobjectionable as far as it goes. Houston App. Tab 1 (RR 5/312-13) (Dr. Gomez permitted to discuss general principles of anatomy). But his further opinions that Dr. Holt must have damaged adjacent nerves while puncturing or tearing the axillary artery and that this injury gave rise to some unknowable portion of Houston's current physical limitations and symptoms cannot be grounded in his clinical experience. *See Whirlpool Corp.*, 298 S.W.3d at 647 ("each material part of an expert's theory must be reliable").

In the first place, Dr. Gomez does not actually have any experience with nerve damage resulting from shoulder replacement surgery, or even with the axillary artery more generally. Houston App. Tab 2 (CR 183-84, 193). He explained this gap in his knowledge by claiming that such injuries are rare, though Christus' other expert, an orthopedic surgeon, has seen it. *Id.* (CR 183); RR 3/239. Never having witnessed the nerve damage he believes occurred, Dr. Gomez could not explain the mechanism of the supposed nerve damage, or what actually happened to the nerves. Houston App. Tab 2 (CR 195, 211). In fact, the one person who did see Houston's nerves – Dr. Martin, while performing the bypass graft – reported that he saw no gross abnormalities, such as severing or cutting. RR 5/19, 27. Christus claims that Dr. Gomez could opine about how nerves "react when

they are damaged during a surgical procedure," Christus Brf. 26, but that is exactly where his experience falls short.

In fact, Dr. Gomez gave confused and contradictory testimony on what nerves were even involved. First he said: "There's the ulnar nerve, the median nerve, the musculotaneous nerve. Without examining him, it's hard for me to tell how many of those were injured." Houston App. Tab 2 (CR 190). Then he said: "I mean, the ulnar nerve for sure was injured." *Id.* (CR 191). Then, asked what other nerves were injured, he repeated: "Without examining him, it's hard to know." *Id.* But then he reverted to his first answer: "I believe the median nerve, the ulnar nerve, the musculotaneous nerves were injured." *Id.* And later, after reviewing Houston's nerve conduction study, he said: "The radial nerve – I'm sorry. I guess it was the radial nerve that had the majority of the injury." *Id.* (CR 192). Finally, he conceded that he was "not an expert" in the nerve conduction test. *Id*. (CR 196). This incoherence raises doubt about whether Dr. Gomez could give *any* opinion at all about the nerves near the axillary artery.

Most importantly, as a vascular and cardiothoracic surgeon, he has no experience with hand injuries and so could not opine about whether Houston's current symptoms and limitations are due to the presumed in-surgery nerve damage. Whenever he was asked about what effects the

surgery might have had on Houston's ultimate hand function, he disclaimed knowledge because he is not an orthopedist. *See, e.g.*, Houston App. Tab 1 (RR 5/321) (answering "That's not my area of expertise" when asked whether Houston's inability to grip was caused in-surgery nerve damage); Houston App. Tab 2 (CR 195) (responding "I'm not an orthopedic specialist" when asked about the mechanism by which Houston's nerves were damaged).

Opining in a generalized way that Dr. Holt's surgery must have resulted in nerve damage without being able to relate that damage to specific aspects of Houston's present disability fails to complete the necessary chain of causation from the act that produces injury to the final result and accompanying damages. *See Texarkana Mem. Hosp.,* 946 S.W.2d at 838 (causation requires "proof that establishes a direct causal connection between the damages awarded, the defendant's actions, and the injury suffered"). In other words, there is an analytical gap between the data Dr. Gomez cites – assumed but unverifiable and unspecified nerve damage – and the opinion rendered: that Dr. Holt's act of damaging the nerves during surgery yielded Houston's eventual disability. *See Gammill*, 972 S.W.2d at 726.

Dr. Gomez's lack of experience also precluded his opining about how much of Houston's condition is attributable to nerve damage from any cause versus muscle damage: "I'm not an expert as far as nerve and muscle. And how much of his function is due to loss of nerve versus due to loss of muscle function or muscle capacity, I can't comment on." Houston App. Tab 2 (CR 201); *see also id.* (CR 190) ("I'm not a hand expert or a muscle expert, but some of the contractures and so forth that I think he has now are possibly due to those muscle injuries"), *id*. (CR 200). Yet any part of Houston's current condition that stems from muscle damage cannot be attributed to supposed nerve damage during surgery. As with his inability to distinguish between nerve damage caused by the surgery and nerve damage from ischemia, the fact that Dr. Lopez cannot say what aspects of Houston's disability stem from muscle trauma as opposed to nerve damage renders his causation opinion meaningless.

Three decisions illustrate how an expert's clinical inexperience with the plaintiff's condition can result in exclusion of his causation opinion under *Gammill*. In *Wiggs v. All Saints Health Sys.*, plaintiff offered the testimony of two experts to show that hypertension and blood loss during back surgery caused his ischemic optic neuropathy ("ION"), resulting in blindness. *See* 124 S.W.3d 407, 409 (Tex. App. – Ft. Worth 2003, rev.

denied). Their opinions were based on their claimed experience with ION, and the plaintiff relied on *Gammill* to support admissibility. *See id.* at 412-413. The first expert, an anesthesiologist, relied on his care of over 7,000 patients during surgery – but only one of his cases "may have had" ION, only 1% of his surgeries were spinal cases, he had no training regarding ION or its causes, he had never treated or diagnosed ION, and he had not authored any papers about it. *Id*. The second expert, an ophthalmologist, had only diagnosed 40 post-surgical cases of ION and also lacked special training in the condition or its causes. *See id.* at 413. The court of appeals upheld the trial court's summary judgment based on the absence of valid causation evidence:

> Certainly, if an expert is primarily depending on his experience to support his opinion, he would have to have seen it more than once…

> In summary, the doctors' experience and training in their respective fields and the medical literature did not form a reliable basis for their opinions as to the cause of Mr. Wiggs's post-operative vision loss. When the bases for the experts' opinion are unreliable, their opinions are also unreliable.

*Id.* at 412-14 (quotation and parenthetical omitted).

*Bartosh v. Gulf Health Care Ctr. – Galveston*, is analogous. *See* 178 S.W.3d 434 (Tex. App. – Houston [14th Dist.] 2005). There, appellant claimed that fire ant bites caused her elderly mother's decline and death.

*See id.* at 441-43. Her expert was a family physician and geriatric expert who learned about fire ants in medical school and had treated 20-30 patients for bites. *See id.* at 442. Because the expert lacked experience treating older patients with ant bites, however, and none had experienced the effects suffered by appellant's mother, his opinion was invalid and properly excluded. *See id*. at 442-43; *see also State Farm Lloyds v. Mireles*, 63 S.W.3d 491, 499 (Tex. App. – San Antonio 2001) (construction expert's testimony unsupported under *Gammill* where he relied on his experience but knew of only one other similar case of foundation damage).

This case closely resembles *Wiggs*, *Bartosh* and *Mireles*. Christus relies on *Gammill* and cites Dr. Gomez's experience as the main basis for his opinion, but a closer look at his background shows only passing exposure to the conditions and medical issues at the heart of this case. Having never once encountered an axillary artery injury or associated nerve damage, he lacks even the single instance of familiarity boasted by the anesthesiologist in *Wiggs* and the construction expert in Mireles, let alone the wider experience possessed by the ophthalmologist in *Wiggs* or the geriatric

specialist in *Bartosh*. As in those cases, his experience-based opinion on causation was correctly kept from the jury.[4]

Christus notes that Houston experienced considerable blood loss during the procedure. *See* Christus Brf. 37-38. While this may indicate a serious injury to the axillary artery, it says nothing about whether adjacent nerves were affected, let alone the extent to which any nerve damage affected his current condition. To dramatize the extent of the injury, Christus repeatedly asserts that Houston's axillary artery was "sever[ed]," Christus Brf. 38, when the parties actually disputed how large any hole in Houston's artery was, whether it was punctured or torn, and so on. *Compare* RR 3/138-39 ("a small pinhole tear"), 5/238 *with* RR 5/28-29 (larger). Christus also claims that "[e]ven Plaintiff's own orthopedic surgery expert testified that Mr. Houston's inability to move his arm/hand after the surgery was an indicia of a nerve injury," Christus Brf 38, but Houston's expert said only that this was "possible," and that "the likelihood that the injury was the product of local trauma seems quire remote." RR 5/277-78.

---

[4]    Christus discusses *Rehabilitative Care Sys. of Am. v. Davis*, 43 S.W.3d 649 (Tex. App. – Texarkana 2001) and *State Offc. of Risk Mgmt. v. Trujillo*, 267 S.W.3d 349 (Tex. App. – Corpus Christi 2008), Christus Brf. 23-24, but neither involves experts who relied primarily on their backgrounds or were challenged for lack of relevant experience. Nor are their facts similar to those here. In *Trujillo*, the substance of the opinion was not contested at all. *See* 267 S.W.3d at 354-55.

Christus further points out that Houston never reported regaining sensation or movement in his hand after Dr. Holt's operation. Christus Brf. 38. The evidence on this point is conflicting at best; a nurse documented that Houston had improved movement in his fingers on the morning after the surgery and could flex. RR 3/243, 4/114-16; Def. Exh. 1 at p. Christus000073. Moreover, Christus points out that effects from ischemia could have started as soon as six hours after the surgery, Christus Brf. 39, and Houston would not have regained mobility earlier because his anesthesia (the interscalene nerve block) hadn't worn off yet. RR 3/101-02, 211; Def. Exh. 5. Thus, if Houston never regained mobility in his hand after the surgery, it could be attributable to the anesthesia followed by ischemia rather than any nerve damage that occurred in surgery. *Id*. Since Dr. Gomez cannot allocate between these two possibilities, his causation opinion is invalid even if nerve damage is one option. *See* Point II(A), *supra*. Nor did Dr. Gomez connect Houston's inability to move his hand immediately after the surgery to the specifics of his current condition. RR 5/321 ("That's not my area of expertise").

Christus points again to *Constancio* as an example of a doctor basing medical causation testimony on his clinical experience. Christus Brf. 31-33. The expert in *Constancio* opined that giving morphine, Phenergan and

Ativan together led to an ultimately fatal "respiratory event." *See* 2012 WL 1948345 at ** 1, 3. The expert testified that he prescribed these drugs "on a regular basis" and "was familiar with published information on them." *Id*. at * 5. He taught use of the drugs to residents and based his opinion in part on medical literature. *Id.* at ** 6-8, 13. By contrast, Dr. Gomez has never treated or even witnessed the nerve injury he claims Houston suffered, and he does not rely on medical literature to support his theory. And in *Constancio,* both sides' expert agreed with the challenged expert's methodology, which is far from the case here. *Id.* at * 12. *Constancio* only illustrates why Dr. Gomez's opinions lack foundation.

In sum, Dr. Gomez's limited experience in the required subjects cannot support the causation opinion he wanted to offer, and there is an analytical gap between the data he does rely on and the testimony Christus intended to offer.

### C. Dr. Gomez Was Not Qualified to Opine on Causation

Exclusion of Dr. Gomez's causation opinion was also appropriate because he was unqualified to give it. For the same reasons, discussed

above, that his opinion is not sufficiently supported by his experience, he was also unqualified to testify as an expert under TEX. R. EVID. 702.[5]

Proponents of expert testimony bear the burden of demonstrating the expert's qualifications. *See Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). "What is required is that the offering party establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.* at 153 (quoting TEX. R. EVID. 702). Although a physician need not practice in precisely the same specialty as the medical area involved, *see Keo*, 76 S.W.3d at 732, generalized medical knowledge is not enough: "given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question." *Broders*, 924 S.W.2d at 152; *accord Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 506 (Tex. App. – Fort Worth 2001, rev. denied).

---

[5] Houston's pretrial motion to exclude focused on Dr. Gomez's opinion's inadequate foundation, but it also mentioned his lack of relevant qualifications. CR 173 (¶¶ 30-31). And when counsel renewed the motion at trial, he specifically argued that Dr. Gomez "does not have the qualification to testify in this case." RR 5/294. In any event, this Court may uphold the exclusion of Dr. Gomez's opinion on any ground in the record. *See In re O'Quinn*, 355 S.W.3d 857, 862 (Tex. App. – Houston [1st Dist.] 2011, mandamus den.).

As discussed above, Dr. Gomez lacks the qualifications to inform jurors about causation in this case. He might be capable of opining generally about the relevant anatomy, and the trial court appeared to have no objection to that sort of testimony, assuming its relevance. RR 5/308-09. But Dr. Gomez's own testimony confirmed that he is not qualified to opine on what caused Houston's current disability because he lacks the necessary familiarity with axillary artery injuries; which nerves might have been affected; how the nerves might have been damaged during the procedure; and, most importantly, what effects in-surgery nerve damage might have produced on Houston's hand. *See* Point II(B)(ii), *supra*.

Courts have not hesitated to disqualify experts who, like Dr. Gomez, invoked their professional experience but whose backgrounds failed to supply the necessary support. *See, e.g.*, *Spin Doctor Golf, Inc. v. Paymentech, L.P.*, 296 S.W.3d 354, 360-61 (Tex. App. – Dallas 2009, rev. denied) (expert's experience in valuing businesses and marketing did not qualify him to opine on lost profits); *In re Windisch*, 138 S.W.3d 507, 512-14 (Tex. App. – Amarillo 2004) (radiologist lacked background to opine about standard of care governing treatment for brain tumors); *Pioneer Natural Resources USA, Inc. v. W.L. Ranch, Inc.*, 127 S.W.3d 900, (Tex. App. – Corpus Christi 2004, rev. denied) (expert in vertical drilling may not

opine about issues related to horizontal drilling); *Pack*, 53 S.W.3d at 506-07 (nurse and nursing instructor unqualified to opine on standards of care for nursing home). Therefore, just as Dr. Gomez's opinion is invalid given his inexperience in the necessary subjects, he is also unqualified to opine on those topics under Rule 702.

### III. The Final Judgment is Correct

Christus argues that the final judgment is defective because it fails to account for Dr. Holt's settlement credit, miscalculates prejudgment interest, and requires periodic payment of too small a portion of the award. Christus Brf. Issue 2. These arguments are without merit.

#### A. The Trial Court Correctly Accounted for the Settlement Credit

Christus contends first that the trial court erred in applying the $99,999 settlement credit by deducting it from the award and then further reducing noneconomic damages down to $250,000, rather than the other way around. *See* Christus Brf. 40-45. The Texas Supreme Court faced a similar situation in *Edinburgh Hosp. Auth. v. Trevino*, 941 S.W.2d 76 (Tex. 1997). The jury there awarded $750,000 against a municipal hospital that was subject to the $250,000 cap on damages in TEX. CIV. PRAC. & REM. CODE § 101.023. *See id.* at 81. Before trial, the plaintiffs also settled with the responsible doctor for $44,000. *See id.* The trial court applied the

44

settlement credit and then reduced the resulting award to the $250,000 cap.

*See id.* As in this case, the hospital argued for reversing the process. *See id.*

The Supreme Court rejected this position and held:

> Thus, while the dollar amount of a settlement must be reduced from the verdict under the "one satisfaction" rule, the settlement does not affect the maximum dollar amount to which the government has agreed to waive its immunity. A settlement with one tortfeasor should thus be offset *before* the verdict against the governmental unit is reduced to the statutory maximum. A contrary rule, taken to its logical end, would completely bar recovery against a tortfeasing municipal hospital authority when a plaintiff settles with another defendant for more than the hospital authority's damages cap. Such a result cannot be the intent of the Legislature.

*Id.* at 82 (citation omitted, emphasis in original).

The same analysis applies here. The Legislature's limit on noneconomic damages against healthcare providers mirrors its cap on awards against governmental units. Plaintiffs should therefore be allowed to recover such damages to their statutory limit, as in cases under the Tort Claims Act. Otherwise, as with § 101.023, the cap could completely bar recovery against a liable hospital when the award is for noneconomic damages alone and a settlement with another defendant exceeds the cap. "Such a result cannot be the intent of the Legislature." *Id.*

This reasoning has been accepted by at least one trial court that adjudicated a case identical to this one. In *Hogue v. Columbia Med. Ctr. of*

45

*Las Colinas*, the 193rd district court followed *Edinburgh Hosp. Auth.* and applied the settlement credit before the cap on noneconomic damages in a medical malpractice case: "Finding no holding to the contrary [of *Edinburgh Hosp. Auth.*] regarding the 4590i, § 11.02(a) statutory cap and both being the subject of statutes, the Court holds that the settlement credits applicable in this case should be applied before the statutory caps are applied to the damages." Houston App. Tab 3 (2002 WL 33962000, No. DV-99-01417-L (193rd Dist. Ct. – Dallas County, July 24, 2002)).

Christus offers two rationales for its approach to the settlement credit. First, it stresses certain language in TEX. CIV. PRAC. & REM. CODE § 33.013(b): "each liable defendant is… jointly and severally liable *for the damages recoverable by the claimant* under Section 33.012 with respect to a cause of action." Christus Brf. 41, 43 (emphasis in original). This section establishes the conditions for joint and several liability; it has nothing to do with how courts should apply settlement credits.

Second, Christus argues that Chapter 74 "was designed to limit a health care provider's civil liability for damages," that the hospital effectively received no settlement credit, and that the Legislature must have intended the court to apply the credit as Christus prefers. *Id.* at 44-45. The hospital cites no case law or legislative history to support this contention.

46

*See id.* Christus reaped the benefit of the Legislature's intent to cap Houston's noneconomic damages, but there is no indication that the cap must be applied before a settlement credit. On the contrary, *Edinburgh Hosp. Auth.* holds that the Legislature would not have intended a settlement credit and a damages limit to work in tandem to reduce a plaintiff's recovery below the statutorily mandated ceiling, as Christus proposes.

The Court should follow *Edinburgh Hosp. Auth.* and *Hogue* and affirm the judgment.

### B.     The Court Correctly Calculated Prejudgment Interest

Next, Christus complains that the trial court incorrectly calculated prejudgment interest. Christus Brf. 45-47. The trial court assessed prejudgment interest on the full amount of past damages, but Christus claims "[t]he proper and more fair" method would be to apply a formula whereby the percentage of non-economic damages representing past damages is taken of capped non-economic damages, $250,000, instead of the actual amount of non-economic damages awarded by the jury. *See id.* at 46-47. As with its argument on the settlement credit, it cites no case law or other authority endorsing this novel approach. *See id.*

Christus' proposal is nothing more than a way to charge prejudgment interest on capped damages rather than those selected by the jury, a notion

rejected by the Seventh Court of Appeals in *Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214 (Tex. App. – Amarillo 2003). The *Cresthaven* court stressed that Texas law links prejudgment interest to the jury's award, not the judgment. *Id.* at 222. While the provision the court considered was later repealed, the Finance Code continues to tie prejudgment interest to juries' awards rather than judgments issued later by courts. *See* TEX. FIN. CODE § 304.1045 ("prejudgment interest may not be assessed or recovered on *an award* of future damages" (emphasis added)). The court concluded:

> The legislature did not provide that prejudgment interest is to be awarded on the amount of past damages included in the judgment, but on the amount awarded by the trier of fact. This language implies that prejudgment interest is applicable on the full amount of past damages found by the jury prior to the application of the liability cap, which determines the amount for which the defendant is liable in the judgment.

134 S.W.3d 222. This court should likewise reject the formula Christus invents from whole cloth and affirm the judgment's calculation of prejudgment interest.

### C. The Court Did Not Abuse its Discretion in Deciding What Portion of Damages Christus Can Pay Periodically

Lastly, Christus argues that the district court should have ordered all damages awarded by the jury for future medical care to be paid over ten years pursuant to TEX. CIV. PRAC. & REM. CODE § 74.503(a). Christus Brf.

47-49. It also contends that the court should have permitted it to periodically pay all damages for loss of future wages and household services under § 74.503(b). *Id.* at 49-50. The court did not abuse its discretion in applying § 74.503 to the facts of this case.

Section 74.503(a) provides that "the court shall order that medical, health care, or custodial services awarded in a health care liability claim be paid in whole or in part in periodic payments rather than by a lump-sum payment" upon a defendant's request. In the district court, Christus asked that *all* future medical care damages be paid over ten years, while Houston sought periodic payment of only $50,000 of these damages. CR 584, 683. The court split the difference and permitted Christus to pay $105,000 of future medical care damages periodically, leaving $200,000 to be paid in a lump sum after entry of judgment. Christus App. Tab A (CR 882-83).

First, Christus stresses the Legislature's use of the word "shall" in 74.503(a) to imply that the district court had to accept its request. Christus Brf. 47. But the statute expressly gives the trial court discretion to order periodic payment of these damages "in whole or in part." TEX. CIV. PRAC. & REM. CODE § 74.503(a); *see also Lee v. United States*, 765 F.3d 521, 529 (5th Cir. 2014) (court "must order periodic payments *for at least a portion* of the damages for medical care" (emphasis added)). The court was therefore

empowered to order immediate payment of some portion of damages awarded for future medical care.

Christus also complains that the court's decision conflicts with the evidence at trial. Christus Brf. 48. The district court determined that Houston should receive $200,000 for future medical care now "by determining from the evidence that Plaintiff is likely to need a rounded off $140,000 in the immediate future, together with an allocation of the portion of attorneys' fees which Plaintiff will have to pay on the award." Christus App. Tab A (CR 882-83). Using calculations prepared by his expert life care planner, Houston demonstrated that approximately $142,653.74 in medical costs would be required in fewer than six years, let alone the ten urged by Christus. CR 683; Pl. Exh. 12.

For example, Houston requires three surgeries – two immediately and one when he turns 55 in one and a half years – totaling $39,652.20. RR 6/56-58; Pl. Exh. 12.[6] Over the next two years alone he will need $18,000 in post-surgical physical therapy, $6,000 for psychological counseling, $1,200 in vocational evaluation, and $740 for a post-operative home health aid. RR 6/49-53; Pl. Exh. 12. Other care required over the next six years includes

---

[6] When Houston's life care planner completed Houston's plan on July 13, 2011, Houston was 49 years old. RR 6/30; Pl. Exh. 12. He predicted Houston would need one of his surgeries, the bypass vascular graft, when Houston turns 55. Pl. Exh. 12. Thus, that surgery is now needed in one and a half years.

50

various medications ($35,181.36), rehabilitative services ($19,350.42), diagnostic studies ($8,916.60), physician care ($5,484.00), and essential services ($7,200). *See id.* The district court therefore had an evidentiary basis for concluding that approximately $140,000 in medical costs would be needed on a faster schedule than that proposed by Christus. *See In re K.R.P.,* 80 S.W.3d 669, 674 (Tex. App. – Houston [1st Dist.] 2002, rev. denied) ("There is generally no abuse of discretion if some evidence supports the decision").

Despite this evidence, the hospital attacks the court's decision because Houston "had not taken advantage of any medical treatments recommended and available to him, such as seeing a pain management specialist, taking prescription pain medications and/or antidepressants, or engaging in psychological counseling." Christus Brf. 48. Houston's life care planner testified, however, that Houston will likely need these sorts of services and medicines in the future even if he had not used them to date. RR 6/61-62. For example, the need for pain management, pain medications, antidepressants and psychological counseling grow over time as the patient has to deal with serious pain on a daily basis. RR 6/52 ("suppose every single day you wake up and the back pain is still there and still there and still there. Well, that kind of pain starts to wear on you"). Moreover, the life

51

care planner saw Houston in 2011, *see* Pl. Exh. 12; by the time Houston testified at trial in October 2013, he was taking pain medication six times daily. RR 6/96. The court was not required to defer these kinds of expenses, which make up a relatively small part of the $140,000 in any case, simply because Houston had not yet availed himself of them in 2011.

Christus also argues that Houston will not need his three surgeries until "many years into the future," when his bypass graft fails. Christus Brf. 48-49. Two of the three surgeries – the tendon transfer and right carpel tunnel release – are to his hands and have nothing to do with his bypass, and Houston's life care planner testified that they are needed now. RR 6/56-57; Pl. Exh. 12. As for the bypass procedure, Christus argues that it does not remedy a compensable injury because the original bypass in 2009 fixed the non-negligent axillary artery rupture. Christus Brf. 49. Because Christus did not previously object to this expense on this ground, the argument is waived. See CR 907 (Christus' objection to second bypass surgery expense in trial court). In any case, this is an argument against including the expense at all – not against when it is paid. The jury awarded $305,000 in future medical care, and Christus does not argue that there was insufficient evidence supporting this figure regardless of whether some portion may

ultimately go toward medical needs beyond those directly caused by the hospital's negligence.

Christus also claims that the court further abused its discretion by not requiring periodic payment of other future damages under subsection (b). Christus Brf. 49-50. This section is entirely discretionary. *See* TEX. CIV. PRAC. & REM. CODE § 74.503(b) (court "*may* order that future damages other than medical, health care, or custodial services" be paid periodically (emphasis added)). Christus asserts that it should not have to pay damages for loss of household services and lost wages now because, it claims, Houston has not yet suffered these losses. Christus Brf. 50.

Houston's ex-wife testified that they "had to pay people" to do housework because of Houston's limitations. RR 3/63. Houston testified that he would probably have to stop work within three years. RR 6/102-03. To the degree Christus complains about other non-medical injuries, such as pain and suffering, physical impairment and disfigurement, there was also testimony that Houston had suffered these harms too. RR 3/59-63, RR6/95-108. The trial court was permitted to credit this evidence even if there was conflicting proof in the record. *See In re K.R.P.,* 80 S.W.3d at 674 ("an abuse of discretion does not occur when the trial court bases its decision on conflicting evidence").

## PRAYER

The Court should affirm the district court's judgment.

February 19, 2015                    Respectfully Submitted,


                    *Martin J. Siegel*          */s/*
                    Martin J. Siegel
                    Texas State Bar No. 18342125
                    LAW OFFICES OF MARTIN J. SIEGEL, P.C.
                    Bank of America Center
                    700 Louisiana St., Suite 2300
                    Houston, TX 77002
                    Telephone: (713) 226-8566
                    Martin@siegelfirm.com

                    David Hodges
                    Gabriel Assaad
                    KENNEDY HODGES, LLP
                    711 W. Alabama Street
                    Houston, Texas 77006
                    Telephone: (713) 523-0001
                    Dhodges@kennedyhodges.com

                    *Attorneys for Appellee Jay Houston*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Appellee's Brief and Appendix was served on counsel of record for Appellant on February 19, 2015 by electronic means in accordance with this Court's rules on electronic filing:

Erin Lunceford
Sprott Newsom Lunceford Quattlebaum Messenger
2211 Norfolk, Suite 1150
Houston, TX 77098
Lunceford@sprottnewsom.com

*Counsel for Appellant*

/s/        *Martin J. Siegel*
Martin J. Siegel

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit of TEX. R. APP. P. 9.4(i)(2)(B) because this brief contains 11,924 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(1).

/s/            *Martin J. Siegel*

Martin J. Siegel

Dated:  February 19, 2015

# APPENDIX

# INDEX

**Tab:**

Excerpts from Argument on Motion to Exclude Dr. Gomez .......................... 1

Excerpts from Dr. Gomez's Deposition .......................................................... 2

*Hogue v. Columbia Med. Ctr. of Las Colinas,*
   2002 WL 33962000, No. DV-99-01417-L
   (193rd Dist. Ct. – Dallas County, July 24, 2002) ....................................... 3

# TAB 1

FIRST COURT OF APPEALS

01-14-00399-CV
REPORTER'S RECORD
VOLUME 5 OF 8 VOLUMES

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/6/2014 10:10:47 AM
CHRISTOPHER A. PRINE
Clerk

TRIAL COURT CAUSE NO. 2011-01306

| | |
|---|---|
| JAY HOUSTON | ) IN THE DISTRICT COURT |
| | ) |
| vs. | ) HARRIS COUNTY, TEXAS |
| | ) |
| CHRISTUS HEALTH GULF | ) |
| COAST, D/B/A CHRISTUS | ) |
| ST. JOHN HOSPITAL | ) 55TH JUDICIAL DISTRICT |

---

**TRIAL ON MERITS**

---

On the 27th day of September, 2013, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Jeff Shadwick, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype machine.

Gina Wilburn, CSR
Official Court Reporter
55th District Court

proof that Mr. Houston's body is identical to what's in the picture. There is no identical proof, there is no proof, that there is any type of support -- and Martin exposed the nerves.

THE COURT: Either I've got stupid or your guys are horribly under explaining this, so let's put him on the stand and let me hear him?

MR. HODGES: Can we take him on voir dire?

THE COURT: Yeah. Now, do you want to take a break or put him on right now?

MR. ASSAD: Your Honor --

MR. HODGES: Put him on.

MS. LUNCEFORD: The issue is -- he has to -- I know they told me they were going to go this, he has to be off today.

THE COURT: Let's go fast.

(Off record discussion was had.)

Q. (BY MS. LUNCEFORD) Dr. Gomez, what is your background?

A. I'm a cardio vascular and thoracic surgeon.

Q. And what is the difference between a cardio vascular and thoracic surgeon?

A. A vascular surgeon can't do any operations on the heart.

Q. And do you as a cardio vascular thoracic

surgeon to operations on other vascular structures in the body?

A.   Yes.

THE COURT:   I'm not concerned about this part of the foundation.

MS. LUNCEFORD:   You're not?

THE COURT:   I want to know the context to the issues in front of the jury.

Q.   (BY MS. LUNCEFORD) Part of your testimony in this case is that this nerve injury to Mr. Houston happened at the time of the original laceration of the artery by Dr. Holt, correct?

A.   Yes.

Q.   Explain to Court what the basis of that opinion is.  How do you believe that on why -- what is your foundation?

A.   It's based on the anatomy.

Q.   Okay.  Do you need the anatomy chart or whatever?

A.   Then -- the axillary artery where it was injured, there is multiple nerves.  The major branches of the brachial plexus are intimately involved with the axillary artery at that point where it was injured.  And so to injure the artery, you almost invariably injure multiple nerves.

Q. You've read Dr. Vance's testimony, and I will represent to you that Dr. Martin testified this morning that he believes that Mr. Houston's injury was mostly -- injury caused by ischemia from the lack of blood flow after the thrombosis cut off the blood flow. You understand that that's the opposing side's contention?

A. Yes.

Q. Explain why you don't believe that's true?

A. I don't believe that's true, because of where the injury occurred and the artery. Like I stated earlier, there's is multiple nerves, and it's almost virtually impossible to injure an artery without -- with a significant injury that the patient had without also involving the nerves in that area. And the patient since the moment of the operation had no function in that extremity, it's reasonable to ascertain that he had nerve injury since the time of his first surgery.

Q. Dr. Martin this morning said that the base -- the reason that he knew that it wasn't a nerve injury was because after he restored the vascular artery to his arm, that it immediately pinked up and he was able to move his fingers. Why is that not a reasonable explanation?

A. Because -- just 'cause a hand returned blood flow and you can see that it went from dusty to pink,

that's not an assessment of the nerve function of that extremity. And from the injuries that he's had from the initial operation, he never had complete regain -- he did not retain all of his nerve function from the initial surgery. And so there almost impossible to determine what part was due to the injury during the first surgery and what was due to ischemia. It's -- it's impossible to know.

Q. How would it ever be possible to know -- I mean, would it ever be possible?

A. No.

Q. So part of your opinion is there is no way to separate out whether the nerve injury was completely done at the time of the first surgery due to a nerve injury or was a combination of a nerve injury of the first surgery and ischemia caused by the thrombosis?

A. Right.

MS. LUNCEFORD: I don't have anything further.

THE COURT: Let me ask you a question, then. So what am I to make of that last part? Is -- is his testimony that he's bringing -- that he is challenging the credibility of other witnesses?

MS. LUNCEFORD: Yes.

THE COURT: Because -- because I'm not

sure -- we're talking about from an evidence standpoint, not from a professional standpoint.

THE WITNESS: Sure.

THE COURT: I'm not sure he has said anything when he has said for his on account, he can't tell what happened.

MS. LUNCEFORD: Well, no --

THE COURT: So that all by itself is -- it doesn't really meet the standards of opinion testimony because it's not even an opinion.

MS. LUNCEFORD: Well, no. It is an opinion because he first gave the opinion that he thought that the nerve injury occurred at the time because of what happened with Mr. Houston's hand and arm.

THE COURT: Yeah, so far so good on that. And the fact -- the fact when the blood returned, the motion also returned -- didn't sound quite right when he -- but he's the doctor and I'm not, but it didn't sound quite right when he said, well, then you can't attribute it to the blood. I wasn't sure I got that, but it was -- it's the part after that that he says -- where he goes on to say and you can't say -- you cannot allocate between events and percentages of what it is. That's the part that's sounding like I'm not sure it

comes in from an evidence standpoint.

MS. LUNCEFORD: Just that part about he can't allocate between the two?

THE COURT: Yeah, because that part -- back to my comment, I'm the gatekeeper for opinion testimony.

MS. LUNCEFORD: Sure.

THE COURT: But that right there is sort of a non opinion.

MS. LUNCEFORD: Yeah.

THE COURT: And that's why I pointed out. It's usefulness might be in challenging the credibility of people who might say otherwise.

MS. LUNCEFORD: And that's the reason. When I asked him to review things, I asked him: That was my question is: Can you tell whether the injury was done the time of the original surgery? And it's based on the anatomy and where the nerves are.

THE COURT: Right. But is he saying -- are you saying, I can't tell or those guys can't tell and they shouldn't have said.

MS. LUNCEFORD: Well, I think -- he thinks it happened at the time of the original surgery for those reasons. And so, yes, he's disputing the fact that they can say that it didn't.

THE COURT: All right. You guys see what my problem is?

MR. ASSAD: That's what we're saying is like he cannot -- he cannot -- I feel like standing up when I talk, Your Honor.

THE COURT: Stand or sit. The jury's not there.

MR. ASSAD: He cannot determine there is no opinion as to -- as to whether or not it was -- he can't allocate the percentage of whether it was ischemia or was it nerve injury. And, therefore -- he doesn't know what happened.

THE COURT: Yeah.

MR. ASSAD: He doesn't know what happened.

THE COURT: Right. Right. Right. I'm with you on that, but now I'm trying to figure out in terms of whether it's useful to the jury of whether or not it's a comment on what the other experts have said or it's just not admissible because it's not foundational opinion testimony.

MR. HODGES: Under Rule 702. You hit the nail on the head, Judge. He didn't come in for that reason. It's not going to help the jury in determining an issue of fact in this trial.

MS. LUNCEFORD: It is.

*Raymond M. Vance, M.D. - September 27, 2013*
*Direct Examination by Mr. Assaad*

THE COURT: But do -- I'll let him -- do I let in the first part? Sounds like we're all having trouble with the second part. The first part was, I'm a doctor, I'm familiar with veins; therefore, I'm familiar the nerves around veins.

THE WITNESS: Am I allowed to interject?

THE COURT: Let me work through it on my lawyer brain first.

THE WITNESS: Okay.

THE COURT: And I know that when they've done this sort of surgery, that the veins must have been damaged and I attribute some of the damage to the original surgery.

I was okay up until then. When you -- I don't want to repeat myself as to the rest of it. Do you drawn that line, also?

MR. HODGES: Yeah. I see. You're saying there is two parts of it, and I think relative to second part of it, clearly ought to come in, but as to first part of it, still has to have an adequate foundation. All right? And if it doesn't have an adequate foundation, then it's not reliable, which means it's not relevant. If it's not relevant, it does not come into evidence. And in this case, okay, we have every single doctor, every single doctor, except for Dr. Gomez

respectfully, sir, saying that, no, this was due to ischemia. This is an ischemic injury. And they all supported their opinions on why, including Dr. Martin, the vascular surgeon, the treater who opened up the arm, looked at it, said the nerves were intact. This was a vascular injury. And we know because he regained movement once we established blood flow along with the color.

So, Dr. Gomez, not being a treater, not being there, not visualizing the nerves, must have some sort of foundation to give some peer-reviewed literature, some scientific journal that says, hey, you know what? When we've done this in the past, he's what we found. Yet he comes here with none of that. Only a contrary opinion to every single other expert in this case.

THE COURT: Well, I'm not sure it's fair to say that he comes here with -- he comes here with an M.D. and years of experience. This is the issue that we talked about when it first came up is how much opinion testimony can a doctor or, particularly, a specialist, give about general principals simply by virtue of being specialist in that area? And I'm -- I'm sort of willing to have him talk about general principals within that scope. That was where I thought I -- I drew the line,

because he wants to come up and say this -- despite the fact that I haven't seen this stuff, here's some general principals and, of course, your counter is but everything who has seen the patient disagrees. I don't think that makes --

MS. LUNCEFORD: That goes to weight.

THE COURT: Yeah. That's weight, not credibility. I don't think that makes his testimony inadmissible as far as that goes.

MR. HODGES: Well, Judge, you know, the -- the case law, and we've cited in our brief, that multiple cases have said, look, just because you have an M. D. does not make your opinion reliable.

THE COURT: I agree with that.

MR. HODGES: That is not the position. And they use the term lone wolf, and I think that is out to explain what we have here. We have one doctor, amongst many, who gives a lone wolf opinion without a scientific literature to back it up. And he's giving a opinion, contrary to people -- if we want to look at the gold standard, the guy who visualized the nerves and said, hey, there was no injury.

MS. LUNCEFORD: Didn't visualize the nerves.

MR. HODGES: I don't see how it happens

other wise is not going be helpful to this jury. It's going to add to confusion because now the jury's left with the task that this doctor cannot do himself, which is, well, if I'm going to allocate, which they're going be asked to do, between Dr. Holt and the nurses, how do I figure out how much of it was Dr. Holt who severed the nerves during the surgery versus the nurses not catching a vascular injury? And he offers no help in that regard.

*MS. LUNCEFORD:* Well, I argued or I told them that it was our contention that it happened all at the beginning of the first surgery. So that's we -- we excluded the testimony from Vance where he tried to say what percentage of it was due the nurses or to the doctor, because they invades the province of the jury, and I would agree with the Court that it does invade the province of the jury for Dr. Gomez to say that you can't tell which -- how much of it is due to the original and how much is due to the ischemia. He can cross them on, well, all of these other doctors have said it's ischemia and why is it not? And he can talk about that.

*THE COURT:* I don't think the jury's being asked to make that distinction anyways. The jury's being asked to allocate between Hold and the nurses.

*MR. ASSAD:* This is causation.

THE COURT: This goes to -- this goes to simply how much you lay on Holt.

MS. LUNCEFORD: Exactly.

MR. ASSAD: Another thing, Your Honor, another issue is, there is no deviations of standard of care against Dr. Holt for the surgery. There is no allegation. So this is all about causation. And they're going to have to allocate causation as to what was the cause by the lack of blood flow as compared to what was caused by his, you know, theory that just because the nerves are together. And he can't even himself testify as to what of the damages were -- actually he testified that all of the damages from the elbow to here were result of -- of --

MR. HODGES: Ischemia.

MR. ASSAD: -- ischemia. And he can't even testify as to what damages, if any, were caused by any type of nerve damage at the surgery.

MS. LUNCEFORD: That's not what he said.

MR. HODGES: Let's be clear here. We're talking about the field of neurology. Not talking about the field of cardio vascular surgery or cardio thoracic surgery, or even vascular surgery. We're talking about neurology here.

MS. LUNCEFORD: We're talking about nerve

injuries that occur as a result of vascular injuries, right.

MR. HODGES: It's neurology.

THE COURT: There is some cross understanding there for sure.

MR. ASSAD: Dr. Martin manipulated the artery, took it apart in a graft, and did not injury any of the nerves around it, so it's possible to cut arteries and not damage nerves.

THE COURT: I'm not going to argue the medicine of it.

MR. ASSAD. I understand that, but --

THE COURT: I'm much more interested in how does this assist the jury answering a question that they're going to have.

MS. LUNCEFORD: Just so --

THE COURT: They're going to be asked -- what -- was there negligence by these two parties. And -- and then if they say yes to more than one, they're going be asked to allocate. So which -- which question does this testimony go towards? It increases the chances that the jury will find that Holt did something inappropriate, right?

MS. LUNCEFORD: Right. And, in fact, just to clarify. I don't want to misrepresent to the Court,

my designation and Dr. Gomez's testimony during his deposition is, as a vascular surgeon, while he hasn't prepared this particular one, he gets called in with vascular surgeon for significant blood loss all of the time, and that as a surgeon he believes that it was a breach of the standard of care to have not called a vascular surgeon. And he's testified to that. And I designated him to testify to that. That so directly goes to Holt's percentage of negligence.

*MR. ASSAD:* Wait. Wait. Wait. He testified that he has no opinions to -- during the June 8th surgery --

*MS. LUNCEFORD:* No.

*MR. ASSAD:* I have it. I can site it to Court right now.

*THE COURT:* I wasn't under the impression that anybody was claiming Holt erred during the surgery.

*MS. LUNCEFORD:* No. In his response. So it's not the surgery itself. It's in fact the response and Dr. -- Dr. Edwards said that, too.

*THE COURT:* What relevance is it that he's going to testify that something happened during the surgery?

*MS. LUNCEFORD:* Not during the surgery, Your Honor. It's his response to the significant blood

loss during the surgery.

THE COURT: He's going to get up here and say there is no way that there couldn't have been nerve damage during the surgery.

MS. LUNCEFORD: Right.

THE COURT: Must have been nerve damage during the surgery. But during the surgery predates any -- I mean, in the timeline, is prior to any negligence. So what does it matter if that's what he's going to say?

MS. LUNCEFORD: Well, because we still have to get to the question of: Did the negligence, if any, of the persons named below proximately cause the injury in question? If the injury wasn't caused by either party's negligence, because it was caused in the surgery, his testimony is completely relevant. If it's caused by the first surgery, but it's not negligence, they can still answer "no" and "no". You see that's an absolutely valid opinion. It is totally -- it is totally helpful to the jury.

MR. ASSAD: That's not what he's saying.

THE COURT: So he's -- so if there is no negligence, we stop. So the jury will have to find there is some negligence, but what you want them to find is that the damage doesn't flow from the negligence.

*MS. LUNCEFORD:* Yes.

*THE COURT:* The damages flows from the original surgery.

*MS. LUNCEFORD:* Exactly.

*MR. ASSAD:* Which is contrary to what he's saying. Okay?

*THE COURT:* No. That is what he's saying.

*MR. ASSAD:* No. No. No. He's saying that there is a vascular injury and ischemia caused nerve --

*THE COURT:* He's also saying that there is something done to the nerve during the surgery.

*MR. ASSAD:* Can't even allocate.

*MR. HODGES:* He can't -- he can't figure it out.

*MR. HODGES:* Nobody could.

*THE COURT:* Ms. Lunceford, if he can't allocate how much, then how can he offer the injury anything for them to hang their hat on? They've gotten a thought out there and no further guidance as to a percentage.

*MS. LUNCEFORD:* Actually, I think we're confusing things and maybe Dr. Gomez can help. The injury to the forearm, as I recall what he was saying, that that injury was to the muscles and nerves that part

because of the swelling and the fasciectomy. We're talking about the permanent nerve injury caused --

THE WITNESS: Radial nerves.

MS. LUNCEFORD: Is that not right?

THE WITNESS: Uh-huh.

MS. LUNCEFORD: And he testified that all of that flowed. You're going have some his fasciectomy and his arm opened up, because he'll even tell that if it had been fixed at the time or within a day, you know, the day that he wouldn't have had to have a fasciectomy. Did that damage, they can argue, was all due the nurses for not, you know, recognizing it or due to Holt. But we're taking about specific nerve injury from this injury. And he's going say all of it was due to that.

THE COURT: What he is telling me that he couldn't allocate.

MS. LUNCEFORD: Just that how much -- you tell him. I can't.

A. The radial nerve injury I was what occurred at the time of the operation. And the other -- the median never, the ulnar nerve, it's difficult to tell whether that occurred at the time of the surgery or that occurred from the ischemia. Nobody can know that, but the radial never, I think, without a doubt, it's out from the site of the injury all of the way down the arm.

THE COURT: And when it comes time for the jury to talk about damages and the various categories, how will -- how will that distinction help them?

MR. HODGES: It won't.

MS. LUNCEFORD: When you look at the medical records and you look at the nerve conduction studies later on, the damage flows from the radial never. That's why he can't --

THE COURT: So his ability to mow the grass is because of radial nerve.

MS. LUNCEFORD: He can't grip. Am I right?

THE WITNESS: That's not my area of expertise.

MR. HODGES: Yeah, that's --

MS. LUNCEFORD: That's not his area.

MR. HODGES: I'll tell you from the brachial plexus cases, that's not correct.

MS. LUNCEFORD: I'm saying is that he -- the reason that no one has a neurologist is because nobody can tell, okay, but with respect to the injury and when it occurred and I'm just saying how much do -- they can't allocate it. There is no doubt that an injury occurred at the time to the nerves and that's what he can testify to.

THE COURT: If I -- if I accept that and let him testify about that, I'm having trouble relating it to anything that the jury can do, because the jury's going to be asked to testify about lost wages that's unrelated to that; lost, you know, the -- ability to do things around the household, and -- let's say that they find it's worth a dollar a day that he can't hammer a nail. I don't know what he's going to be asked to do, but if the experts can't designate what portion of the -- the inability to do that act came from the original surgery versus what the nurses did versus the subsequent surgery, then the testimony hasn't contributed to anything the jury's going to need to say.

MS. LUNCEFORD: I understand it hasn't for damages, but for injury it has. Because he's going testify that there is no way it could haven't been injured at the time, but just because --

THE COURT: But we already resolved that. That doesn't relate to an issue, either, because the because the first and second -- the first question is negligence, if it doesn't relate 'cause nobody's saying Holt's surgery was negligent. The second question is -- is percentage allocations, which are both functions of negligence. And the third one is damage, which is the one that I'm having trouble sorting out because he can't

THE COURT: If I -- if I accept that and let him testify about that, I'm having trouble relating it to anything that the jury can do, because the jury's going to be asked to testify about lost wages that's unrelated to that; lost, you know, the -- ability to do things around the household, and -- let's say that they find it's worth a dollar a day that he can't hammer a nail. I don't know what he's going to be asked to do, but if the experts can't designate what portion of the -- the inability to do that act came from the original surgery versus what the nurses did versus the subsequent surgery, then the testimony hasn't contributed to anything the jury's going to need to say.

MS. LUNCEFORD: I understand it hasn't for damages, but for injury it has. Because he's going testify that there is no way it could haven't been injured at the time, but just because --

THE COURT: But we already resolved that. That doesn't relate to an issue, either, because the because the first and second -- the first question is negligence, if it doesn't relate 'cause nobody's saying Holt's surgery was negligent. The second question is -- is percentage allocations, which are both functions of negligence. And the third one is damage, which is the one that I'm having trouble sorting out because he can't

allocate that particular injury to a particular damage.

MS. LUNCEFORD: 'cause nobody can from that perspective. But I guess I'm trying to get past the -- you're stopping with the surgery is not negligent, the severing of the artery was not negligence. That's something that's a complication. But the rest of the surgery and the reaction he's going to testify about this, and he's said that in his deposition, and in our -- our designation, and they asked him about that.

THE COURT: Okay. So you're going to say Holt was negligent in the surgery.

MS. LUNCEFORD: In response to the excessive bleeding, which is exactly what Dr. Edwards said, too, but he talked about it afterwards.

MR. ASSAD: He's not an orthopedic.

THE COURT: Then what does the nerve damage have to do with the response to the excessive bleeding?

MS. LUNCEFORD: Well, that has to go to what the -- I mean, that has to go to what the damages flows from, but I think if he's testifying that he believes the nerve damage happened because he couldn't feel his arm afterwards and even though he got pink, he couldn't, you know, do certain things, there was no

nerve conduct test to know what was going on. That's absolutely relevant to the jury to know that there isn't a way of figuring that out.

MR. ASSAD: He's not an orthopedic surgeon. He can't testify as to what an orthopedic surgeon should or shouldn't have done at the time when there is excessive bleeding.

THE COURT: I don't see that has anything to do with what I'm worried about, though.

MS. LUNCEFORD: This is the problem because Holt's not -- I mean, it's a problem because Holt's not here, and you've got this big elephant in the room. And if they could tell, they would have gotten a neurologist to be able to testify but --

MR. ASSAD: The reason why there was no neurologist because he's the first doctor in five years that has come up with this theory out of the blue because he got paid $40,000 to come up with it.

THE COURT: You know that doesn't bother me.

MR. ASSAD: I'm saying, we're not getting --

MR. HODGES: We didn't get a neurologist. Come on. We're not the ones saying this.

THE COURT: Not what I'm struggling with.

MS. LUNCEFORD: I think that he's going to testify, and correct me if I'm wrong, Doctor, that that the nerve injury occurred at the time of the original surgery based on these factors. What happened after the surgery, how, you know, he didn't get any feeling back in his hand, and they can cross him on, well, you know, Dr. Martin said he -- it pinked up and all of that. And he can ask him why is that not the case? That's direct contrary testimony -- testimony.

MR. HODGES: Still didn't get over 702, Judge.

MS. LUNCEFORD: I think it does.

MR. HODGES: Does not come close, not even close.

THE COURT: What I'm struggling with is what information it would impart to the jury that they would use. And I've been through out loud the questions that the jury has to answer. And I think I've been through potentials yeses and nos and numbers. And -- and I thought for a while about whether or not it's important to have him in just to damage the credibility of other people, which by itself is okay. It isn't on a point -- it isn't on a point that -- those people are being used for as -- as -- as I sort through it in my head.

*MS. LUNCEFORD:* But, Judge, they all have said Vance, Martin has said the injury occurred at the -- because of the ischemia. And so they're alleging that because of the delay in recognizing the injury and, therefore, the discharge -- the effectuation of the discharge by nurse, that that caused the ischemia to get worse and that caused the injury. Now, certainly we have arguments that Hold could have recognized that, so that's a separate --

*THE COURT:* Okay. So -- maybe you're saying -- maybe you're saying that this injury isn't ischemia and, therefore, the nurses didn't fail to respond to the ischemia because that wasn't the damage.

*MS. LUNCEFORD:* Exactly. That's one of the -- that's one of the things, and that's important for the jury to know.

*MR. ASSAD:* Well, I think it's very clear that the nurses failed to -- with all of the circulation issues that they failed to recognize there was a vascular injury, and he's not going to say there was no vascular injury here.

*THE COURT:* We're back to failure to -- I mean, enable to allocate because -- because now -- now I'm understanding what you've always been saying. I don't want to say now you're saying -- that the nurses'

failure to respond to ischemia is one thing, but the nurses failure to respond to the nerve damage is completely separate. And that is something they didn't fail to do, and this is the source of the damage. But that's the one thing that he's saying he can't allocate.

*MS. LUNCEFORD:* He can't allocate, but he can certainly say that based on reasonable medical probability, that he -- that was a nerve injury that occurred to the radial nerve at the time of the original surgery.

*THE COURT:* I'm not sure you can just raise it and then lay it out there, because at that point if the jury makes any decision based on it, it's not based on the evidence.

*MR. HODGES:* Uh-huh.

*THE COURT:* I think I strike him.

*MS. LUNCEFORD:* Strike him totally? He can't talk about whether a vascular surgeon can come in and he believes -- he talks about standard of care that a vascular -- that any surgeon who encounters counters this much bleeding --

*THE COURT:* Uh-huh.

*MS. LUNCEFORD:* -- his responsibility is to call someone like him to come in and evaluate what the source of the bleeding is.

# TAB 2

## ORIGINAL CLERKS RECORD

**APPELLATE COURT NO.**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
5/22/2014 1:45:27 PM
CHRISTOPHER A. PRINE
Clerk

**CHRISTUS HOSPITAL - ST ELIZABETH**
    **APPELLANT(S)**

**VS.**
                  **TRIAL COURT NO. 2011-01306**

**JAY HOUSTON**
    **APPELLEE(S)**

**FROM THE 55th District Court of Harris County, at Houston, Texas**

HON. JEFF SHADWICK, JUDGE PRESIDING.

Applied for by ERIN E LUNCEFORD on 14TH day of MAY A.D., 2014 and delivered to the **"1ST"** COURT OF APPEALS on the

6TH day of JUNE A.D., 2014.

CHRIS DANIEL
Harris County, District Clerk

By: **/S/ PAT TIPPINS**
PAT TIPPINS, Deputy

Attorney for Appellant:

ERIN E LUNCEFORD
SPROTT RIGBY NEWSOM ROBBINS & LUNCEFORD P C
2211 NORFOLK SUITE 1150
HOUSTON, TEXAS 77098

Attorney for Appellee:

DAVID W HODGES
KENNEDY HODGES LLP
711 WEST ALABAMA STREET
HOUSTON, TEXAS 77006

AP3 R04-30-92

1

Page 22

Q. In the past --

A. It's mid 2000s.

Q. Now, going -- continuing to go through your CV, on page 2, Publications, "Management of Tracheobronchial Injuries - 28 Years Experience, Annals of Thoracic Surgery" --

A. Yes.

Q. -- are you the only author on that case?

A. No.

Q. Are you the primary author on that publication?

A. No.

Q. How many other authors were there?

A. I don't remember how many were listed.

Q. Any of the -- anything in that article apply to the facts in this case or issues in this case?

A. No.

Q. Okay. With respect to your practice, do you have any subspecialty other than cardiothoracic surgery?

A. No.

Q. Just describe your practice. What do you -- what do you mainly do in your practice?

A. Everything in the cardiovascular and thoracic arena. I do heart surgery, I do bypass surgeries, I do vascular surgeries, I do robotic surgeries, I do

Page 23

minimally invasive surgeries, I do endovascular surgeries; and in the past, I've done -- when requested by specific patients, I have done some general surgery procedures, but not very often. I pretty much limit myself to the cardiovascular and thoracic arena.

Q. Is there a difference between a cardiovascular surgeon and a vascular surgeon?

A. Yes.

Q. What are the differences?

A. A vascular surgeon cannot operate on the heart, is not specialized in operating on the heart. I shouldn't say cannot, but he's...

Q. So would a vascular surgeon, be fair to say, deals with everything vascular besides the heart?

A. Not everything. There's the aorta that's attached to the heart. The proximal aorta and the arch vessels. Usually that's a cardiovascular surgeon that deals with that. The vessels beyond that level, a vascular surgeon may tackle.

Q. Okay.

(Cell phone interruption.)

MS. LUNCEFORD: Do you want to take that?

THE WITNESS: Sorry.

MS. LUNCEFORD: That's okay.

Page 24

THE WITNESS: Just make sure it's -- the nurse from the hospital is texting me. Sorry.

MS. LUNCEFORD: That's okay. If you need to take a break, just let us know.

THE WITNESS: I'll see. I mean, she was asking if I was at the hospital and I told her I'm not. See what she responds.

MS. LUNCEFORD: Okay.

(Discussion off the record.)

Q. (By Mr. Assaad) What percentage of your surgeries that you perform are outside the heart, aorta and the main vessels?

A. My practice, I would divide it 30 percent, 30 percent, 30 percent. 30 percent cardiac, 30 percent vascular, 30 percent thoracic.

(Cell phone interruption.)

THE WITNESS: I have to take this call. Sorry.

(Discussion off the record.)

Q. (By Mr. Assaad) We're going back as to the breakdown of your practice --

A. Yes.

Q. -- which we only ended up to 90 percent. So you said 30 percent cardio, 30 percent vascular, and 30 percent thoracic?

Page 25

A. I guess you can say a third, a third, a third.

Q. Okay. Let's describe -- let's discuss the 30 percent that's vascular. When you refer to a third of your practice being vascular, what are you referring to? Like, what type of surgeries do you do?

A. The majority are carotid endarterectomies, bypasses to the lower extremities, femoral popliteal bypasses and aortic aneurysm repairs, as well as vein -- varicose vein issues.

Q. Have you ever performed the surgery that Dr. Martin performed in this case?

A. No.

Q. What type of surgery did he perform?

A. He did a bypass from the axillary artery to the brachial artery, which is extremely rare.

Q. Why is it extremely rare?

A. Because the only time you really do it is for injuries to the axillary artery, and you don't see those.

Q. In your practice, do you perform any surgery or have you ever performed any surgery that involved the axillary artery?

A. By "involve," what exactly do you mean?

Q. Besides moving it out of the way, actual

7 (Pages 22 to 25)

Magna Legal Services

183

Page 26

manipulation or any type of -- anything with the axillary artery. I mean, you've been thinking about it a long time, so...

A. Yeah. Well, no.

Q. Hypothetically speaking, if Mr. Houston was presented to you, would you have performed -- are you comfortable performing the surgery that Dr. Martin performed or would you refer it to a vascular surgeon?

A. I am a vascular surgeon. Yes, I would do it.

Q. Is there anything a vascular surgeon -- I don't want to use the word "can do," but is more of his -- in his practice that's not involved or that a cardiovascular surgeon, is not within the realm of his practice?

A. No. It -- would you like me to elaborate?

Q. Sure.

A. Okay. It used to be that cardiovascular surgeons were the only vascular surgeons, and it was not till recent that this new division of vascular surgeons. So it was always -- in previous times, the heart surgeon was always the vascular surgeon. It's only till the last few years that you have, quote/unquote, just vascular surgeons that don't do any cardiac surgery.

Q. Is there a difference in the training?

Page 27

A. Yes. The vascular surgeons don't -- don't get any training in cardiac.

Q. When you say "the last few years," what, five years?

A. Yeah. Within the last five to ten years, that has developed.

Q. Are there any vascular surgeons at Methodist West Houston Hospital?

A. Yes. Me and -- me, Dr. Lafuente, who's a cardiovascular surgeon as well, and Dr. Olson, who's a cardiovascular surgeon as well.

Q. Besides the cardiothoracic surgeon or any vascular --

A. No.

Q. -- non-cardiovascular surgeons?

A. Non-cardiovascular surgeons, no. They are -- we're the -- well, I -- okay. On staff, I can't speak to that. I think there are vascular surgeons on staff. But Dr. Olson, Dr. Lafuente and doctor myself do greater than 95 percent of all the vascular cases that are done at Methodist West Houston.

Q. Going down to your lectures, any of those lectures deal with any of the issues in this case or are relevant to issues in this case?

A. No.

Page 28

Q. Do you have any -- you're not a neurologist, correct?

A. No.

Q. Do you hold yourself out as an expert in neurology?

A. No.

Q. And you're not an orthopod, correct?

A. Correct.

Q. And you don't hold yourself out as an expert in orthopedic surgery, correct?

A. No.

Q. In reviewing the medical records and depositions in this case, did you make any notes besides notes that I've seen in the records themselves?

A. Just the markings in the records that you've seen.

Q. No hand notes, written notes?

A. No.

Q. Any e-mails to Ms. Lunceford about your thoughts?

A. I don't -- no.

MS. ASSAAD: Shaking your head.

A. No.

MS. LUNCEFORD: No, I was thinking of -- making sure that I was --

Page 29

A. No.

MS. LUNCEFORD: -- that I had produced them, if I had any of that.

A. No. No, we didn't -- the only communication -- no. There was...

Q. (By Mr. Assaad) Well, you mentioned there was an e-mail that you received from Ms. Lunceford in the beginning of this case.

A. Right.

Q. Okay.

A. Asking me to -- if I would review the case.

Q. Any other e-mails besides that one?

A. Between her and I?

Q. Uh-huh.

A. Yes, I believe.

Q. How many e-mails?

A. Three or four, I think; but I don't know.

Q. Do you still have copies of those e-mails on your computer?

A. I don't know.

MS. LUNCEFORD: You can go down and look at them. If I have them, I'll give them to you.

Q. (By Mr. Assaad) And prior to today, have you met with Ms. Lunceford or anyone at her office?

A. Yes.

8 (Pages 26 to 29)

Page 30

Q. When?

A. I met with Ms. Lunceford last week.

Q. For how long?

A. For an hour.

Q. Did you go over the medical records together?

A. We talked about the case.

Q. Did you go over the medical records when you talked about the case?

A. I don't believe we had medical records with us.

Q. Okay. Any deposition testimony in front of you?

A. She handed me the depositions of a couple of doctors that she wanted me to review.

Q. Besides last week meeting for an hour with Ms. Lunceford or anyone at her office, did you ever meet with Ms. Lunceford prior to last week?

A. No.

Q. Any phone conversations?

A. Yes.

Q. How many?

A. I don't remember exactly, but I think it was one.

Q. Do you recall when?

A. No.

Page 31

Q. Do you recall the substance of that phone conversation?

A. This case.

Q. Anything specific?

A. No.

Q. Do you recall how long the phone conversation was?

A. Maybe 20 minutes.

Q. Did you meet with Ms. Lunceford prior to beginning this deposition?

A. Yes.

Q. For how long? What time did you arrive here today?

A. I don't remember the exact time I arrived here. I met her maybe three or four minutes before we started this deposition.

Q. So it would be fair to say you arrived here after 9:45 a.m.?

A. Yes. Yes. I think I was -- it was after 10:00. I think I arrived a few minutes after 10:00. I'm sorry about that.

MR. ASSAAD: Ask you mark this Exhibit 2.

(Gomez Exhibit No. 2 marked.)

Q. (By Mr. Assaad) Doctor, what's been marked as

Page 32

Exhibit 2 is plaintiff's amended notice of your oral deposition with a subpoena duces tecum. Have you seen this document before?

A. No. Not that I recall, I should say.

Q. Have you kept all the documents that you received in this case?

A. I believe so.

Q. Did you bring them here with you today?

A. Yes.

Q. Okay. Doctor, if you look at page 3, there was a request for numerous documents to be produced here today. But before we go through that request, I just want to go over what you have reviewed in this case, in formulating your opinions in this case. What have you reviewed?

A. Everything that's in front of you.

Q. So you reviewed the Christus St. John medical records?

A. I mean --

Q. Feel free to --

A. Yeah. Yes, the medical records of Christus St. John.

Q. What else?

A. The Plaintiff's Original Petition, the medical records of Southwest Orthopedic Group, Dr. Jeffery

Page 33

Brudoff, the medical records of Gordon Martin, the medical records of Fairmont Diagnostic Center & Open MRI, the statement written by Dr. Holt during mediation, reports of plaintiff's expert Raymond Vance, the deposition of Jay Houston, the deposition of Rae Houston, the deposition of Jacqueline Stringfellow, L.V.N., the deposition of Sherry Schumacher, R.N., the deposition of Joahnna Songer Budge, R.N., the deposition of Raymond Vance, the deposition of Thomas Edwards, M.D., and the deposition of Marston Holt, M.D.

Q. Thank you, Doctor. Is that everything that you reviewed in this case?

A. Yes.

Q. Have you done any literature search or review?

A. No.

Q. Are you relying on any literature or peer-reviewed articles to support your opinions here today?

A. That I have reviewed recently, no.

Q. That you reviewed at any time?

A. In my career? I'm -- literature that I have read in the past will help me formulate the opinions I have now.

Q. Can you list the literature that will support your opinions here today?

Page 34

A. No.

Q. Or any peer reviewed articles?

A. No, I can't. I don't remember.

Q. Okay. If you look at item No. 6 on the subpoena duces tecum, it says the witness is instructed to bring with him the following: "A copy of, or in the alternative, a bibliography of each and every article, item or page of literature, regulation, statute, textbook page or other reliable authority upon which the Deponent relied or to which the Deponent has referred to in forming any of the expert opinions expressed or to be expressed by said Deponent."

I take it you didn't bring anything here today responsive to item No. 6, correct?

A. No.

Q. And that is because you're not going to rely on any specific literature or textbook or document to support your opinions here today?

A. That I brought, no.

Q. Or that you could...

MS. LUNCEFORD: We did provide you this.

Q. (By Mr. Assaad) Or that you could refer to with a specific...

A. Well, anatomy text.

Q. Okay. Besides that, is there anything you

Page 35

will be able to refer me to today that's going to support your opinions, such as an article, textbook or anything like that?

A. I don't know until you ask me the question.

Q. But until today...

A. As far as I know, no.

Q. Okay.

MR. ASSAAD: I'd like to mark this as Exhibit 3.

(Gomez Exhibit No. 3 marked.)

Q. (By Mr. Assaad) What's been marked as Exhibit 3 is a letter from Ms. Lunceford to you, dated March 14, 2012, providing you -- I guess, attaching the medical records; is that correct? That's what Exhibit 3 is?

A. Yes.

Q. Is that the first time you received the medical records to review in this case?

A. I believe this was the first time.

Q. Okay. You didn't review any medical records prior to March 14, 2012?

A. I don't believe so.

Q. Okay.

MR. ASSAAD: Mark this as Exhibit No. 4.

(Gomez Exhibit No. 4 marked.)

Q. (By Mr. Assaad) Doctor, what I've marked

Page 36

Exhibit 4, can you please describe what that is?

A. That is my bill for reviewing the -- I believe the previous exhibit you showed me.

Q. So that's your bill for doing the medical records that are listed in Exhibit 3, correct?

A. Correct.

Q. Okay. Prior to June 27th -- and just to be clear -- strike that -- you spent 18 hours reviewing those documents?

A. Yes.

Q. Okay. And your bill is for $9,000?

A. Yes.

Q. Prior to June 27, 2012, did you have any conversations with Ms. Lunceford or anybody at her office regarding your opinions regarding what you reviewed in medical records?

A. Yeah. I believe we talked before then, yes.

Q. Regarding your opinions?

A. No. I mean, regarding the case.

Q. Okay. Would you have put that in your invoice, the time you spent speaking with Ms. Lunceford?

A. We -- not always, no.

Q. Do you see Ms. Lunceford outside of -- on a social basis, like mutual friends?

A. No.

Page 37

Q. Okay. I understand there's someone used to work here, Ms. Hirsch?

A. Uh-huh.

Q. Do you guys -- like the same jogging group together or same -- work out at the same gym together?

A. No.

Q. Okay. And the reason I ask, I didn't mean to be funny in any way, but the last expert, they worked out together. They had the same class together at the Y. So that's -- so it's not that out there. So...

When did you first inform Ms. Lunceford that -- that you're willing to -- strike that.

Would it be fair to say that you like to review cases and the medical records before you decide whether or not you will be an expert on behalf of a party?

A. No. I mean, if a lawyer asks me to review a case and I have time in my practice to do it and to give my opinion of what the case is, then I will consider it and tell them my charges and -- and then I will -- once he gives me the material, I will tell them what my thoughts on the case are.

Q. Okay. So you agree with me that you're not going to agree to be an advocate for one side or the other until you review the records?

Magna Legal Services

Page 38

A. I'm not an advocate for one side or the other. I'm --

Q. Okay.

A. I give you what my thoughts are on this opinion. I'm not for the plaintiffs, I'm not for the defendants.

Q. Okay. But in this case, you're being paid by the defendant. Correct?

A. Yes, to give my opinion.

Q. Okay.

A. But if you want to pay me for my opinion, I'll -- sure. No problem.

Q. If I pay you, will it change your opinion?

A. No.

Q. So you agree that when you review a case, you should be unbiased. Correct?

A. Correct.

Q. Should be fair and impartial?

A. Correct.

Q. And you should not advocate for either side?

A. Correct.

Q. You should rely on the facts. Correct?

A. Correct.

Q. And should not imply or assume any facts?

A. Okay.

Page 39

Q. You agree with that or disagree with that?

A. I agree. You can't assume facts, no.

Q. And you agree with me that in a medical malpractice case, you should rely on the medical records and the sworn testimony?

A. Yes. But I am a physician, so I know the workings of a hospital. And even though documents only provide one story of what has occurred, there's many things that occur that aren't in the documents. So as a doctor, I can give you opinions of what is -- what usually happens in a -- in taking care of a patient that's not necessarily reflected in the documents.

Q. Okay.

A. That's what I'm saying, that, to form an opinion, you don't just rely on the documentation.

Q. So to form an opinion, you don't rely on the documentation or the sworn --

A. You don't only, only --

Q. Okay. You don't only --

A. -- refer to the documentation.

Q. So just to be fair, you rely on the documentation. Correct?

A. Correct.

Q. You rely on sworn testimony, such as deposition testimony?

Page 40

A. Correct.

Q. And how would you want to describe the third factor, the -- how would you want to describe that?

A. My experience in working in a hospital as a physician.

Q. Your experience?

A. Yes.

Q. Of working in a hospital? Okay.

And in reviewing a case, you agree that you should be objective?

A. Correct.

Q. And you must take into consideration all the relevant data that you have?

A. Correct.

Q. And do you agree that you should have evaluate the case objectively and not let your opinions be prejudiced by the end result?

A. Correct.

Q. Going back to the five cases or handful of cases that you've done -- that you reviewed, have you ever informed the party requesting for you to review the case that you can't support their position?

A. Yes. I mean, I give -- I can't remember a specific case, but when they give me the information and I review it and I give my opinion, sometimes it's not...

Page 41

Q. What they want to hear?

A. What they want to hear, yes. That's happened before.

Q. Do you know if that was for the plaintiff or the defendant?

A. I can't remember, but...

Q. Can you remember one case that you -- that you were requested to review on behalf of a plaintiff?

A. I remember the lawyer who asked me to re --

Q. Who's the lawyer?

A. Why am I having a hard time remembering names? Well, I mean, my brother is a plaintiff's attorney, Jorge Gomez.

Q. Your brother's a plaintiff's attorney?

A. Yes.

Q. Where?

A. Here, in Houston. And I've --

Q. What's the name of his practice?

A. Gomez Law Firm. And I know I reviewed a case for him and I reviewed a case for one of his friends who is also a plaintiff's attorney. And I'm blanking on his name. I'm sorry.

Q. The case reviewed for your brother, did you find -- I take it he's a plaintiff's attorney, so he was asking you if there was a deviation of standard of care?

Page 42

A. I don't remember the specifics, but I -- most likely you're correct.

Q. Did you decide to be an expert on the case or did he ask you to be an expert on the case?

A. No.

Q. Did he keep the case?

A. I don't -- I don't remember, but I don't think so.

Q. Okay. And his friend, the other plaintiff's attorney?

A. Will Adams. Will Adams. Will Adams.

Q. When you reviewed the case, did you find anything in those medical records that was a deviation of standard of care?

A. I believe the case that Will asked me to review I told him I didn't think there was a deviation.

Q. Did you ever talk to your brother about this case?

A. No.

Q. Have you talked to anyone besides Ms. Lunceford about the facts in this case?

A. No.

Q. When asked to review this case by Ms. Lunceford, were you asked to focus on any certain area?

Page 43

A. No.

Q. Okay.

A. She just gave me the records and asked for my opinion.

Q. With respect to what?

A. What I thought about the case.

Q. Okay. She didn't ask you to see whether or not Dr. Holt deviated from the standard of care or any of the nurses deviated from the standard of care?

A. She did not point me in any -- she didn't say anything. She said just review the case and tell me what you think.

Q. Okay.

MR. ASSAAD: Mark this as Exhibit 5.

(Gomez Exhibit No. 5 marked.)

Q. (By Mr. Assaad) Doctor, what's Exhibit No. 5?

A. That's my bill for reviewing those depositions.

Q. Okay. And that's for the four depositions of Nurse Songer Budge, Dr. Vance, Dr. Holt and Dr. Edwards?

A. Correct.

Q. Okay. And it took you 12 hours to review those depositions?

A. Yes.

Q. Okay. $6,000?

Page 44

A. Yes.

Q. Going back, when did you make your highlights and marks in the medical records of Christus St. John's? Was that prior to your invoice of June 27th or after?

A. No. Prior.

Q. Prior. Okay.

MR. ASSAAD: Mark this as Exhibit 6.

(Gomez Exhibit No. 6 marked.)

Q. (By Mr. Assaad) Doctor, I've marked an invoice dated -- marked as Exhibit 6 an invoice. Can you please describe what this invoice is?

MS. LUNCEFORD: Check.

Q. (By Mr. Assaad) Or check, I'm sorry.

A. This is a check. It's kind of smeared. I think I know what it is, but it's a check for the predeposition meeting and the deposition.

Q. Okay. That's for $5,750?

A. Correct.

Q. Okay. 2103 Water Canyon Court, is that your home address?

A. Correct.

Q. Are there any other invoices that you have tendered in this case to Ms. Lunceford that we haven't covered so far?

Page 45

A. No. This is it so far.

Q. Have you reviewed the medical records of Christus St. John since June 27, 2012?

A. I looked at them briefly last night, but not...

Q. Okay.

A. I just skimmed through it real quick.

Q. For how long?

A. Probably less than an hour.

Q. Are you going to bill for that time?

A. I wasn't. Do I have to say? I don't know. I won't -- probably not.

Q. Did you make any notes or comments regarding the depositions when you read them? Anything in the depositions, any ...

A. I made -- yeah, in some -- in some of the records I made notes. Not all of them, but some of them I did.

Q. In the depositions?

A. I don't remember in which ones I made notes.

Q. Okay.

A. In the -- you skimmed them earlier, so you can tell where I made notes and where I didn't.

Q. With respect to the depositions of plaintiff's experts, is there anything, sitting here today, that you

12 (Pages 42 to 45)

Page 46

disagreed with when you reviewed them?

A. You're going to have to be more specific. You're going to have to remind me exactly what comments I might have agreed with or disagreed with.

Q. Well, is there anything that you wrote down or anything that you highlighted that you disagreed with?

A. I don't remember.

Q. Okay. So sitting here today, you don't recall or you don't remember anything that you may have read in the deposition testimony of plaintiff's experts that you specifically disagree with?

MS. LUNCEFORD: Objection, form. You can answer.

A. I did not mark all the things I may have disagreed with or --

Q. (By Mr. Assaad) Okay.

A. -- or agreed with. I didn't -- I didn't do that. I didn't...

Q. Do you disagree that the nurses in this case were negligent?

MS. LUNCEFORD: Objection, form.

A. Do I disagree with -- repeat the question.

Q. (By Mr. Assaad) Okay. Do you disagree with any of the opinions that plaintiff's expert nurse Songer gave in her deposition regarding the nursing care in

Page 47

this case?

MS. LUNCEFORD: Objection, form.

A. I have -- you're going -- you're going to have to be more specific because I get the Nurse Stringfellow confused with Songer, what each of them --

Q. (By Mr. Assaad) Would you like --

A. -- said. So, if you're not -- give me a specific statement and I will tell you if I agreed with it.

Q. Okay. Well, just to clarify. Plaintiff's expert is Nurse Songer.

A. Okay.

Q. Nurse Schumacher is the one that made the Kevorkian comment.

A. Okay.

Q. Does that help you out?

A. Yes.

Q. Nurse Stellar is the one that was the first nurse that received this patient on the floor?

A. Right.

Q. Fair enough? You agree with that?

MS. LUNCEFORD: Objection, form.

A. I don't remember.

Q. (By Mr. Assaad) Oh, you don't remember?

A. No.

Page 48

Q. Okay.

A. Show me on the medical -- in the depositions and medical records and I'll tell you.

Q. Show you that Nurse Stellar worked on the floor -- received Mr. Houston on the floor? I mean, I don't understand your question. What do you want me to show you?

A. If you're saying that that was the nurse that received him on the floor, I will take your word for it.

Q. Okay.

A. There was multiple patient -- multiple nurses that took care of Mr. Houston, and many of their signatures I couldn't read their names. So...

Q. Okay. Are you going to testify or offer the opinion that the nurses at Christus St. John complied with the standard of care?

A. I'm not an expert on the standard of care for nurses.

Q. Okay. So you're not going to offer any standard of care opinions regarding the nursing care in this case?

A. I'm not an expert in the standard of care for nursing.

Q. So can you answer my question? You are not

Page 49

going to offer any opinions regarding the standard of care of the nurses in this case? Is that a correct statement?

MS. LUNCEFORD: We will stipulate to that.

A. Okay.

Q. (By Mr. Assaad) Are you going to offer any opinions regarding the orthopedic care of Dr. Holt in this case?

A. In how he handled the vascular injury, I would say yes.

Q. Okay. Would it be fair to say that you're not going to offer any opinions regarding the orthopedic care that Mr. Houston received from Dr. Holt in this case?

MS. LUNCEFORD: Objection, form.

A. I'm not an expert in orthopedics.

Q. (By Mr. Assaad) Okay.

MS. LUNCEFORD: When you get to a point, I have to go to the bathroom.

MR. ASSAAD: Why don't we take a break now then.

(Brief recess.)

Q. (By Mr. Assaad) Doctor, if you could, just summarize what your opinions are going to be in this

13 (Pages 46 to 49)

Page 50

case that you formulated.

A. I think Dr. Holt, during his surgery, had a major injury to the axillary artery. I don't think it was small. It was a major laceration or major partial transection of the axillary artery during his surgery. And from that point on, the patient had a axillary artery that was injured and thrombosed, clotted; and I believe at the time of the axillary artery injury, he most likely injured major nerves to the arm, 'cause where the injury occurred, it's almost virtually impossible to damage the artery without damaging multiple nerves.

Q. Any other opinions?

A. That's -- that's my opinion of what occurred on this case.

Q. With respect to the permanent injuries that Mr. Houston has presently, you agree that they're due to nerve damage, correct?

A. Yes.

Q. Okay. Is it your opinion that the nerve damage was caused by a nerve injury during the surgery or --

A. Most likely during the surgery.

Q. -- or as ischemic injury as a result of poor blood flow to the nerves or a compression because of

Page 51

blood?

A. My opinion is that it was injury -- when the axillary artery was injured, multiple nerves were injured.

Q. So was the nerve injury reversible at any time?

A. I don't think so.

Q. Okay.

A. But we'll never know for sure.

Q. Well, let's preface this, just going forward, can I ask you that all the opinions that you proffer today or formulate are made with a reasonable degree of medical probability?

A. Yes.

Q. Okay. What is your definition of the standard of care?

A. It's what a reasonable and prudent surgeon would do in a -- physician would do in this situation.

Q. Okay. Before we discuss your opinions, I just want to kind of eliminate other areas we could discuss, just so I know where you stand on these issues.

With respect to the timing of the repair of the axillary artery, do you have an opinion whether or not it would have made a difference if it was done on January 8, 2009 or January 12, 2009 with respect to the

Page 52

permanent damage sustained by Mr. Houston?

MS. LUNCEFORD: Objection, form.

A. I mean, I think it would have made a difference to repair it earlier. Yes.

Q. (By Mr. Assaad) What would have been the change if it was repaired earlier in Mr. Houston's condition?

A. I mean, he had ischemic changes to his hand. He lost some skin, he lost -- you know. And how much muscle he lost, I'm not sure. I mean, I didn't examine Mr. Houston, so it's hard to tell completely. But I think skin and muscle injuries would have been less.

Q. Okay. Are any of those skin and muscle injuries he sustained permanent?

A. I'm not a hand expert or a muscle expert, but some of the contractures and so forth that I think he has now are possibly due to those muscle injuries.

Q. Okay. Well, let's take it from this point of view: Based on your review of the medical records, what is your understanding of Mr. Houston's injuries?

A. He has a non-functioning left upper extremity.

Q. Non-functioning left upper extremity. Anything else?

A. That's my understanding.

Page 53

Q. Any injuries to his -- is the left upper extremity, is it a nerve injury, a muscle injury?

A. Both.

Q. Both?

A. Both.

Q. Any other injuries besides the left upper extremity injury?

A. Well, they had to take vein from his leg to repair the artery, so he has that scar. But I think that's -- as far as to my knowledge, I think that's it.

Q. Any injuries to his nerves in his hand?

MS. LUNCEFORD: Objection, form.

A. Left upper extremity includes the hand.

Q. (By Mr. Assaad) Okay.

A. It's the entire extremity.

Q. Okay. Can you pinpoint exactly where the nerve injury is in his left upper extremity?

A. It was the artery, the nerves surrounding the axillary artery.

Q. Do you know which nerve?

A. There's multiple nerves there. There's the ulnar nerve, the median nerve, the musculocutaneous nerve. Without examining him, it's hard for me to tell how many of those were injured.

Q. So sitting here today, can you identify which

14 (Pages 50 to 53)

Page 54

nerves were injured during the surgery performed by Dr. Holt on January 8, 2009?

A. I mean, the ulnar nerve for sure was injured.

Q. Any other nerves?

A. Without examining him, it's -- it's hard to know.

Q. Sitting here today, can you offer an opinion, within a reasonable degree of medical probability, as to which nerves were injured on January 8, 2009 during the surgery of Dr. Holt?

A. I believe the median nerve, the ulnar nerve, the musculocutaneous nerves were injured.

Q. And what is the basis behind your opinion regarding that the ulnar nerve was injured?

A. His hand. He never had any function in his hand from the time of the surgery on.

Q. Did the block have anything to do with his lack of function in his hand after surgery?

A. In median -- interscalene blocks usually last eight to twelve hours max. He still had a non-functioning left upper extremity the following day.

Q. Do you have an opinion, within a reasonable degree of medical probability, how long it takes for a nerve to become injured if it's not receiving any blood?

A. I would say it's usually -- six hours is

Page 55

usually the time frame.

Q. So would you agree with me, Doctor, that if the axillary artery thrombosed and there was no blood flow, that the nerves that the artery was providing blood to, within six hours, would be damaged?

MS. LUNCEFORD: Objection, form.

A. Yes. If the axillary artery was the only artery supplying blood to those nerves, then those nerves would be damaged.

Q. (By Mr. Assaad) Okay. What nerves does the axillary artery provide blood to?

A. The axillary artery is a major branch of the left upper extremity, so it provides blood flow to all the arteries of that extremity.

Q. And nerves?

A. Excuse me, nerves. All the nerves to that extremity the axillary artery provides blood flow to.

Q. Okay. So you would agree with me, Doctor, that if the axillary artery was blocked by a thrombosis or a clot, same thing, that there would be a major reduction in blood flow to the nerves from the point of the blockage or the thrombosis in the axillary artery down to the left extremity?

A. Yes.

Q. Okay. And within six hours, that there would

Page 56

be nerve damage as a result of a thrombosis and a lack of blood in the axillary artery causing a lack of blood flow down to the nerves of the left extremity?

A. The problem is -- I mean, there's other small collateral blood vessels, arteries that supply blood to the proximal arm. The axillary artery supplies all the blood flow to the distal part of the arm, so you could have a thrombosis here (indicating) and nerves around that artery would not be damaged except the nerves distal in the hand would be damaged. Do you understand that?

Q. Yes.

A. So...

Q. So it's your opinion today that if there is a blockage in the axillary artery, that there's enough blood flow going to the nerves around the shoulder area to supply enough oxygen and enough --

A. Yeah. The brachial plexus nerves would still be intact.

Q. And no damage to them at all?

A. Right.

Q. No matter how long that block was?

A. Right.

Q. Do you have any literature to support that opinion?

Page 57

A. No.

Q. Do you have any textbook to support that opinion?

A. No.

Q. Okay. Have you attended any lecture or seminar that you could point to that supports that opinion?

A. Just my medical knowledge.

Q. With regard to the ulnar nerve injury, can you point to me anything in the medical records that supports that opinion? Feel free to look in the medical records.

A. Okay. The Michael Vennix, M.D. --

Q. Is there a Bates number at the bottom of the page?

MS. LUNCEFORD: At the bottom of the page. That's from somebody else. It's not from -- Southwest Orthopedic Group records.

A. He suffered a brachial plexus injury. So like I was saying, all the nerves to the extremity were injured and he did -- I assume this Dr. Vennix is a -- either a neurologist or a physical medicine doctor, and he did nerve conduction studies and electrodiagnostic findings consistent with a left brachial plexus injury, which is an injury high in the arm; and moderately

15 (Pages 54 to 57)

Page 58

severe.

There are abnormalities seen throughout most of the brachial plexus. Radial nerve distribution greater than median and ulnar nerve distribution, greater than axillary musculocutaneous nerve distribution, greater than suprascapular nerve distribution.

In regards of the median and ulnar nerve distribution, there are findings of ongoing denervation with evidence of partial axonal continuity seen to both nerve distributions.

The radial nerve -- I'm sorry. I guess it was the radial nerve that had the majority of the injury. It shows it has active denervation of the radial. So...

Q. What is the radial nerve control?

A. I'm not an orthopedic surgeon. So I mean, you will need to ask an orthopedics.

Q. Or a neurologist?

A. Or a neurologist, yes.

Q. What's the date of that?

A. That is May 27, 2009.

Q. So five months or five months after the surgery, correct?

A. Five months after the surgery.

Page 59

Q. Is there anything in Christus St. John medical records at the time of the surgery, the first admission or the second admission on January 12, 2009, that you could point to that indicated that there was an injury to the nerves during the operation?

A. Like I said, he had an interscalene block, which only lasts usually 8 to 12 hours in the majority of the patients. It's highly unusual for the block to last longer than that; and longer than 24 hours, it's virtually unheard of. But -- and if -- he had a nonfunctioning arm at the time of discharge, according to many of the nurse's notes, and they were saying it was from the scalene block, but I believe it was from the nerve injury.

Q. Doctor, I agree with you that there's a nerve injury here. I think there's no dispute about that in this case.

What I'm trying to ascertain is, what is your basis that you rely on to formulate the opinion that the nerve was -- the nerves were injured during the operation by Dr. Holt on January 8, 2012?

A. Where the artery was injured, where the laceration occurred, if you look at the anatomy textbooks, it's surrounded by the nerves. It's almost impossible to damage that artery without damaging the

Page 60

nerves at the same time. And -- because he never regained any function to that arm since the time he was operated.

Q. Okay.

A. If the nerves were intact, he would have regained some function.

MR. ASSAAD: Let's mark this as Exhibit 7.

(Gomez Exhibit No. 7 marked.)

Q. (By Mr. Assaad) Doctor, what is Exhibit 7?

A. That's an anterior view of the axilla from an anatomy textbook, Netter's Anatomy Textbook.

Q. With your pen, can you mark the area in which the axillary artery was injured?

A. On this?

Q. Yes.

A. (Indicating)

Q. And I take it you circled the area which you believe --

A. Approximately, yeah.

Q. You're not saying the injury was that large, are you?

A. Well, he -- the injury was large. How extensive, I don't know.

Q. Let's talk about that. What's your support

Page 61

that the injury was large?

A. If the injury was small, you would not -- you would repair the injury because it's small. You wouldn't do a bypass on a small injury. You would repair the artery and be done with it. You'd take out the clot, stitch the tiny hole up and be done with it. But that wasn't the case. They couldn't. He did an endovascular procedure.

If it was a small injury, he would have been able to endovascularly repair it, which Dr. Martin tried to do. But all his catheters, all his guide wires, as soon as he tried to pass it down the artery, it just went into space because there was a large hole or tear or transection of the artery.

Q. When you say "a large," how large are we talking about here?

A. I mean, large enough that Dr. Martin felt that it couldn't be repaired and that he had to do a bypass.

Q. When you say "large enough," are we talking an inch, two inches, a centimeter?

A. It's hard to know. It's hard to know.

Q. Are you aware of any -- strike that.

I'm just trying to figure out what your definition of "large" is.

Do you recall how long the thrombosis

16 (Pages 58 to 61)

Page 62

was.

A. Here's the definition. The --

Q. Go on.

A. The laceration was large enough -- the transection or the damage to the artery was large enough that Dr. Martin felt it could not be repaired and that he had to do a bypass. That's a -- that's a significant injury to the artery.

Q. Okay. Well, I'm not a vascular surgeon, so explain to me, a layman, I mean, is a 2-millimeter laceration large?

A. No.

Q. Okay. Is a 5-millimeter laceration large?

A. It depends on the size of the vessel.

Q. How large is the axillary artery?

A. The axillary artery is probably usually in the range of a centimeter in diameter.

Q. Centimeter in diameter?

A. Centimeter to a centimeter and a half, yes.

Q. Okay.

A. But I mean, it also depends -- it depends on the size of the patient, the size of the person. So I mean, it varies; but on average, for an average person, yeah.

Q. Okay. Now, was the laceration across the --

Page 63

was it a lateral laceration or was it up and down?

A. No one knows.

Q. Okay. Do you know whether the vessel, the artery, the axillary artery was still connected or was it completely lacerated?

A. No one knows.

Q. Okay. The fact that it stopped bleeding during the surgery by Dr. Holt, was that indicative of anything?

A. Not really.

Q. Okay.

A. You can -- like, you can have a major injury and it stops the bleeding. If you compress on an artery long enough, it will stop, it will clot.

Q. Okay. Do you recall in Dr. Holt's operative report whether or not he pressed on the artery to stop it from bleeding?

A. He did. He said he held pressure and he gave a bunch of coagulants, thrombin, into the -- which is a -- something that forms clots, into the wound. And he said he held pressure, and that once he stopped, then it -- there was no more bleeding.

Q. In your practice have you ever seen an injury to the axillary nerve and no injury to -- or axillary artery and see no injury to the brachial plexus?

Page 64

A. I have not seen that.

Q. Okay. How many times have you seen an injury to the axillary artery?

A. I have never seen an injury to the axillary artery.

Q. Even in med school or residency?

A. Never. I mean, it's extremely rare. And I practiced at a hospital with multiple orthopedic surgeons doing lots of shoulder surgeries. And they have called me for other injuries they have had but never for a -- not in a shoulder surgery. But in knee replacements and so forth they have damaged arteries in the leg and we have had to repair them. But never been called for an axillary artery injury.

Q. Never in a trauma situation, broken bones?

A. No.

Q. Car accident?

A. That's where you see it more often, but I haven't had to deal with that injury.

Q. Okay. And you mentioned that even with an injury to the axillary artery where there was no blood flow, that there is enough blood flow around the brachial plexus to supply enough of the requirements for the nerves that they need from the blood; is that correct?

Page 65

A. Yes.

Q. However, not at the distal part of the -- like the hand?

A. Correct.

Q. Okay.

A. Forearm and hand.

Q. Okay. How far down will that, I guess, supplemental blood flow?

A. It varies from person to person, you know, but...

Q. Past their elbow?

A. No. No. It would be proximal to the elbow.

Q. Okay. There has to be some blood passing through the forearm and the hand, correct?

A. It all comes from the axillary artery.

Q. All of it?

A. All of it. From the forearm, the hand, all of it comes from the axillary artery.

Q. Nowhere else?

A. Correct.

Q. So you agree with me that post-surgery there was still blood flow coming down to the hands?

A. Yes. I mean, there was some blood flow, yes.

Q. Where did it come from?

A. Through the capillaries.

17 (Pages 62 to 65)

**Page 66**

Q. The capillaries?

A. Yeah, through the capillaries. Through small collateral branches.

Q. Capillaries are pretty small, aren't they?

A. Yes.

Q. Tiny?

A. They are tiny.

Q. So it's your opinion today within a reasonable degree of medical probability that the blood flow to Mr. Houston's hand post-surgery on January 8, 2012 came from capillaries?

A. Yeah. But he -- he would have -- if it wouldn't have been repaired on Monday and it had waited a little bit longer, that hand would have turned black and would have been dead. He was able to survive several days with that amount, minimal amount of blood flow; but the arm wouldn't have survived forever on that amount of blood flow.

Q. If you had blood flow to the hand that was supported -- that came basically only from capillaries, what would the capillary refill be in the fingers?

A. Delayed.

Q. How delayed?

A. I mean, it wouldn't be normal. Over four seconds.

**Page 67**

Q. Would it be over eight seconds?

A. Possibly.

Q. Over ten seconds?

A. Possibly.

Q. Just so I understand it 100 percent, it's your testimony that blood flow to the hands when the axillary artery is blocked comes from the capillaries all the way -- capillaries from the shoulder area all the way down to the hands?

A. And small branches.

Q. What small branches?

A. That don't have names. I mean, they're small branches. Because they're variant in every person.

Q. Are all capillaries connected with each other?

A. All capillaries connected with each other?

Q. Yeah, like --

A. No.

Q. Can you go from --

A. The liver capillaries aren't connected to the --

Q. In the arm.

A. -- heart capillaries and --

Q. In the arm, sir. In the arm.

A. No, all the capillaries in the arms are not connected to each other.

**Page 68**

Q. So how does it go from the shoulder area all the way down to the hand through capillaries?

A. Through different connections.

Q. Is there any literature to support that?

A. Anatomy textbooks.

Q. You have, that are right there?

A. No. I mean anatomy -- I don't know if Netter has the -- the capillaries are unnamed. You don't have names for your capillaries because they're variant from person to person.

Q. Can you point me to one document, one peer-review article, one textbook, anything that supports your opinion that, if the axillary artery is blocked, that the distal extremity such as the hand can receive blood from the capillaries?

MS. LUNCEFORD: Objection, form.

Q. (By Mr. Assaad) Yes or no?

A. Do I have a textbook right now, no. Do I have any literature, no.

MS. LUNCEFORD: Just wait for a question.

THE WITNESS: Yeah, I will.

Q. (By Mr. Assaad) In a hypothetical situation, Doctor, if the axillary artery was repaired intraoperative -- or during the operation on January 8,

**Page 69**

2009, a vascular surgeon was called in and it was repaired, what injuries would Mr. Houston have sustained in the case?

A. I think he still would have had nerve injuries because the injury that damaged the axillary artery I think damaged the brachial plexus nerves.

Q. Can you identify with a "B" on each nerve that you believe was damaged in Exhibit 7?

A. (Indicating).

Q. And what you have marked "B" here are the nerves that you believe were damaged, what is your support, the medical records that indicate these nerves were damaged?

A. Well, I mean, one thing that I found was that in Dr. Vennix' electrodiagnostic study of the left brachial plexus injury.

Q. When she said that the median nerve was -- was it the ulnar nerve or the median nerve that was really damaged?

MS. LUNCEFORD: Objection, form.

A. He did radial more than median and ulnar, and median and ulnar more than axillary and musculocutaneous, and axillary and musculocutaneous more than suprascapular. So there were degrees of injury to the different nerves.

18 (Pages 66 to 69)

Magna Legal Services

194

Page 70

Q. (By Mr. Assaad) Were the nerves still intact?

A. According to -- according to the specialist, the radial nerve I guess is completely gone. And there is differing degrees of damage to the median and ulnar and the axillary and musculocutaneous.

Q. Based on that record there, can you narrow down in this picture where the exact injuries being that could injure -- that a laceration to the axillary artery could injure all those nerves?

A. No. I mean, I can give you a generalized area like I did but not exact pinpoint.

Q. What was the mechanism that Dr. Holt must have done to injure all those nerves according to your opinion?

A. I don't know. I'm not an ortho -- I don't know. I'm not an orthopedic specialist. I don't know what instruments he uses to do the hemiarthroplasty and how he got down to that area. I don't know that. I'm not an orthopedic specialist.

Q. So you're not an orthopedic specialist, you're not a neurologist; but you're willing -- you feel you are qualified to offer an opinion as to how the nerves were injured?

A. Not how but when.

Q. When. Okay. Were the nerves stretched? Do

Page 71

you know one way or the other?

A. Don't know. I mean, in medicine you try to -- I mean, he had an axillary artery injury; we know that. And we know where the axillary artery injury occurred. And where that injury occurred, all these nerves surround the artery. And it's hard to even imagine that however he injured that artery that somehow all the nerves escaped injury and just the artery was injured. I can't -- I don't know how that could happen. Somebody would have to explain that to me because I have no idea how he could injure the artery there and not injure any of the nerves.

Q. Well, is it possible that he lacerated the artery with a scalpel and did not hit any nerves?

MS. LUNCEFORD: Objection, form.

A. He didn't describe that in the operating report.

Q. (By Mr. Assaad) I'm saying, is it possible?

A. I have no idea why he would have a scalpel to cut the axillary artery.

Q. No. He was cutting through fat or tissue or muscle or whatever he does and accidentally hit the -- hit the artery. Is that possible?

A. Sure, that's a possibility.

Q. Do you think the artery damage, the injury to

Page 72

the artery was caused by an object or by stretching or what? Do you have an opinion?

A. I don't have an opinion how he did it, no.

Q. Well, do you think it would affect your opinion whether or not it was an injury caused by an object or if it was caused by being stretched?

A. I mean, either way it's a significant injury to -- you know.

Q. I understand that. I'm questioning would it make a difference to your opinions today?

A. If this was all caused by stretching?

Q. Yes. Or if it was caused by an object, like a scalpel, would it change your opinion?

A. No. I mean 'cause the stretch -- no.

Q. Let's assume that the nerves were not injured during the operation.

MR. ASSAAD: Ms. Lunceford, I understand that you might not like my questions, but for the past half hour you have been shaking your head up and down or shaking your head yes and no.

MS. LUNCEFORD: That's what I do.

MR. ASSAAD: Well, I don't think that's proper in a deposition. And this is for the record. And it's after my questions and it kind of indicates which way you want the doctor to answer.

Page 73

MS. LUNCEFORD: Oh, that is not true.

MR. ASSAAD: And this has nothing to do --

MS. LUNCEFORD: Ask him whether he is getting coached by me and then you can get a clear question on the record.

MR. ASSAAD: I just wish you would just stand still and not respond to every single question. Is that very hard for you to do, Ms. Lunceford?

MS. LUNCEFORD: It is impossible for me to do, so you can go ahead and ask your question.

Q. (By Mr. Assaad) Assuming hypothetically that there was no injury to the nerves during the operation, could the lack of blood flow caused by the blockage in the axillary artery cause the injury to the nerves that Mr. Houston sustained in this case?

MS. LUNCEFORD: Objection, form.

A. I don't think so, because the injuries were in the brachial plexus. That's where the diagnosis. It was all high, so I don't think so.

Q. (By Mr. Assaad) Do you know whether or not the injuries to the nerves according to the EMG report were distal from the injury to the axillary artery or closer?

A. My impression from what -- reviewing the

19 (Pages 70 to 73)

Page 74

depositions and the medical records is that the injury was at the site -- the nerve injuries are at the site of that artery injury.

Q. And what's your basis?

A. The medical records and the electrodiagnostic.

Q. Looking at Exhibit 7, you do agree with me that all the arteries that are injured are going down the arm, correct?

MS. LUNCEFORD: Nerves?

Q. (By Mr. Assaad) All the nerves that were injured? I'm sorry.

A. All the nerves are -- yeah, they all --

Q. Okay.

A. -- go down the arm.

Q. So what in the medical record indicates that the injury to the nerves was not distal from the injury to the axillary artery?

A. Abnormalities seen throughout most of the brachial plexus. It's not --

Q. Okay.

A. -- specific to one peripheral nerve. It's all up here.

Q. Where is the brachial plexus?

A. The brachial plexus is up in the shoulder.

Q. Okay. It's one specific spot or is it an

Page 75

area?

A. It's an area. It's multiple nerves.

Q. Okay. Multiple nerves over the area. It's not -- doesn't it go throughout the whole shoulder, the brachial plexus?

A. No.

Q. Okay.

A. No, no, no. The brach --

Q. Circle where the brachial plexus is in diagram 7. Exhibit 7.

A. (Indicating).

Q. Doctor, just so we have a Bates numbers, -- we don't have a Bates number here?

MS. LUNCEFORD: Not in these records. It's number five.

THE WITNESS: Are we going to get to eat lunch?

(Discussion off the record.)

Q. (By Mr. Assaad) Doctor, are you an expert in EMGs?

A. No.

Q. Okay. You understand it's a conduction study, correct?

A. Correct.

Q. Okay.

Page 76

A. It can tell you the level of the injury.

Q. Yes.

A. That's why they do it.

Q. But if the injury on the ulnar nerve was at the elbow or --

A. Higher up.

Q. -- higher up --

A. It would tell you.

Q. It would?

A. Yes.

Q. How would it tell you?

A. I'm not an expert so...

Q. So how do you know it would tell you?

A. Because I've had EMGs done on patients and neurologists have told me where the injury is.

Q. Okay.

A. How far up the nerve it occurred.

Q. Doctor, let's look at the next page. You see where in the EMG he is discussing the segment of the nerves that are injured?

A. Uh-huh.

Q. What does it tell you for the ulnar nerve? Where is it injured?

A. I don't know how to interpret --

Q. Well, --

Page 77

A. -- the report.

Q. -- do you see here where it says "wrist below elbow"?

A. Wrist below elbow, yes, I see that.

Q. Okay. Would you believe that is the area that he's testing on the ulnar nerve?

A. I'm not an expert in how to read EMGs.

Q. Well, it seems like you're an expert to determine by reading that EMG that the injury was in the brachial plexus?

MS. LUNCEFORD: Objection, form.

A. I didn't read the EMG. Dr. Vennix did. And I'm reading what his comments were on the EMG.

Q. (By Mr. Assaad) Okay. If you look at the medial nerve, do you see where it says --

A. Median.

Q. -- median nerve that's wrist to elbow?

A. Uh-huh.

Q. Okay. That's not up in the shoulder, is it? Correct?

A. I didn't understand your question.

Q. I mean, the wrist to the elbow is not up in the shoulder area where the axillary injury occurred?

A. The wrist and the elbow is not at the shoulder, no.

20 (Pages 74 to 77)

Page 78

Q. Okay. And you agree, Doctor, that the report you are referring to, which was dated -- which was dictated on May 27, 2009, dated May 27, 2009, is using the electrodiagnostic testing study done on May 27, 2009, correct, to support its conclusions?

MS. LUNCEFORD: Objection, form.

A. I assume that's what he used.

Q. (By Mr. Assaad) Doctor, you mentioned before that the axillary artery was blocked but that you had seen no blood flow or very little blood flow to the distal part of the left -- to the extremity, correct?

A. Correct.

Q. Okay. How long would it take for nerve damage to occur in that lower extremity from the elbow to the tip of the hand?

MS. LUNCEFORD: Objection, form.

A. It depends on how much blood flow was getting down there through the capillaries and small collaterals.

Q. (By Mr. Assaad) Do you have an opinion --

A. I mean, your plaintiff, your experts are -- you know, the difference -- your experts say it was clotted at the time of discharge. What's their explanation of the hand not falling off? He didn't come -- it wasn't repaired until Monday. Because there

Page 79

was collateral flow through small capillaries keeping the arm open. I'm saying that it was clotted off and damaged at the time of surgery.

So there is no difference between your experts and my opinion of how the arm stayed alive until Monday.

Q. Yeah, but the arm -- an arm could stay alive, but there could be significant injury, correct? I mean, your arm might survive, but there could still be nerve injury, correct?

A. Correct.

Q. Okay. How long would it take for that nerve injury to occur if your blood flow is only coming from your capillaries?

A. It depends on how much blood flow that was. Every -- you know, how much capillary flow.

Q. So you don't know?

A. It's impossible to know. It varies from patient to patient.

Q. Well, if a patient --

A. If somebody -- if somebody is a smoker, they have even less blood flow. And any kind of injury to a major artery, they're more likely to --

Q. And --

MS. LUNCEFORD: Let him finish.

Page 80

A. Somebody who's healthy -- in somebody who's healthy, you're able to last several days with an occluded artery. And he was a healthy man. But if he was a very unhealthy man, he probably wouldn't have been -- his arm wouldn't have survived that long with this type of injury. So it varies from case to case.

Q. (By Mr. Assaad) Do you have an opinion within a reasonable degree of medical probability of how long it would take an individual such as Mr. Houston to have nerve damage if his distal extremity was only being supplied with blood from capillaries?

MS. LUNCEFORD: Objection, form.

A. No, it's hard to tell. Out of all of -- you know, out of all the, you know, the structures in the hand, the nerve requires probably the least amount of blood compared to muscles and skin. Those require more so... but it varies.

I mean that, the whole idea that ischemia, you would have seen was the whole cause of it, he never had return of any function the whole time. From the injury in the O.R., from the time of discharge, to the time he presented, there was no nerve function going on in that arm.

Q. So is it your testimony that the physical therapy he received and the -- after January 12th had no

Page 81

improvement in his arm?

MS. LUNCEFORD: Objection, form.

MR. ASSAAD: Basis.

MS. LUNCEFORD: It's confusing, it's vague, it's ambiguous with respect to what you're asking him.

Q. (By Mr. Assaad) Doctor, did he have any improvement in his function after January 12, 2012 -- or 2009, after the surgery by Dr. Martin?

A. Yes. In his muscles, in his skin, those improved.

Q. What about --

A. As far as nerve function, I don't think so.

Q. Well, assuming that there was improvement in the nerve function, --

A. Okay.

Q. -- would that change your opinion today?

A. No. I mean --

Q. Okay.

A. -- sure, he could have had -- no.

Q. No? Okay.

A. No.

MR. ASSAAD: Mark this as Exhibit 8.

(Exhibit No. 8 marked.)

Q. Doctor, Exhibit 8 is the operative report of

21 (Pages 78 to 81)

Page 82

January 8, 2009, regarding the surgery performed by Dr. Holt on Mr. Houston. Do you recognize this document?

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. Do you have any criticisms of the operative report in any way?

MS. LUNCEFORD: Objection, form.

A. The one criticism I have is that it was dictated several days after the procedure was done and on the day that he was readmitted.

Most surgeons try to dictate their operative reports within 24 hours after doing the surgery because you remember more of what happened and what occurred and what you did.

And so that's the one criticism I have, that he dictated it several days after the procedure was done.

Q. When you have a surgery on a Friday, do you wait until Monday to dictate it sometime?

A. I don't. I dictate immediately after I do the case because that's -- I'm just compulsive that way.

Q. At what point during this operation did the injury to the nerve occur, in looking at the operative

Page 83

report?

A. I don't know. I mean, my most likely guess is --

Q. Doctor I don't want a guess. I asked you before, I want all your opinions within a reasonable degree of medical probability.

A. Okay. I would say it probably occurred with reasonable medical certainty is when the head was reduced into the socket, there was bleeding which appeared to come from the lower border of the subscapularis tendon. No vessel could be identified. The wound was suctioned and lap sponges were packed in the area to identify a source of bleeding. No particular vessel could be identified superiorly or inferiorly to the wound. The cephalic vein was completely intact. The bleeding eventually stopped completely.

Q. And --

A. Observation of the surgical incision then took place for approximately 15 minutes. No further -- the soft tissue was probed. No further bleeding was recognized. In that time period, I would guess.

Q. You mentioned the bleeding was stopped because there was pressure on the axillary artery?

A. Right.

Page 84

Q. Where is that here in the operative report?

A. Lap sponges were packed in the area.

Q. So it's your opinion within a reasonable degree of medical probability that a laceration as significant as you discussed previously to the axillary artery can be stopped by packing the area with lap sponges?

A. Yes.

Q. Okay.

A. It's actually a very common maneuver. If you have a liver laceration, which bleed even more than an axillary artery, that's what they do; they pack it with lap sponges.

Q. Do they pack the liver?

A. Right.

Q. Right on top of the liver?

A. Yes.

Q. They put pressure on it?

A. Yes.

Q. Was any pressure put on these lap sponges?

A. He didn't dictate that.

Q. So you're assuming that it was?

A. When you say you're going to pack something with laps, that's -- usually it comes with pressure is applied.

Page 85

Q. Well, didn't he say here that he -- the wound was suctioned and lap sponges were packed in the area to identify a source of bleeding?

A. Uh-huh.

Q. Did I read that correctly?

A. You read that correctly.

Q. Does it say there it was used to put pressure on the vessel, on the artery to stop the bleeding?

MS. LUNCEFORD: Objection, form.

A. It doesn't say that.

Q. (By Mr. Assaad) So you made that assumption that there was pressure put on the lap sponges to stop the bleeding?

A. When you say you packed with lap sponges, that's -- in medical terms when you say you packed something off with lap sponges, that's usually what you do.

Q. But when you pack something with lap sponges, Doctor, you're actually packing an area that you see is bleeding, correct? Correct?

A. Correct.

Q. Like the liver example, you said?

A. Yes.

Q. You see the liver bleeding, you put the lap sponges, you put pressure to stop the bleeding?

22 (Pages 82 to 85)

Page 86

A. Right.

Q. He doesn't know where the bleeding is coming from, correct?

A. He does.

Q. He does? Where does it say that?

A. There was --

Q. Well, underline it on the exhibit where he said he saw where the bleeding was coming from.

A. That's where he put the lap sponges. Why would you put lap sponges there if there was no bleeding?

Q. No vessel could be identified. So where does he identify where the bleeding is coming from?

A. Wherever he put the lap sponges.

Q. Did you read his deposition, Doctor? Did you read Dr. Holt's deposition?

A. I did.

Q. Did you just not believe him when he said he couldn't identify where the bleeding was coming from?

A. No, I believed that he couldn't identify it.

Q. Okay. So why don't you put an arrow to the sentence where you believe that the injury occurred to the nerves in Exhibit No. 8?

MS. LUNCEFORD: Objection, form.

MR. ASSAAD: Basis?

Page 87

MS. LUNCEFORD: It assumes facts not in evidence and assumes that this expert can do that based on Dr. Holt's op report.

Q. (By Mr. Assaad) Please, do it, sir.

A. You want me to put -- what do you want me to put, an arrow?

Q. Yes, on the sentence you read before where you believe that the injury to the nerve occurred; at what point in the operation?

MS. LUNCEFORD: Objection, form.

A. (Indicating).

Q. Can you underline the area in which you believe supports your contention that pressure was applied to the axillary artery.

A. Okay. With another arrow?

Q. Underline.

A. Oh, underline. (Indicating)

Q. And can you circle the sentence that you believe supports your contention that Dr. Holt identified the source of the bleeding.

MS. LUNCEFORD: Objection, form.

A. I don't think he identified it. I mean, that's obvious he didn't. There was an axillary artery injury and he never identified that.

Q. (By Mr. Assaad) How much pressure is required

Page 88

to stop the bleeding on a severely damaged axillary artery?

A. It varies.

Q. Well, the one such as the one that occurred in this case?

A. You could put pressure with one finger and cut off the axillary artery.

Q. So in this case if it was identified in which the injury was so large that you couldn't repair it but had to do a bypass, such an injury to the nerve or artery can be -- the bleeding could be stopped by just putting pressure on it?

A. Yes.

Q. Do you have any literature to support that opinion?

A. No.

Q. Well, what's your basis to support that opinion?

A. My medical knowledge and experience.

Q. Well, what experience would that be, Doctor? You've never seen an injury to an axillary artery.

A. Well, I've seen injuries to bigger arteries than the axillary artery.

Q. Such as?

A. The femoral artery.

Page 89

Q. And how long did it take to put pressure on the femoral artery to stop the bleeding?

A. You can stop it with one finger, too.

Q. For how long did you have to keep pressure on it so you don't have to --

A. It varies.

Q. And in those cases, after you stop the bleeding, did you do any repair to the artery? To the femoral artery?

A. If it was injured, yes.

Q. Okay. Well, if you stopped the bleeding, why would you do the repair?

A. Because the artery is injured.

Q. Okay. In those cases in which you put pressure on the femoral artery, the bleeding stopped prior to doing the repair?

A. Sometimes it did; sometimes it didn't.

Q. Okay. The ones that didn't stop -- I'm sorry. The ones that did stop, was it a significant injury to the femoral artery?

A. Yes.

Q. Such that a bypass was required?

A. I don't think I've done one where I had to -- I had to do a bypass for, no. I think I was able to repair it. Actually, I take that back. Yeah, I had

23 (Pages 86 to 89)

Page 90

to put a graft in for an injury, yeah. So I had to do a bypass, yes.

Q. And in that instance were you able to stop the bleeding by putting pressure on it --

A. Uh-huh.

Q. -- permanently?

MS. LUNCEFORD: You need to answer "yes" or "no."

A. Yes.

Q. (By Mr. Assaad) You stopped the bleeding permanently?

A. At that time, yes.

Q. Okay.

A. That's...

Q. That's what?

A. I lost my train of thought.

Q. Are you going to offer any standard of care opinions with respect to Dr. Holt's operation?

A. No.

Q. So just to narrow things down, you're only going to testify or offer opinions with respect to the time of the nerve injury. And in your opinion it occurred during the operation, correct?

A. Yes.

Q. You're not going to offer any standard of care

Page 91

opinions with respect to the nurses, to Dr. Holt or anyone else?

A. I guess it depends on the question I'm asked, whether I feel comfortable that I can give a medical opinion.

Q. Well, have you formulated any opinions that anyone in this case deviated from the standard of care?

A. I think Dr. Holt did.

Q. In what way?

A. I think a surgeon that experiences a major bleed of greater than two liters on a patient during an operation that usually does not cause much bleeding, and that patient requires blood transfusions, and that patient at the time of his discharge is not having a functioning extremity and is still discharged home and the surgeon doesn't have any suspicions or curiosity to investigate further where all that bleeding came from, I don't think that's the standard of care. I think most doctors would investigate that further.

Q. If Dr. Holt investigated further or immediately obtained a vascular surgeon and repaired the axillary artery during the operation, do you have an opinion as to what the change or what the cause, the causal effect would have been on Mr. Houston?

A. It's difficult to say.

Page 92

Q. So you don't have an opinion within a reasonable degree of medical probability?

A. It's difficult to say how -- I mean...

Q. Let me ask it this way.

A. I mean, it's -- how much of his nonfunctioning of his arm is nerve versus muscle and skin, I am not an expert to testify to. So if the artery was repaired immediately, he might have not had as much muscle and skin damage to his extremity. How much nerve damage would have been saved, it's hard to tell.

Q. Let's break it down. You've testified that discharging Mr. Houston by Dr. Holt with a nonfunctioning left extremity was a deviation of the standard of care?

A. Yes.

Q. Okay. If he didn't discharge and complied with the standard of care, would there be -- do you have an opinion within a reasonable degree of medical probability whether or not that would have caused any difference in the outcome of this case?

MS. LUNCEFORD: Objection, form.

A. It's possible.

Q. (By Mr. Assaad) I asked within a reasonable degree of medical probability.

A. I mean, yes. The longer an artery is

Page 93

occluded, the more damage occurs to that extremity. So the quicker you fix it, the less damage that occurs. So if, yes, it would have been fixed on Friday instead of Monday, he would have less damage, yes.

Q. When you say "less damage," can you quantify that?

A. It's hard.

Q. What -- can you -- feel free to look at the medical records, Doctor. Can you indicate to me what damage occurred to Mr. Houston as a result of the blocked axillary artery and not as a result of the injuries to the nerve which you have the opinion occurred during the operation?

MS. LUNCEFORD: Objection, form.

A. It's hard to tell.

Q. (By Mr. Assaad) So you can't?

A. It's difficult to tell.

Q. So you can't? Just answer the question.

A. Repeat the question again.

Q. Can you identify with a reasonable degree of medical probability what injuries occurred to Mr. Houston as a result of the blocked axillary artery in this case?

MS. LUNCEFORD: Objection, form.

MR. ASSAAD: Basis?

24 (Pages 90 to 93)

Page 94

MS. LUNCEFORD: It is vague, confusing and assumes facts not in evidence.

MR. ASSAAD: Okay. Withdraw that question.

Q. (By Mr. Assaad) Did Mr. Houston have any injury, permanent injury as a result of the axillary artery being blocked?

A. Yes.

Q. What injury?

A. I think he had motor -- muscle damage.

Q. Motor or muscle, or both?

A. Muscle damage.

Q. Was that injury permanent?

A. I don't know.

Q. So let me ask the question again. Do you have an opinion within a reasonable degree of medical probability that the axillary artery that was blocked in Mr. Houston caused him any permanent injury?

MS. LUNCEFORD: Objection, form.

MR. ASSAAD: Basis?

MS. LUNCEFORD: Same objection as before.

MR. ASSAAD: Can you please list them out? This is a different question.

MS. LUNCEFORD: It's the same question

Page 95

and the basis is: Assumes facts not in evidence, vague and ambiguous with respect to the term "blocked axillary artery."

Q. (By Mr. Assaad) Did you understand my question, Doctor?

A. No.

Q. Okay.

A. I don't understand your question.

Q. Can you identify the permanent injuries that Mr. Houston sustained as a result of the injury that occurred during the operation to Mr. Houston's axillary artery?

MS. LUNCEFORD: Objection, form.

MR. ASSAAD: Basis?

MS. LUNCEFORD: Assumes that he testified -- it just assumes facts not in evidence, vague, ambiguous.

A. Well, I mean -- okay. He had -- I mean, they had to do compartment releases because of the -- you know, because of the blocked axillary artery. And you do compartment releases to try to spare the muscles from dying because of all the swelling from not having blood supply.

I'm sure there is muscles that he lost that he will never regain. How much, I don't think

Page 96

anybody can tell you how much.

Q. (By Mr. Assaad) Can you identify any medical records that support that opinion that there are muscles that were lost due to the compartment syndrome that you identified?

MS. LUNCEFORD: Objection, form.

A. I'm not an orthopedic expert. You can ask the orthopedic experts that. They're the muscle experts.

Q. (By Mr. Assaad) When you talk about muscle loss, are we talking about significant muscle loss?

MS. LUNCEFORD: Objection, form.

A. I mean, that varies from person to person. I mean, one person, what they consider decrease in the strength of their muscle, whether it's significant or not, it depends on the person.

Q. (By Mr. Assaad) Mr. Houston's lack of functionality in his left extremity, is that -- would you agree with me that it's primarily caused by the nerve damage?

A. Is lack of function in that arm? Is that what you said?

Q. Yes.

A. I'm not an expert as far as nerve and muscle. And how much of his function is due to loss of nerve versus due to loss of muscle function or muscle

Page 97

capacity, I can't comment on.

Q. Doctor, I'm just trying to figure out, the damage that was caused by the axillary artery injury that is solely a result of the axillary artery injury and not the nerve damage to Mr. Houston.

Is it correct to say that you cannot offer that opinion within a reasonable degree of medical probability?

A. I don't think anybody can.

Q. So you can't offer that opinion within a reasonable medical probability?

A. No. I don't think anybody can.

Q. Doctor, would you agree with me that the nurses failed to inform the physician regarding the poor capillary refills that Mr. Houston sustained on January 8th and January 9th of 2009?

MS. LUNCEFORD: Objection, form.

A. No.

Q. (By Mr. Assaad) You don't believe that's a deviation of standard of care?

MS. LUNCEFORD: Objection, form.

A. I -- your statement is incorrect. The nurses did inform the physician.

Q. (By Mr. Assaad) When?

A. In the PACU.

25 (Pages 94 to 97)

Page 98

Q. Okay. What did -- are you talking about Nurse Hicks?

A. I forgot the name of the nurse in the PACU.

Q. Show me in the PACU record where the nurse informed the anesthesiologist regarding the poor capillary refills.

A. Somebody feel free to help me.

Q. Page 51 at the bottom.

MS. LUNCEFORD: Yeah.

A. Okay. Patient admitted. I'll read her notes. 10:55. Patient admitted. Reactive to name on admission. Patient cool to touch. Blood pressure low on admission. Fingers on left hand pale, cool to touch, with poor profusion noted.

Q. (By Mr. Assaad) Do you believe the standard of care required a nurse to inform the doctor of that information?

MS. LUNCEFORD: Objection, form.

A. Yes. At 11:15 Dr. Lam here, aware of patient's status. Left hand fingers feel cold. Still pale. Cold to touch. Poor cap refill.

Q. (By Mr. Assaad) What time are you reading? 11:15?

A. 11:15.

Q. Do you know what kind of doctor Dr. Lam is?

Page 99

A. I believe he's an anesthesiologist.

Q. Okay. And would you agree with me that an anesthesiologist is more concerned -- is concerned with the anesthesia part of the patient, the heart rate?

A. In most hospitals -- this patient was in the post-anesthesia care unit, PACU, it's called, abbreviated. Anesthesia controls the PACU. All right. If a patient is having problems, the nurses usually inform the anesthesiologist.

Q. Well, 11:15 it says patient alert, correct?

A. Uh-huh.

Q. Yes? Is that a "yes"?

A. Sorry. Yes.

Q. Okay. BP coming up slowly?

A. Yes.

Q. Says Dr. Lam here, aware of patient's status, correct?

A. Yes.

Q. Is it anywhere there in this document that you see it states that Dr. Lam is aware of the left hand and fingers feel cold or the capillary refills?

A. Yeah, the next sentence, a little bit further down, its says, "States left hand, fingers feel cold, feel cool to touch with poor capillary refill."

Q. Does it say Dr. Lam was aware of that?

Page 100

A. Aware of patient's status. That's part of the patient's status.

Q. So you're assuming that Dr. Lam, an anesthesiologist, is doing the capillary refill and touching the patient and checking to see whether or not the patient is cold or hot?

A. The nurse is informing him of the patient's status. And she is telling you what the patient's left hand is like. That's part of the patient's status and she's telling Dr. Lam that.

Q. So you're assuming that she told Dr. Lam that?

A. It states here that she's telling him that.

Q. Okay. Look at 14:15. It says blood pressure increasing very slowly. Dr. Lam notified of patient's status.

A. I mean she -- she --

Q. Did you read that? I haven't asked the question yet. Did you read that?

A. I read that, yes.

Q. Do you have an opinion as to what the nurse informed Dr. Lam at 14:15 hours?

A. My opinion is the entire patient's status.

Q. The entire patient's status?

A. Yes.

Q. Okay. So she's only referring to, in the note

Page 101

of 14:15, the blood pressure increasing very slowly?

MS. LUNCEFORD: Objection, form.

A. That's all she wrote, --

Q. (By Mr. Assaad) Okay.

A. -- but she's telling Dr. Lam about his status.

Q. Okay. Have you talked to Ms. Hicks?

A. No.

Q. You agree that, when a nurse has an abnormal finding, that she should notify the doctor?

MS. LUNCEFORD: Objection, form.

A. It depends on the finding, the gravity of the finding.

Q. (By Mr. Assaad) Do you agree that nurses are advocates of the patient?

A. Yes.

Q. They're the eyes and ears of the doctor?

A. Yes, they can be.

Q. They spend more time with the patient on the floor than the doctor does?

A. Usually.

Q. A lot more time?

MS. LUNCEFORD: Objection, form.

A. Usually, but it depends.

I've been in cases where I've been at the

26 (Pages 98 to 101)

Page 102

bedside 24 hours and no nurse has been at the bedside for 24 hours. So it depends.

Q. (By Mr. Assaad) Let's take the bell curve and take away the 10 percent, you know, the times -- those times you spent with the patient and the 10 percent with the nurse, you spent more time with the patient and you look at the average, would agree with me on the average nurses spend a lot more time with the patient than the doctor?

A. Yes, but that's not what you asked me earlier.

Q. Okay.

A. I was answering your question according to how you asked me.

Q. Okay. Do you believe that the standard of care requires a nurse to inform a doctor if there is a poor capillary refill?

MS. LUNCEFORD: Objection, form.

A. It depends on the whole clinical picture.

Q. (By Mr. Assaad) Okay. In this case do you believe that the standard of care requires the nurse to inform a doctor regarding Mr. Houston's poor capillary refill?

MS. LUNCEFORD: Objection, form.

A. Yes.

Page 103

Q. (By Mr. Assaad) Do you agree with me, Doctor, that postoperatively the neurovascular checks are very important?

A. Yes.

Q. Okay. And we're talking about not just in the PACU but also on the floor, correct?

MS. LUNCEFORD: Objection, form.

A. Yes.

MR. ASSAAD: Okay. Basis?

MS. LUNCEFORD: It's outside the area of this witness' expertise. He's not a nursing expert. He told you that.

Q. (By Mr. Assaad) Doctor, you deal with nurses on a daily basis, correct?

A. Yes.

Q. And you have expectations from nurses on what you want them to inform you regarding your patients, correct?

A. Yes.

Q. Okay. As a cardiothoracic surgeon if at any point after a surgery that there is some issue with the vascular issue of your patient, you want to know immediately, correct?

MS. LUNCEFORD: Objection, form.

A. It depends on the gravity and the whole

Page 104

clinical picture.

Q. (By Mr. Assaad) Okay. Well, would you agree with me, Doctor, that if there is no radial pulse in one of your patients, you want to be notified immediately?

A. If the patient had a radial pulse before and they lost it, yes.

Q. Okay.

A. There are patients that don't have radial pulses.

Q. Doctor, let's turn to page 66. Do you agree at 1500 hours the radial pulse was taken in the right and left upper extremity and it was indicated as normal?

A. I think that's what she meant by those markings, but it's hard to know for sure.

Q. At 2000 you have a "P" for the right and a negative for the left?

A. Yes.

Q. That's a change in the condition. Do you agree?

A. Yes.

Q. As a doctor, would you want to be notified immediately of the change in condition of a radial pulse?

MS. LUNCEFORD: Objection, form.

A. Yes.

Page 105

Q. (By Mr. Assaad) Okay. Do you see anywhere in the records here that this nurse notified anybody regarding the change in the pulse of Mr. Houston on January 8, 2009 at 8 p.m.?

A. I did not.

Q. Would you agree with me that that's a deviation of standard of care?

MS. LUNCEFORD: Objection, form.

A. I can't speak to the standard of care for nursing.

Q. (By Mr. Assaad) But you could to the standard of care for an orthopedic surgeon?

MS. LUNCEFORD: Objection, form.

A. No.

Q. (By Mr. Assaad) Oh, you can't?

A. No.

Q. Okay. So you agree with me you're not qualified to offer any opinions with respect to the standard of care regarding an orthopedic surgeon?

MS. LUNCEFORD: Objection, form.

A. When he performs orthopedic procedures, no; but as a doctor, yes.

Q. (By Mr. Assaad) Well --

A. The standard of care for a doctor.

Q. So you're a vascular -- you're a

Magna Legal Services

Page 106

cardiothoracic surgeon, a vascular surgeon, correct?

A. Correct.

Q. Vascular integrity is your expertise, correct?

A. Correct.

Q. You can't tell me -- you can't sit here today and offer an opinion regarding what is the standard of care required by a nurse in assessing the neurovascular issues of a patient?

MS. LUNCEFORD: Objection, form.

A. No. I'm not a nurse.

Q. (By Mr. Assaad) Well, do you work with nurses?

A. Yes.

Q. Okay. Do you have expectations of nurses?

A. Yes.

Q. Okay. If one of your nurses did not inform you that a radial pulse was no longer present in a patient, would you think that was acceptable?

A. No.

Q. Would you talk to that nurse?

A. Yes.

Q. What would you tell that nurse?

A. That she needs to call me.

Q. Okay. Do you employ any nurses?

A. No.

Page 107

Q. If you were to employ nurses, would you employ Nurse Schumacher?

MS. LUNCEFORD: Objection, form.

A. I don't know. I would have to interview her first.

Q. (By Mr. Assaad) So her Kevorkian remark wouldn't bear anything on whether or not you hired this person?

MS. LUNCEFORD: Objection, form.

A. I wasn't there. I don't know the context, how it -- you know, things can be taken out of context sometimes.

Q. (By Mr. Assaad) Do you expect your nurses to chart in the record --

MS. LUNCEFORD: Objection, form.

Q. (By Mr. Assaad) -- that you're working with?

A. My expectation of my nurses is the patient comes first. And we're in an era where they stress documentation. And that's not what's important.

What is important is to take care of the patient first. And a nurse that is busy filling out paperwork instead of taking care of the patient is not a good nurse. That's my view.

Q. Well, you criticized Dr. Holt for not dictating his operative report until three days or fours

Page 108

days after the surgery?

A. I said that --

Q. You criticized him for it?

A. Yes.

Q. Okay. So it's not okay for him to do an operative report four days after the surgery; but it's okay for a nurse not to document if there's, you know, other things better to do?

MS. LUNCEFORD: Objection, form.

A. To dictate an op report takes ten minutes max. And most doctors can dictate an operative report in two or three minutes. So it's hard to believe -- for me to believe -- but it can happen. I'll give you that -- that a doctor is so swamped the entire day that every once in a while he doesn't dictate his op report immediately after. But that can happen.

Q. (By Mr. Assaad) How long do you think -- I mean, you agree with me that a nurse that's monitoring a patient should check these things listed on page 66, correct?

A. Yes.

Q. Okay. And you're not saying that she should not be doing these things?

A. No.

Q. You're just saying documentation is not as

Page 109

important as actually her doing her job?

A. Exactly.

Q. Well, how long do you think it takes after she checks the patient to go down the column and just go through here?

MS. LUNCEFORD: Objection, form.

A. I don't know how many different -- I mean, it's sad to say, you should look at the amount of different papers that nurses have to fill out. It's just not one piece of paper. I mean, it's incredible nowadays how many different documents they have to fill out while they're taking care of the patient. And I think it's unreasonable.

Q. Do you think there should be more nurses in the hospital?

MS. LUNCEFORD: Objection, form.

A. Yes.

Q. (By Mr. Assaad) Okay. Doctor, do you agree with me that from the time Mr. Houston's on the floor to the time that he's discharged that there are many entries into the medical record of an abnormal capillary refill?

A. Yes.

Q. And do you agree with me at no time is there anything in the record or even the deposition testimony

28 (Pages 106 to 109)

Magna Legal Services

204

Page 110

of some of these nurses that Dr. Holt or any other doctor was notified of the abnormalities?

MS. LUNCEFORD: Objection, form.

MR. ASSAAD: Basis?

MS. LUNCEFORD: Assumes facts not in evidence, mischaracterizes his prior testimony concerning PACU notes.

Q. (By Mr. Assaad) I mean -- Fair enough. All right. After -- on the floor -- from the time the patient is on the floor to the time the patient is discharged, Mr. Houston, there is no evidence or no entries into the medical record or no mention in any of the depositions that any doctor was informed of the capillary refill results?

A. From admission to the floor to discharge?

Q. Yes.

A. Correct. I did not see any documentation --

Q. Do you agree --

A. -- except there was one -- one instant of a telephone order from Dr. Holt to a nurse at 4:30 about a medication. He gave a telephone order for a medication. I don't know the full extent of that conversation. I mean, the only thing that was documented was the medication. But I don't know if the nurse told him anything else about the patient's

Page 111

status.

Q. Well, so actually the nurse had an opportunity, had Dr. Holt on the phone to inform him of that status?

A. Right, I don't know if she did or did not.

Q. If she didn't, would that be a deviation of standard of care?

MS. LUNCEFORD: Objection, form.

Q. (By Mr. Assaad) You may answer.

A. I can't speak to the standard of care of the nursing.

Q. Okay. Can I see that?

MS. LUNCEFORD: You need a break or anything?

THE WITNESS: No, I'm good. Just power through.

Q. (By Mr. Assaad) On your page 66 you write in red "no palpable left radial"?

A. Yes.

Q. What was the significance of that note?

A. What we talked about earlier, that there was a change.

Q. Okay. On page 5 you put a star and highlighted damage to nerves and then block vessels and informed consent?

Page 112

A. Yes.

Q. Why did you put a star near that?

A. That Dr. Holt appropriately told the patient of the risks of the surgery.

Q. Okay. On page 15, the PACU op center post-anesthesia --

A. Uh-huh.

Q. -- you highlighted "H and H stat" and then "given Heparin 500 ccs. I.V."?

A. Hespan.

Q. Or Hespan. Why did you highlight that? What's the significance of that?

A. I mean, it kind of speaks to the significant injury that the patient had, they were giving him still a lot of fluid resuscitation. I mean, he got three liters in the operating room. Then he got another three liters of fluids in the PACU. That's extremely unusual. I mean, that shows you that there was an issue with an artery.

Q. Do you believe that he was still -- when do you believe the bleeding stopped? What's your opinion?

A. I mean, when you have an injury and you have a clot, if you start moving the arm or anything like that, that could cause bleeding; so he probably had ongoing some amount of blood loss throughout the period that the

Page 113

artery was injured.

Q. Well, do you disagree with Dr. Holt's operative report that the bleeding stopped during the operation?

A. No.

Q. You agree with that?

A. Yes.

Q. Okay. But --

A. Bleeding that he could see, yeah.

Q. When you say there was -- do you have any evidence to support your contention that there was ongoing bleeding?

A. Yes.

Q. What evidence?

A. The fluid resuscitation. He continued to require fluids.

Q. In the PACU?

A. In the PACU.

Q. What about on the floor?

A. On the floor I don't recall how much fluid he got. And he was tachycardic the whole time he was in the hospital, his pulse was -- so it shows you that there was still some active bleeding going on.

Q. Did any of the nurses notify Dr. Holt or any other doctor that Mr. Houston was tachycardic?

29 (Pages 110 to 113)

Page 114

A. It doesn't look like it by the documentation.

Q. Would that be something that's important to inform the doctor?

A. Yes.

Q. So besides the fluids that were given in the PACU, is there any evidence on the floor that he was still bleeding?

A. Well, he required a blood transfusion.

Q. At what point in time?

A. Wasn't that on the floor when he received it?

Q. I don't think so, but --

MS. LUNCEFORD: PACU.

A. In the PACU?

Q. (By Mr. Assaad) PACU.

A. All right. In the PACU. Sorry. I couldn't remember exactly when he gave the blood transfusion.

Q. (By Mr. Assaad) So he got his fluids in the PACU, was released to the floor?

A. Uh-huh.

Q. Do you have any evidence that he was continuing to bleed while he was on the floor?

A. He was tachycardic.

Q. Now, when you say continuing to bleed, are we talking about a high, like, a strong bleed or a slight bleed or what?

Page 115

A. Just slight, oozing bleeding.

Q. So how much blood do you think he was losing or do you have an opinion?

A. Well, I mean, he required another blood transfusion when he came back in for the other surgery, so he continued to bleed. If he hadn't, he wouldn't have required another blood transfusion when he was readmitted.

Q. Do you know when he obtained the blood transfusion? Was it before or after the surgery by Dr. Martin on the 12th?

A. I can't remember exactly.

Q. Doctor, there are many reasons why a patient could be tachycardic, correct?

A. Yes.

Q. One is loss of blood?

A. Yes.

Q. Another is pain?

A. Yes.

Q. Stress?

A. Yes.

Q. Besides the patient being tachycardic, is there any other evidence that you could point to that Mr. Houston was bleeding while he was on the floor or anytime up until the bypass surgery done by Dr. Martin?

Page 116

A. Well, I think his blood pressure was also on the low end of the scale, besides being tachycardic.

Q. Okay. So those two things?

A. Yes.

Q. And based on those two, it's your opinion within a reasonable degree of medical probability that the cause of him being tachycardic and the slightly low blood pressure was a result of him bleeding?

MS. LUNCEFORD: Objection, form.

A. Yes.

Q. (By Mr. Assaad) Okay. Was there any evidence when they went in to do the arteriogram that there was any bleeding?

A. Yes.

MR. ASSAAD: Mark this Exhibit 9.

(Exhibit No. 9 marked.)

Q. Doctor, what I have marked as Exhibit 9 is the operative report of Dr. Martin on January 12, 2009, where an arteriogram was done by Dr. Martin?

A. Uh-huh.

Q. Do you agree that's what Exhibit 9 is?

A. Yes.

Q. Can you indicate to me in this document what supports your opinion that the axillary artery was still bleeding at the time of January 12, 2009?

Page 117

A. "Injection of contrast demonstrated clearly extravasation into the tissue surrounding the vessel."

Two sentences before the one you have underlined.

Q. Two sentences where? Sorry.

A. The two sentences before the one you have underlined. "Injection of contrast demonstrated clearly extravasation into the tissue surrounding the vessel."

Q. And the contrast, you agree, is done through the catheter, correct?

A. Yes, I believe that's how he did it.

Q. Okay. And he is doing the injection here of the contrast after the sentence that says, "However, on passing the glide wire and catheter, the wire and catheter were easily passed into the extraluminal space"?

A. Right.

Q. Okay. So the catheter is basically outside into the extraluminal space and the contrast demonstrates that it's outside the extraluminal space, correct?

A. Right.

Q. Okay. And it's your opinion that because the catheter is going outside the vessel into the extraluminal space and the injection of contrast

30 (Pages 114 to 117)

Page 118

demonstrated that it was outside the extraluminal space, that that is indicative of the continued bleeding that you mentioned before?

A. Yes.

Q. Okay. Was it a significant bleed?

MS. LUNCEFORD: Objection, form.

Q. (By Mr. Assaad) Can you tell one way or the other?

A. When -- when -- repeat your question.

Q. Was there a significant bleed at the vessel at this point on January 12, 2009?

A. I think he had continuous bleeding.

Q. Where was all the blood going?

A. Into his arm. That's why it was swollen.

Q. Was there any, like, hematoma found in his arm at all?

A. Yes, I believe they did -- he did have a hematoma in his arm.

Q. And where did you obtain that information from?

A. I think from Dr. Martin's notes.

Q. Operative note?

A. No.

Q. What note?

A. When he examined him, when he said the arm was

Page 119

swollen, I think he mentioned that it was from a hematoma.

Q. Can you point to that in the medical records that supports that?

A. Let me see. Can I see that, see which number Dr. Martin -- it says here on his consultation he was noted to have more than expected swelling about the shoulder. So that swelling I think goes to a hematoma, the blood that was bleeding.

And in his impression, left upper extremity weakness, numbness following recent left shoulder surgery with an episode of significant intraoperative bleeding. Of concern the patient may have a significant hematoma or pseudoaneurysm at the operative site.

Q. At the operation was there any hematoma found?

A. I think he did not explore the hematoma. He decided that on the angiogram that the injury was too big and he decided to go ahead and do the bypass, so he didn't explore the injury or the -- or the hematoma that would be surrounding it.

Q. So you don't believe -- you don't think when you have to dissect out the axillary artery to do the bypass that you would not be able to see if there was a hematoma in the area of the bypass?

Page 120

A. He went to the areas that weren't injured. I mean, he went proximal to the injury and dissected the normal axillary artery there and then distal to the injury dissected the normal artery there and then bypassed it. He didn't explore the area where it was injured.

Q. Well, how much blood do you think was lost between -- from the bleed that occurred throughout the 8th, 9th, 10th, 11th and 12th?

MS. LUNCEFORD: Objection, form.

A. Not a lot. I mean, but there was some.

Q. (By Mr. Assaad) When you say "not a lot," a liter?

A. No. No, I wouldn't think so because I mean, it's an enclosed compartment so the blood has no space -- nowhere to go. There is muscles and fat and everything else there, so it's not going to be a liter.

Q. Would the blood cause any compression on the nerves?

A. It can, yes.

Q. And that would be in the brachial plexus area?

A. Yes.

Q. So it's possible that the blood that was bleeding out of the axillary artery for four days was putting pressure on the brachial plexus nerves?

Page 121

A. Yes.

Q. Do you have an opinion within a reasonable medical probability as to why it wasn't the blood that was seeping out that was putting pressure on the brachial nerve that caused the nerve injury and not -- compared to the iatrogenic injury caused during the operation?

A. I mean, I go back to that he never had any function return since the time of the operation. He never regained anything that whole time, so I think the injury occurred during the operation.

Q. Can you go to page 73. And before I ask you this question, let's talk about the nerve block real quick. I understand you said, you know, in eight to twelve hours it should wear off. Is that what your testimony was before?

A. Yes.

Q. You've heard testimony that a nerve block could last up to 24 hours? Have you seen that in a deposition?

A. I saw that in a deposition.

Q. Do you disagree with that?

A. It's highly, highly unusual. So if you have -- if you've done a block on somebody and in 24 hours it's still in effect, it should set off some

Page 122

alarms -- you know, alarms in your head that maybe something else is going on.

Q. Okay. Do you see that on January 9th at 5:00 in the morning it says, "No changes noted except improved movement with left hand and fingers"?

A. Page 66, you said? I'm sorry.

Q. 73.

A. Oh, 73. Okay. Yes.

Q. Do you agree that there is a note there that -- a nurse has noted there was an improvement with the movement of the left hand?

A. That's what she wrote.

Q. Do you disagree with that note?

A. She's the only nurse that ever documented any movement in the hand.

Q. So if there was improvement with the left hand and fingers, what's your explanation?

MS. LUNCEFORD: Objection, form.

A. What's my explanation of what?

Q. (By Mr. Assaad) Yeah. You said there was no improvement in the left extremity --

A. Right.

Q. -- as a result, because that's why you believed that the injury occurred iatrogenically during the operation?

Page 123

A. Right.

Q. Okay. Now, there's a note here less than 24 hours after the operation --

A. Uh-huh.

Q. -- that shows that there is improved movement in the left hand?

A. Right.

Q. So how can you correlate the two?

A. You take --

MS. LUNCEFORD: Objection, form.

A. You take preponderance of the documentation. The preponderance of the documentation shows no movement in the arm. I take Dr. Holt's deposition where he said there was no function in that arm; it didn't move, it didn't do anything and he said it was the scalene block. The only place in this entire documentation is that one line by that one nurse. Every other nurse documents that there was no movement.

Q. So would you agree with me --

A. And Dr. Holt testified to that.

Q. Okay. So you agree with me that, if there was improvement at 5:00 in the morning in the movement of Mr. Houston's left extremity, if that fact is true, --

A. Uh-huh.

Q. -- then your opinion that the nerve injury was

Page 124

caused iatrogenically during the operation cannot be true?

A. No.

MS. LUNCEFORD: Objection, form.

A. No, I disagree. I mean, this is a very nonspecific statement. I didn't -- and, you know, every nerve to the arm wasn't injured. And it doesn't -- you know, it doesn't say which movement she -- the patient was making. And as we know, the nerve, the damages to the nerve was graded. Some were worse, some were better. So I mean, it's impossible to tell.

Q. Do you know whether or not there was improvement in Mr. Houston's left extremity with regard to movement on January 9th on the morning -- after Dr. Holt saw Mr. Houston?

A. No.

Q. Why not?

A. There is no documentation of that.

Q. There is actually no documentation at all regarding the left extremity, correct?

A. Correct.

Q. So sitting here today, based on the medical records, we don't know?

MS. LUNCEFORD: Objection, form.

A. I mean, he -- according to Dr. Holt's

Page 125

deposition, there was -- he thought it was -- the block was in effect and that's why the arm wasn't working.

Q. (By Mr. Assaad) Okay. Let's go to page 134.

A. 134?

Q. Yes. The top note, Dr. Holt's note of January 13, 2009, at 5:50 in the morning says, "Status post-axillary artery bypass, starting to move fingers."

Do you agree that the ability to move fingers is an improvement in Mr. Holt's -- or Mr. Houston's condition on January 13, 2009?

A. I believe so.

Q. Okay. And do you agree that it was after the bypass was done on the axillary artery?

A. Yes.

Q. Do you agree with me that the -- based on this note and what's occurring at this time, that the axillary artery and the lack of blood flow to Mr. Houston's left extremity was having an effect on his nerves?

MS. LUNCEFORD: Objection, form.

A. Repeat your question.

Q. (By Mr. Assaad) That the lack of blood flow as a result of the axillary artery being totally occluded was having an effect on his nerve function?

MS. LUNCEFORD: Objection, form.

32 (Pages 122 to 125)

Page 126

A. It's hard to tell whether his nerve function or his muscle function. His muscles didn't have any blood supply when the axillary artery was occluded, so when you profuse them, they have some muscle supply now.

Q. (By Mr. Assaad) Were the muscles not supplied with the capillaries as well; capillary blood?

A. Yes, they were.

Q. So they did have blood supply?

A. Yes, but marginal. That's why he -- further down it says "areas of necrosis." So he was -- his arm was dying on the palm and the dorsum. So he had areas that were dying because the blood supply was not quite enough.

Q. Yeah, his skin was dying, correct?

A. Uh-huh.

Q. His muscles were dying?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. His nerves were dying?

A. Yes.

MS. LUNCEFORD: Objection, form.

Q. (By Mr. Assaad) Okay. And you would agree with me, Doctor, that it was also a concern of Dr. Martin that there could be compression of the

Page 127

neurovascular bundle at the brachial plexus? If you want to look at page 144.

A. Yes.

Q. Now, Mr. Houston was seen by an orthopedic surgeon, a vascular surgeon, a neurologist, had an EMG, plastic surgeon, many nurses, many other doctors throughout this course and afterwards.

Do you recall any or seeing any evidence or anyone indicating that the injury to his extremity is a result of nerve damage that occurred during the surgery?

MS. LUNCEFORD: Objection, form.

A. I don't remember anybody else mentioning that, no.

Q. (By Mr. Assaad) And you're the only one that has formulated that opinion that the nerve injury was caused by damage to the nerves during the operation?

MS. LUNCEFORD: Objection, form.

A. I don't know that. I haven't spoken to the other doctors.

Q. (By Mr. Assaad) Okay. Well, you haven't spoken. Have you seen any -- have you seen anything in the deposition testimony of any of the experts?

A. I just said that earlier that I did not see anybody else mention that possibility.

Page 128

Q. Well, was it a possibility or a probability?

A. For me it's a probability. That's my opinion.

Q. Okay. But for some other doctors that might be a possibility?

MS. LUNCEFORD: Objection, form.

A. You would have to ask them.

Q. (By Mr. Assaad) And just to clarify something, Doctor, let's go to page 154, the transfusion records.

A. Uh-huh.

Q. You agree with me that these transfusions were given in the evening on the 12th after the surgery was performed by Dr. Martin?

A. Transfusion started at 5:35. And what time was the operation? Remind me.

Let's see. Where is the nurse's note from the second operation?

MS. LUNCEFORD: I don't have that one in here with me.

A. I mean, or the hospital records. We need the anesthesia record to see what time before I could answer that for sure.

MS. LUNCEFORD: The operative report?

A. Anesthesia record -- no. It was during the

Page 129

operation. Before, you know -- no, it wasn't after.

Q. (By Mr. Assaad) I'm sorry, you're right. I apologize. It was during the operation.

A. Well, I mean, actually, no, it was before the operation because the operation started --

Q. What page are you looking at, Doctor?

A. 172, anesthesia time 16:45 to 20:55 and the blood transfusion was started at 17:35.

Q. So it was after anesthesia started?

A. Yeah. So it was just after they put him to sleep they started giving him blood.

Q. Was that normal in that type of surgery?

A. If the blood count is low to begin with and you're worried that the patient's bleeding, yeah, you start the blood before you even...

Q. Doctor, would you agree with me that if the nerve injury in the brachial plexus nerve was not iatrogenic during the operation, that more likely than not it was caused by ischemia and/or compression as a result of the axillary artery injury?

MS. LUNCEFORD: Objection, form.

A. So you're saying that if we take out, there was no iatrogenic injury, if that's --

Q. The nerve --

A. That's not a possibility?

33 (Pages 126 to 129)

Page 130

Q. Yes.

A. That we knew that for a fact, which we don't?

Q. Just assuming that fact.

A. Assuming that fact, then the injuries would be due to ischemia or compression?

Q. And/or? Could be both, could be one or the other?

A. Yeah. Yes, I agree with that.

Q. Doctor, what is evidence-based medicine?

A. Evidence-based medicine is -- tries to look at the literature. And they have a grading scale. And I don't know the grading scale completely. But they look at the evidence and then they grade the evidence, how accurate it is, what the preponderance is, are -- the studies that were done, are they the gold standard? Is it a double-blind, randomized study? Did they perform that?

And then grade the evidence and tell you based on the literature that's out there and the science that we have, this particular treatment, we think the evidence is A, B, C, D evidence.

Q. You're not perfect, Doctor, are you? You've made mistakes? Correct?

A. I'm human.

Q. Everyone makes mistakes. Have you ever been

Page 131

wrong with respect to a patient's case of the cause of a certain ailment?

A. Yes.

Q. Okay. Do you think that Dr. Holt is 100 percent responsible for the injuries sustained by Mr. Houston?

MS. LUNCEFORD: Objection, form.

A. It is an iatrogenic injury and those sometimes happen. As much as a doctor tries to do the best they can, sometimes there are things that occur during an operation or during the care of the patient that causes an injury to the patient.

Mr. Houston, if he had not had this operation, this would not have occurred. So during the course of the operation, the injury sustained is what caused the damage to his left upper extremity.

Q. So assuming that -- so it's your opinion that the nurses that failed to notify the doctor on the numerous occasions we discussed previously are not responsible in any way for the injuries that Mr. Houston sustained?

MS. LUNCEFORD: Objection, form.

A. It would have been better if the injury would have been picked up sooner. What degree of fault was the doctor and what degree of fault with the nurses,

Page 132

it -- you know,, even though you hate to say it, the doctor is the captain of the ship and it behooves a doctor to be -- when something out of the ordinary occurs, to try to investigate it and try to be suspicious if the course of the patient is not normal after something out of the ordinary has occurred, to try to get to the bottom of it to make sure that it doesn't progress. So...

Q. You're --

MS. LUNCEFORD: Let him finish.

MR. ASSAAD: Okay, Ms. Lunceford. I thought he was done.

A. I would say the majority of the fault is the doctor's. And I mean, it's hard to ask the nurses to make diagnosis. I mean, you can't; that's not what they're there for. It's a doctor's responsibility to try to diagnose the patient, not the nurse's.

Q. (By Mr. Assaad) What is the nurse's responsibility?

A. To care for the patient.

Q. So if one of your patients is bleeding out, shows signs of bleeding and the nurses do not notify you and the patient dies in the middle of the night, you're 100 percent responsible?

MS. LUNCEFORD: Objection, form.

Page 133

A. No, that's not what I said.

Q. (By Mr. Assaad) You're the captain of the ship?

A. Right. Right.

Q. Okay.

A. But that's not what I said. I said -- something extraordinary happened during the operation that is not routine, that the patient bled significant amounts of blood and required a blood transfusion even after the surgery. That should make a doctor very suspicious that something serious has happened and not just aspirin caused him to bleed that much.

Yes, is it possible aspirin can do that, yes, but very small possibility. And that shouldn't be the first one you think of. You should be thinking, wow, what -- what did I damage, what's happening and what major artery could cause that amount of bleeding?

And but, you know, nurses need to report to the doctors when there is abnormal findings; I completely agree with you. And I expect that of my nurses.

Q. Going back to the question, do you believe the nurses are responsible, partly responsible for the injuries sustained by Mr. Houston?

MS. LUNCEFORD: Objection, form.

34 (Pages 130 to 133)

Page 134

A. What do you mean by "sustained"?

Q. (By Mr. Assaad) Well, you criticized Mr. Houston -- or Dr. Holt for discharging Mr. Houston and failing to recognize that there was an issue. Okay? The nurses are also aware of the abnormalities or were aware of the abnormalities and also ultimately the ones that discharged the patient eight hours -- eight hours after -- they followed the orders of Dr. Holt to discharge the patient eight hours after. You would agree?

A. Yes.

Q. So being aware of the condition and not notifying Dr. Holt, do they bear any liability?

MS. LUNCEFORD: Objection, form.

A. I'm not a lawyer. I don't know the legal requirements for liability and so forth. I agree that the nurses should have called the doctor more often. I don't disagree with you there.

Q. Okay. Hypothetically, if the nurses notified -- the floor nurses notified Dr. Holt of the poor capillary refills, do you have an opinion whether or not that would have changed the course of Mr. Houston's treatment?

A. I hope so. I hope if a nurse had called Dr. Holt and said, The capillary refill is still poor,

Page 135

that he would have come in and investigated further. But I don't know that for a fact. Especially after everything that's happened in this case, it makes me wonder about Dr. Holt.

Q. Do you think Dr. Holt would have ignored that?

A. I don't know.

Q. Okay.

A. It just makes me wonder.

Q. If the nurses notified Dr. Holt and he came in and ordered a vascular consult on January 8th, and the surgery was done on January 8th, what effect would that have on Mr. Houston's present condition?

MS. LUNCEFORD: Objection, form.

A. I mean, it would have been better for him. I mean, he wouldn't have had the necrosis, he wouldn't have lost muscle, you know, and maybe -- maybe some of his nerve problems would have been better, too.

Q. Would he be able to move his arm?

MS. LUNCEFORD: Objection, form.

A. I don't know.

Q. (By Mr. Assaad) Or shoulder?

A. I don't know.

Q. Do you believe it's possible that he could have had a full recovery and no damage at all?

MS. LUNCEFORD: Objection, form.

Page 136

A. I don't.

Q. (By Mr. Assaad) You don't think it's possible?

A. I don't. Where that injury occurred to that artery, I suspect, and with medical probability that he injured nerves too with the injury to the artery. That's my opinion.

Q. If a neurologist testifies that the injury did not occur iatrogenically but occurred as a result of compression or ischemia, would you disagree with the neurologist?

MS. LUNCEFORD: Objection, form.

A. Yes, I would.

Q. (By Mr. Assaad) And what education and training do you have in neurology to be able to disagree with a neurologist formulating that opinion?

A. I know anatomy. I know where the injury occurred the nerves are intimately involved with the axillary artery there. To have a big injury to the axillary artery, I can't even think of how he could not have injured no nerves.

If you look at that picture -- like they say, a picture tells a thousand words. It speaks for itself. I mean, I can't even think of a way.

Q. Are you saying Exhibit 7 in Netter is the

Page 137

actual anatomy of Mr. Houston?

A. No.

Q. Okay. And in fact, you would agree with me that everyone's anatomy is different, correct?

A. Yes.

Q. Okay. Nerves are not always in the same places in every patient?

A. The major nerves almost always are.

Q. Now, sitting here today, you can't tell me, to summarize it, from the evidence that you saw whether or not the nerve was lacerated, correct? Is that correct?

A. Correct.

Q. You don't know whether or not the nerve was stretched, correct?

A. Correct.

Q. You don't know whether or not the nerve was -- had a contusion or some type of injury, you know, iatrogenic injury such as a contusion?

A. Contusion is unlikely because usually a nerve will recover from a contusion. And we're far enough out now from this injury that, if it was from a contusion, his nerve injury, that he'd have function back in his arm by now if it was a contusion.

Q. Well, you also said a nerve could also improve from a stretch injury?

35 (Pages 134 to 137)

Page 138

A. Yes, they can.

Q. Okay.

A. But it depends on how much of a stretch injury.

Q. So in this case you could rule out a contusion?

A. Uh-huh.

Q. Correct?

A. Yes, I believe so.

Q. You can rule out a laceration or a stretch?

A. Correct.

Q. But if it was a stretch, it would have to be a significant stretch, correct?

A. Yes.

Q. Can you rule out whether or not the injury was caused by compression as a result of hematoma?

MS. LUNCEFORD: Objection, form.

A. No, I don't think you can.

Q. (By Mr. Assaad) Can you rule out whether or not the injury was caused by ischemia?

A. I believe so.

Q. Can you rule it out within a -- if you had a differential diagnosis of ischemia, could you rule that out?

A. Probably, yes, for the reason I stated

Page 139

earlier.

Q. Do you know who Dr. Edwards is?

A. Yes.

Q. Outside of the deposition?

A. No.

Q. Okay. I'm almost done. I just wanted to make sure I understand all your opinions before I leave today.

A. Sure.

Q. One of your opinions that we covered is Dr. Holt discharged this patient from the hospital and that was a deviation of standard of care?

A. For a doctor, yes. To do that, --

Q. Okay.

A. -- to discharge somebody with abnormal, after -- abnormal findings, significant abnormal findings with no functioning in the left upper extremity, to write discharge orders, yes. Yes. Most doctors would not do that.

Q. And you offered the opinion that he failed to -- I'm not trying to put words in your mouth, but he failed to follow up on the bleed that happened during the surgery?

A. What I said was that he should have had a high degree of suspicion that there -- that a significant

Page 140

injury of some kind had occurred because the patient bled over two liters in the operating room, required blood transfusions, and then had a nonfunctioning extremity the next day; I think it should have set some alarm bells off and he should have investigated it further instead of saying, Oh, it's the scalene block.

Q. At what point in time do you think that he should have done something?

A. When he saw him the next morning.

Q. Okay. So you don't criticize Dr. Holt for not seeing the patient on the 8th after he left the PACU?

MS. LUNCEFORD: Objection, form.

A. I mean --

Q. (By Mr. Assaad) Let me ask you this question.

A. If I -- if it was me and I had a significant bleed that I wasn't expecting, I would be checking on that patient in the PACU a couple of times, because I would be worried about some injury that I missed.

Q. Okay. But do you believe it was a deviation of the standard of care -- not what you would do, because you might be the best doctor in the world. And talking about the standard of care, that's the requirement. You know, that's the standard we're looking at -- for Dr. Holt not to see the patient on

Page 141

January 8, 2009, after he left the PACU?

A. I mean, there is -- there is no evidence that he saw him in the PACU.

Q. We'll get to that later. But on the floor. Is there any -- do you -- are you going to offer the opinion that Dr. Holt deviated from the standard of care for not seeing Mr. Houston on the floor on January 8, 2012?

A. On the floor, no.

Q. Okay. Are you going to offer the opinion that Dr. Holt deviated from the standard of care for not seeing Mr. Houston in the PACU?

A. I would say yes. I would say most surgeons, if they have an extraordinary amount of bleeding during the case, that they usually would go check on that patient in the PACU and make sure that there is not more bleeding going on, there is not a major injury that needed to be addressed that they missed in the O.R.

Q. Well, Dr. Lam was an anesthesiologist, correct?

A. Correct.

Q. And he would have been aware of the bleeding?

A. In the operating room, yes.

Q. Yes. So you're saying that Dr. Holt cannot rely on Dr. Lam who is aware of what occurred in the

36 (Pages 138 to 141)

Page 142

operating room regarding the patient?

A. No.

Q. How long was -- do you know whether or not Dr. Holt was available to see the patient in the PACU?

A. No.

Q. Is it possible he could have been in surgery the entire time?

A. Sure, that's a possibility.

Q. If he was in surgery the entire time and he was -- and Mr. Houston was released by the anesthesiologist to go to the floor, would you agree with me that Dr. Holt did not deviate from the standard of care for not seeing Mr. Houston in the PACU?

MS. LUNCEFORD: Objection, form.

A. Okay. Let me try to get this straight because it's getting confusing. You're saying that Dr. Lam knew all the issues that were going on in the PACU?

Q. (By Mr. Assaad) No, no. Let me rephrase the question. The question is: If Dr. Holt was in surgery the entire time that doctor -- or that Mr. Houston was in the PACU --

A. Uh-huh.

Q. -- and didn't have an opportunity to leave the operating room to see Mr. Houston prior to him being discharged to the floor, would you still fault Dr. Holt

Page 143

for not seeing Mr. Houston in the PACU?

MS. LUNCEFORD: Objection, form.

A. If you have a patient that you're concerned about because there has been a major bleed during the operation and they're in the PACU after your operation, I -- most doctors, if they can't come to the bedside at least to look at the patient, would at least call back there to see how their patient is doing and talk to the nurse, "Is everything okay"?

Q. You say most doctors would have seen a patient such as Mr. Houston in the PACU?

A. If they can, yes.

Q. Okay. If they can?

A. If they can, yes.

Q. Do most doctors not rely on the PACU nurses and staff to notify them if there is an issue?

A. But those are nurses. I mean, they can't make diagnoses. So the nurse in the PACU was informing Dr. Lam of all of the patient's status which was not normal. So she was telling a doctor. But it was Dr. Holt's patient and I think he would want to know what's going on, too.

Q. You think the doctor should have told Dr. Holt since it's his patient -- I mean, do you think the nurses should have told Dr. Holt since it's his patient?

Page 144

A. Yes.

Q. In the PACU, those nurses should have told Dr. Holt?

MS. LUNCEFORD: Objection, form.

A. Yes, they should tell Dr. Holt, as well as Dr. Lam.

Q. (By Mr. Assaad) Was that done in this case?

MS. LUNCEFORD: Objection, form.

A. Doctor -- as far as I can tell, the nurses contacted Dr. Lam. But usually the anesthesiologists have communication with -- I'm sure the nurse was thinking, I'm telling the anesthesiologist and he's going to tell Dr. Holt back in the operating room, who's operating, what's going on. None of that's documented, but that's what I think would happen.

Q. (By Mr. Assaad) That's an assumption you're making?

A. Yes. But that's what happens in hospitals every day.

Q. And you agree with me that a lot of these things happen in hospitals every day?

MS. LUNCEFORD: Objection, form.

A. Yes, mistakes happen in hospitals.

Q. (By Mr. Assaad) Okay. So would you agree with me that more mistakes are made by hospital staff

Page 145

such as nurses and techs than doctors?

MS. LUNCEFORD: Objection, form.

A. I don't know the exact numbers of who makes more mistakes, whether doctors or nurses. We're all humans. If I had to guess, I bet it's -- it's pretty even.

Q. (By Mr. Assaad) Going back to sum up, are you going to offer the opinion within a reasonable medical probability that the iatrogenic injury that you allege occurred during the operation was a deviation of standard of care by Dr. Holt?

MS. LUNCEFORD: Objection, form.

A. I'm not an orthopedic surgeon so, he did tell the patient that he could have nerve injuries and artery injuries in his consent. So those were possibilities. So I don't think it's a deviation of standard of care for an orthopedic surgeon to damage the axillary artery during that procedure. But I'm not an orthopedic surgeon. You would have to ask another orthopedic surgeon.

Q. That's fine. I'm just trying to get whether or not -- I don't want to be surprised at trial. I'm trying to get all your opinions.

So my understanding is with respect to the surgery itself and iatrogenic injuries to the

37 (Pages 142 to 145)

Page 146

nerves, you're not going to offer the opinion that Dr. Holt deviated from the standard of care; is that correct?

A. That is correct.

Q. Okay. Doctor, assume that Mr. Houston's current condition is baseline. It is what it is in the left extremity. Okay?

Now, for this question, if the axillary artery was repaired intraoperatively by a vascular surgeon, can you state within a reasonable medical probability the improvement in a percentage that would have occurred in Mr. Houston's condition presently?

MS. LUNCEFORD: Objection, form.

A. No.

Q. (By Mr. Assaad) Did you understand my question?

A. I think I did. But, no, you can't give a percentage.

Q. Okay. Can you state within a reasonable degree of medical probability that there would have been any improvement in his condition if a vascular surgeon was consulted and repaired the artery during the surgery?

A. Yes. A hundred percent, there would be some improvement.

Page 147

Q. But you just can't give us an amount?

A. Right. Right.

Q. Okay. Well, if I asked you, would it be like a 50 percent improvement or you wouldn't know even 50 percent?

A. With medical probability, nobody's going to be able to give you a percent.

Q. Well, would there be any improvement to the brachial plexus nerves if a surgery was performed?

A. It -- I mean, we still don't know -- you know, if one of the nerves were transected, if one of the nerves had been cut with the axillary artery injury, you could repair it at the time that you repair the axillary artery.

But nerve repairs are very tricky. I mean, most nerve repairs don't work. But if there was something that was transected, then they could have hooked the nerves back together and they might have grown back.

Q. You're not going to offer an opinion, Doctor, you're not saying that Dr. Holt should have contacted a neurosurgeon or get a consult from a neurosurgeon at the time of the surgery?

A. No. I mean, there was no way to know what kind of nerve injury until you explore the area, so...

Page 148

Q. Well, do you believe that that area should have been explored for a nerve injury, for a laceration or transection on January 12th?

A. I think they were trying to save his arm as best they could. That -- I mean, nerve injuries only work if you repair them immediately. The longer you wait, much less likely to respond to that repair.

So I think they were worried about him losing his arm. It was necrotic. And nerve injuries that need repair is something they could do later. They were just trying to save his arm. And that's appropriate. I mean, what they did on the 12th I completely agree with.

Q. We kind of went off on a tangent, started talking about the nerve injury. But if blood flow was restored on January 8th, 2009 intraoperatively by vascular consult, they came and did what was done on January 12th, would that have any effect on the damage to the brachial plexus nerves?

A. I don't believe so.

Q. So, to simplify, the repair of the axillary artery would have only benefited or reduced the damage to the skin and the muscles?

A. And the nerves peripherally.

Q. Yeah.

Page 149

A. I stated that earlier, yeah.

Q. Was there any evidence of peripheral nerve damage in the EMG report?

A. I believe so, yes.

Q. So you believe the peripheral nerves were damaged by a lack of blood flow?

A. Yes, would be damaged with the lack of blood flow.

Q. Not with the iatrogenic injury that occurred in the operation?

A. Yes, of course. I mean, the nerves that were cut at the or damaged at the time of the surgery were getting damaged by this --

Q. I admit that was a bad question. The injury to the nerves peripherally was not an iatrogenic injury to those specific nerves?

MS. LUNCEFORD: Objection, form.

A. That weren't injured at the time in the O.R.?

Q. (By Mr. Assaad) That weren't injured at the time in the O.R.?

A. Correct.

Q. They were injured as a result of a lack of blood flow to that area?

A. Correct.

Q. So, again, to summarize, the injury is a

38 (Pages 146 to 149)

# TAB  3

 Original Image of this Document (PDF)

2002 WL 33962000 (Tex.Dist.) (Trial Order)
Motions, Pleadings and Filings

District Court of Texas,
193rd Judicial District.
Dallas County
Athena HOGUE, Individually and as Executrix of the Estate of Robert Hogue, Jr., Deceased, Christopher
Hogue, and Robert Hogue, III, Plaintiffs,
v.
COLUMBIA MEDICAL CENTER OF LAS COLINAS, INC., Defendant.
No. DV-99-01417-L.
July 24, 2002.

Order on Post Verdict Motions

David Evans, District Judge.

ON FEBRUARY 2ND AND 4TH, 2002, this Court heard the parties' motions pertaining to the jury's verdict received on or about November 7, 2001. The Court considered the moving and responsive papers, post-hearing briefing, the argument of counsel and waited for medical malpractice opinions issued by the Supreme Court after the hearing and then finished an unrelated four week trial. In making these rulings, in many instances the Court limits its rulings to this trial court's appropriate function of applying existing law while leaving for the appellate courts the role of resolving conflicts between appellate opinions or reconsidering the rationale of appellate opinions or considering changes in policy or jurisprudence.

1. *Constitutionality of Exemplary Damage Caps:* The Texas Supreme Court characterized the "language to the effect that the legislature is without power to abrogate a claimant's wrongful death punitive damages recovery by statute" in *Fort Worth Elevators Co. v. Russell,* 123 Tex. 128, 70 S.W.3d 397, 408 (Tex. 1934) and *Morton Salt Co. V. Wells,* 123 Tex. 151, 70 S.W.2 409, 410 (Tex. 1934) "is dicta, a mere expression of opinion on a point or issue not necessarily involved in the cases which does not create binding precedent under stare decisis." *Travelers Indem. Co. v. Fuller,* 892 S.W.2d 848, 852 n.3 (Tex. 1995). Until the principles of Texas constitutional law on which Plaintiffs rely are clearly established, this trial Court should not nullify the work of the Legislature by declaring a statute it passed to be unconstitutional. The Court, therefore, overrules Plaintiffs' argument and rules that the exemplary damages limits in TCPRC § 41.008(b) do not violate the Texas Constitution for these reasons and all those asserted by Defendant.

2. *Exemplary Damages: caps 'per plaintiff' or 'per defendant'?*

a. *§ 41.001(1) "Claimant":*

i. "Wrongful death and survival recoveries are independent of one another, and the availability of one should in no way affect the other." *General Chem. Corp. v. De La Lastra,* 852 S.W.2d 916, 924 (Tex. 1993). Thus reasoning, the Texas Supreme Court held that "claimant" in TCPRC § 41.001(1) did not combine the wrongful death claimant and the survival claimant. Defendants have cited no authority holding that survival claimants should-be combined and treated as one "claimant" for the purposes of TCPRC § 41.001(1).

ii. If "related to" in the definition of "claimant" in TCPRC § 41.001(1) combined survival claimants, Defendant's counsel could not explain why all the plaintiffs in a mass tort case, such as a bus or plane crash, would not similarly be treated as one claimant because all of their claims and all of their evidence,

including their claims for punitive damages, "related to injury to another person, damage to the property of another person, death of another person ...." TCPRC § 41.001 (1).

b. *§ 41.008 'per defendant':*

i. The Court of Appeals in *Seminole Pipeline Co. v. Broad Leaf Partners, Inc., 979 S.W.2d 730, 751-52 (Tex. App. - Houston [14th Dist.] 1998, no pet.)* held:

The cap [TCPRC § 41.008(b)] provides that "exemplary damage awarded against a defendant may not exceed four times the amount of actual damages." [Footnote citation to then TCPRC § 41.007, now codified at § 41.008(b).] Like the civil liability cap found in the Medical Liability and Insurance Improvement Act, "the damages cap amounts should be calculated on a 'per defendant' basis because the [the statute] clearly applies to the recovery against the individual [*752] defendant, not the award to the individual plaintiff." *Rose v. Doctors Hosp., 801 S.W.2d 841, 847 (Tex. 1990).*

*979 S.W.2d at 751-52.*

ii. The Supreme Court in *Rose v. Doctors Hosp., 801 S.W.2d 841, 847 (Tex. 1990)* and in *Baptist Hosp. Of Southeast Texas, Inc. v. Baber, 714 S.W.2d 310 (Tex. 1986)* clearly held that Tex. Rev. Civ. Stat. Ann. art. 4590i, § 11.02(a) applies on a 'per defendant' basis. So, although Plaintiffs' and Defendant's counsel disagree on how the *Seminole Pipeline* Court applied its holding and the significance of that application, the Court's statement that it interpreted § 41.008(b) to mean 'per defendant' in the same way and for the same reason that the *Rose* Court meant 'per defendant' seems conclusive on the matter.

iii. Although the Dallas Court of Appeals is not bound by the *Seminole Pipeline* Court's opinion, this Trial Court should and will follow the published precedents in the State of Texas unless there is a conflict between them or some change in the law after the decision not accounted for in the opinion. Such is not the case with the *Seminole Pipeline* decision.

c. Accordingly, this Court holds that, substituting the parties' names into TCPRC § 41.008 (b), the exemplary damages awarded against COLUMBIA MEDICAL CENTER OF LAS COLINAS, INC. in favor of ATHENA HOGUE, *Individually and as Executrix of the* ESTATE OF ROBERT HOGUE, JR., *Deceased,* CHRISTOPHER HOGUE, and ROBERT HOGUE, III, "may not exceed an amount equal to the greater of: (1) (A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000."

d. This holding is based on the reasons stated above and all those urged by Defendant except the Court adopts all those urged by Plaintiff regarding "claimant".

3. *Stowers Doctrine & §§ 11.02(a), 11.02 (c):* Although very difficult to comprehend, the *Stowers* doctrine language of art. 4590i § 11.02(c) does not appear to function as an exception to the statutory limit of a med-mal plaintiffs judgment discussed in art. 4590i § 11.02 (a), but to safeguard the insured physician or health care provider they asserted a *Stowers* claim against their insurer. Accordingly, the Court denies the Plaintiffs' motions regarding art. 4590i § 11.02(c) excepting their verdict from the statutory limits on their judgment set forth in art. 4590i § 11.02(a) for all the reasons asserted by Defendant.

4. *Settlement Credits in Relation to § 11.02(a) Caps:* In *Edinburg Hosp. Auth. v. Trevino, 941 S.W.2d 76, 82 (Tex. 1997),* the Supreme Court of Texas held that, "A settlement with one tortfeasor should thus be offset *before* the verdict against the governmental unit is reduced to the statutory maximum." 941 S.W.2d at 82 (emphasis in original). Finding no holding to the contrary regarding the 4590i, § 11.02 (a) statutory cap and both being the subject of statutes, the Court holds that the settlement credits applicable in this case should be applied before the statutory caps are applied to the damages. The Court so holds for all the reasons stated above and all- those urged by Plaintiffs.

5. *Sufficiency of Loss of Inheritance Evidence:* The sufficiency of the inheritance evidence before this Court

seems less than that in *Thornhill v. Ronnie's 1-45 Truck Stop, Inc., 944 S.W.2d 780, 792-93 (Tex. App. - Beaumont 1997, writ dism'd by agreem't)* and only equal to or less than the evidence in *C&H Nationwide, Inc. v. Thompson, 903 S.W.2d 315, 322-23 (Tex. 1994)*. This Court is, therefore, compelled to grant the judgment notwithstanding the verdict that Mrs. Hogue take nothing by reason of her claim for loss of inheritance for all the reasons urged by Defendant.

6. *Prejudgment Interest in Relation to § 11.02 (a) Caps:* The Supreme Court decided that pre-judgment interest is included in the § 11.02 (a) caps. *Columbia Hosp. Corp. v. Moore,* slip op. 01-0293, 2002 Tex. LEXIS 104, 45 Tex. Sup. J. 957 (2002).' This Court, therefore, rules that Plaintiffs' prejudgment interest should first be calculated and then the § 11.02 (a) caps should be applied.

THE COURT ORDERS AND DECREES that Plaintiffs' counsel draw up a judgment in conformity with these rulings. In the event counsel for all parties cannot agree to the form of the judgment, or there is a matter not reached by this Court's decision, or there is some other disagreement, Plaintiffs' counsel should promptly request a hearing.

SO ORDERED this Wednesday, July 24, 2002 at 11:00 am at the courthouse in Dallas, Texas.

<>

David Evans, *District Judge*

193rd Judicial District Court

Athena HOGUE, Individually and as Executrix of the Estate of Robert Hogue, Jr., Deceased, Christopher Hogue, and Robert Hogue, III, Plaintiffs, v. COLUMBIA MEDICAL CENTER OF LAS COLINAS, INC., Defendant.
2002 WL 33962000 (Tex.Dist.) (Trial Order)

Motions, Pleadings and Filings (Back to top)

• 2002 WL 32919508 (Trial Motion, Memorandum and Affidavit) Motion for New Trial or, in the Alternative, Motion for Remittitur of Defendant Columbia Medical Center of Las Colinas, Inc. d/b/a Las Colinas Medical Center and Motion to Modify, Correct, or Reform Judgment (Sep. 27, 2002) Original Image of this Document (PDF)
• 2002 WL 32919509 (Trial Motion, Memorandum and Affidavit) Defendant Columbia Medical Center of Las Colinas, Inc. d/b/a Las Colinas Medical Center's Motion for Judgment Notwithstanding the Verdict (Sep. 27, 2002) Original Image of this Document (PDF)
• 2002 WL 32919507 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Support of Motion for Entry of Judgment on the Jury Verdict (Feb. 14, 2002) Original Image of this Document (PDF)
• 2002 WL 32919510 (Trial Motion, Memorandum and Affidavit) Defendant Columbia Medical Center of Las Colinas, Inc. d/b/a Las Colinas Medical Center's Response and Objections to Plaintiffs' Motion for Entry on the Jury Verdict (Feb. 1, 2002) Original Image of this Document (PDF)
• 2001 WL 34831166 (Trial Pleading) Plaintiffs' Tenth Amended Original Petition (Dec. 14, 2001) Original Image of this Document (PDF)
• 2001 WL 34831641 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Non-Suit Regarding Defendants Jay C. Story, M.D. and Coppell Family Physicians, P.A. without Prejudice (Oct. 23, 2001) Original Image of this Document (PDF)
• 2001 WL 34831640 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Dismiss as to Gregory Blomquist, M.D. and Questcare Medical Services, P.A. (Oct. 22, 2001) Original Image of this Document (PDF)